Filed 7/30/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
       Plaintiff and Respondent, )
)     S030402
       v. )
)
RICHARD CHRISTOPHER TULLY, )
)     Alameda County
       Defendant and Appellant. )   Super. Ct. No. H97978
_____ )

      An amended information charged defendant Richard Christopher Tully with the 1986 murder of Shirley Olsson (Pen. Code, § 187) and assault with intent to commit rape (*id*., § 1203.065, subd. (b)).[1] The information also alleged a special circumstance that the murder was committed in the commission of a burglary and, as to both counts, that defendant used a dangerous and deadly weapon, to wit: a knife. (§§ 190.2, subd. (a)(17)(vii), 12022, subd. (b).) [2]

      Shirley Olsson, a 59-year-old nurse at the Livermore Veterans Administration medical center, was brutally murdered sometime in the night or early morning hours of July 24 to 25, 1986. A coworker went to her residence and discovered Olsson's nude body in her bed; she had been stabbed 23 times. A bloody knife and Olsson's purse were found on the golf course that abutted her

---

[1] All further unlabeled statutory references are to the Penal Code.
[2] A 1995 amendment to the statute changed the designations of section 190.2, subdivision (a)(17)'s subparagraphs from Roman numerals (i) to (xi) to the letters (A) to (G); the current designation for the burglary-murder special circumstance is section 190.2, subdivision (a)(17)(G).

house.  The screen to her bathroom window was found in a neighbor's backyard. The blood on the knife was the victim's.  Several months later, a fingerprint and palm print on the knife were matched to defendant.  Defendant, who had lived two houses down from Olsson's residence, admitted to police he had been at the victim's house the night she was murdered and had had sex with her, but claimed the murder was committed by another man.

A jury convicted defendant as charged and found true the special circumstance and weapon allegations.  It then returned a verdict of death, which the trial court declined to modify.  This appeal is automatic.  We affirm the judgment.

**I.  FACTS**

*A.  Guilt Phase*

### 1.  Prosecution evidence

*a.  Shirley (Sandy) Olsson's murder and the ensuing investigation*[3]

In July 1986, Sandy Olsson worked as a registered nurse at the Veterans Administration medical center in Livermore.  Her specialty was ostomony — caring for people who had colostomies — and she also worked as a charge or supervising nurse.  Typically, she worked Monday through Friday, arriving sometime between 7:00 and 7:30 a.m. and leaving at 4:00 p.m.  Olsson was 59 years old and divorced with two adult children, a daughter, Sandra Walters, and a son, Elbert "Tripp" Walters III.  For much of the year she lived alone at 1556 Hollyhock Street, except from October through March when her father, Clifford Sandberg, came from Kansas and stayed with her.  Olsson's residence backed up against the Springtown Golf Course.

---

[3]      Ms. Olsson's given name was Shirley but she was called Sandy by everyone but her father.

The portrait of Olsson that emerged from the testimony of various witnesses was of a person of fairly set habits. When she arrived home from work, she locked the front door with a chain lock. After changing her top, she poured herself a glass of Coca-Cola and added a little bourbon to it. When her father visited, he and Olsson ate dinner together and watched television. She usually rejected his suggestions that they do something in the evenings because she was tired from work. Instead, she went into her bedroom with her drink to read her mail, magazines, and the newspaper. Olsson's daughter testified that Olsson went to bed sometime between 9:00 and 10:00 p.m. She first went through her house and made sure all the windows and doors were locked. Olsson was a modest woman who slept in a pair of men's flannel pajamas.

Olsson's father testified that during his annual visits to his daughter, she never had any male visitors. Her social life apparently consisted of occasionally going out to dinner with work friends.

On Thursday, July 24, 1986, Olsson arrived for work at the Veterans Administration medical center at 7:00 a.m. and left at around 4:00 p.m. She walked to her car with another nurse, Deborah Gifford. Gifford testified that Olsson was in a good mood because she was flying to Topeka that weekend for a family celebration of her father's 85th birthday. Olsson's across-the-street neighbor, Elden Freeman, saw her arrive home sometime between 4:15 and 4:45 p.m. From his living room, Freeman saw Olsson leave her den at about 8:00 p.m. and then turn off the light in the room at about 10:00 p.m. At that point, there were no other lights on at her house that he could see.

At about 4:00 a.m., Linda Rocke, who lived in a house on the opposite side of the golf course from Olsson, was awakened by her dog's barking. She took the dog outside to keep it from waking the rest of her family. In her backyard, Rocke

3

found what looked like a small bathroom screen. It had not been in her backyard earlier.

Olsson failed to appear at work the next morning, July 25. This was unusual because Olsson was described as "very reliable" by her colleague Maxine Gatten. When Olsson failed to appear by 7:25 a.m., Gatten called her residence but did not get an answer. Later, she again unsuccessfully tried to reach Olsson by phone. She discussed the matter with other nurses; they worried that Olsson might be sick, because she had complained about chest pains. Eventually, Gatten left the matter of Olsson's absence to another nurse, Barbara Green.

Green and Olsson had a close relationship. They shared an office and frequently ate lunch together. Olsson brought her lunch to work in a paper sack that she kept in her purse. Her lunch sometimes included fruit, like grapes. Green was aware that Olsson was flying to Kansas the next day for her father's birthday. When, at about 8:45 a.m., Gatten told Green that Olsson had not reported for work, Green became "[v]ery concerned." After she, too, failed to reach Olsson by phone, Green drove to Olsson's residence. Green found Olsson's car parked in the driveway and the newspaper in front of her house. She went to the front door, rang the bell, knocked, and called Olsson's name, but did not receive a response. She looked in through a glass panel at the front of the house; there was no movement inside.

Green went around to the back where the house abutted the golf course. The windows and the sliding door were locked. However, she noticed the bathroom window was open. She could not reach it on her own, so she pulled a wooden plant stand beneath it and climbed onto the stand. She was still unable to see through the window. Eventually, Green enlisted the help of Olsson's neighbor, Freeman.

Freeman knew Olsson well enough that she would ask him to water her plants and watch her house when she was on vacation. He had been expecting Olsson to bring him the key to her house so he could take care of it while she was in Kansas. As of Friday morning, the day before she was leaving, she had not done so. Green went to Freeman's house and, after explaining that she had been trying to reach Olsson, asked to use the phone. Green called 911. When there was no response from the 911 call, she and Freeman returned to Olsson's house. With Freeman's help, she managed to get high enough to see through the bathroom window. In the bathroom mirror, she saw Olsson's reflection. Olsson was lying naked on her stomach across her bed; there was a puddle of blood on the floor beneath her head. Green "knew that [she] had to get in as soon as [she] could because [she] had to stop the bleeding." Freeman returned to his house and got a ladder. Using the ladder, Green entered the house through the bathroom window. Freeman went around to the front door and waited.

Green went to her friend's side. She saw "slits" on Sandy Olsson's back, "blood dripping down her face," and "her left eye was bulging out of her head." Her bedclothes were crumpled beneath her. She touched Olsson's body; it was cold. She left the bedroom to find a phone to call 911. As she left the bedroom, she saw a framed photograph had fallen from the wall to the floor while another photograph, still on the wall, was crooked and broken. She was unable to find the phone and went to the front door. She saw that a chain lock had been broken; two of the screws that attached to a plate on the door were hanging from the chain. She opened the door and let Freeman in. She told him she could not find the phone. Freeman told her the phone was in the shape of a Coca-Cola bottle and where she would find it. Green called 911 and told the operator that Olsson had been murdered. Before long, a police officer arrived. He asked Green if Olsson was dead. Green tried unsuccessfully to get a pulse. She told the officer that

Olsson was dead. At some point, Green left the house and went to Freeman's residence.

Sergeant Scott Robertson of the Livermore Police Department was put in charge of the investigation. He arrived at the house at about 9:45 a.m. He conferred with other officers already at the crime scene and then walked though the house. There were some green grapes on the living room carpet. He observed signs of a struggle in the front entryway, where he saw a framed photograph that had apparently fallen to the floor and two photographs on the wall that were slightly askew. Just inside the master bedroom he saw another photograph that had fallen from the wall. He also observed signs of a forced entry into the house in the form of the broken slide chain latch on the front door.

In Olsson's bedroom, he observed blood splatters on the closet door and a smear of blood on a light switch. He examined Olsson's body and saw wounds he believed were consistent with a forced entry into the house. There were bruises on Olsson's forehead and lips that seemed to be consistent with the edge of a door. There was a similar bruise on the outside of her left ankle. Beneath her body police found a pair of flannel pajamas and blankets. There was a glass of Coca-Cola and a glass of bourbon on the nightstand next to the bed. A bathrobe and pair of slippers were on the floor. On a desk in the bedroom were folded clothes, evidently put there by Olsson for her trip to Kansas. Robertson found no money in the house but a receipt in the kitchen indicated Olsson had received change of $3.95 from a supermarket purchase the prior evening.

Around noon, Judith Williams and Cathie Garton were finishing a round of golf at the Springtown Golf Course. They saw a purse floating in a pond on the course. They fished the purse out of the pond and took it into the clubhouse. The purse contained Olsson's hospital identification card, driver's license, credit cards

6

and checkbook, among other items, as well as some loose grapes. It had no cash in it.

Later that afternoon, police searched the golf course for the murder weapon, assisted by security officers from the Lawrence Livermore Laboratory. At about 3:00 p.m., one of those officers, Renorise Conn, discovered a bloody knife beneath a tree in knee-high brush. That evening, police retrieved the window screen that Linda Rocke had discovered in her backyard the previous night. Police determined that the screen belonged to Olsson's master bathroom window.

Pathologist Sharon Van Meter autopsied Sandy Olsson's body. Dr. Van Meter counted 23 stab wounds. The wounds were consistent with the knife recovered from the golf course, a Buck 110 knife. Apart from the stab wounds, Van Meter found hemorrhaging of Olsson's neck and larynx muscles consistent with strangulation. Van Meter also observed injuries to Olsson's lip and head consistent with her head having come into contact with the edge of a door being forced open. While Van Meter found no trauma to Olsson's vaginal area, she testified that the absence of such trauma did not mean Olsson had not been forced to submit to sexual intercourse before her death. Van Meter testified that the cause of death was shock and hemorrhaging, as the result of multiple stab wounds, associated with asphyxia due to fractures of the larynx. Olsson may have survived for more than an hour after the wounds were inflicted.

The blood on the knife was consistent with Olsson's blood. The sheets on her bed had bloodstains that indicated they had been used to wipe off the bloody knife. Forensic examination of Olsson's body, clothes, and bedding failed to reveal the presence of semen or spermatozoa. The criminalist who conducted the examination testified that her findings did not rule out the possibility of sexual intercourse if the assailant had not ejaculated.

7

Two identifiable prints were recovered from the knife handle. Between July 25, 1986, and March 1, 1987, the Livermore Police Department submitted the names of 40 or 50 possible suspects to the California Department of Justice for fingerprint comparison purposes. Among the prints submitted were defendant's. However, the fingerprint analysts were unable at that time to match the prints on the knife or any prints taken from the crime scene to a suspect.

### b. Defendant is connected to the murder

In July 1986, John Chandler lived on Hollyhock Street, two houses from Olsson's residence. Chandler was the boyfriend of defendant's mother and had known defendant since defendant was 15 years old. Defendant had lived with Chandler, moving out only three weeks before Olsson was murdered. Defendant kept a key and sometimes stayed at Chandler's house. He also received mail and phone messages there. Chandler told the district attorney and a district attorney investigator that he was with defendant when defendant purchased a Buck 110 knife in September 1985.[4]

On March 17, 1987, Sergeant Robertson had a conversation with Officer Scott Trudeau, also a member of the Livermore Police Department.[5] Based on that conversation, Robertson resubmitted defendant's prints for analysis. A fingerprint and a palm print on the murder weapon were matched to defendant's right ring finger and right palm. On March 27, Robertson arrested defendant.

---

[4] At trial, Chandler testified that he did not remember if defendant had purchased the knife.

[5] Trudeau had arrested defendant on March 7, 1987, on drug charges following a traffic stop. Defendant made statements to Trudeau that Trudeau ultimately realized connected defendant to Olsson's murder and he informed Robertson of his suspicions. Defendant's statements to Trudeau were suppressed prior to trial, but the trial court declined to suppress the fingerprint evidence as fruit of the poisonous tree. The trial court's ruling is the subject of defendant's first claim.

That same day, defendant was interrogated by Robertson and Detective Mike Newton, also of the Livermore Police Department. Defendant acknowledged that his mailing address was John Chandler's residence and admitted to having lived there. He claimed, however, that he had never met Sandy Olsson and had never been in her house. When Robertson told him that his fingerprints had been found on the knife that killed Olsson, defendant denied any involvement. He said his knife had been stolen from his car in the spring of 1986. Defendant, who said he read about the murder in the newspapers, suggested it was a "domestic type of killing."

Robertson also told defendant's wife, Vicky Tully, that defendant's fingerprints had been identified on the murder weapon. Robertson and Newton met with Vicky Tully the following Monday, March 30, 1987. Afterwards, the officers talked to defendant again.

At the second interview, defendant told the following story: At some point in the early morning hours of July 25, 1986, he met up with a man he knew only as "Doubting Thomas," who was a member of the Hell's Angels. Defendant had already consumed four or five 12-ounce beers and four or five 4-ounce "kamikazes" at a bar in Pleasanton. Thomas told defendant he wanted to go to the house of a woman who lived on Hollyhock Street in Livermore, from whom he bought drugs that she obtained from the hospital. When defendant told Thomas he rented a room from John Chandler on the same street, Thomas said "that worked out good" and told defendant to park at Chandler's because it was "only a couple of houses down" from their destination. The two men walked to the woman's residence. Thomas entered first and then signaled for defendant to enter. While Thomas and the woman talked in her bedroom, defendant waited in the living room where he found a bottle of whiskey and "took a few pulls off" of it.

9

He heard Thomas and the woman start to argue. After they calmed down, Thomas motioned for defendant to come into the bedroom and asked him if he "wanted to have a little fun" with the woman. Defendant entered the bedroom and found the woman naked on her bed. He had intercourse with the woman but was too drunk to maintain an erection and did not ejaculate. He was in the bedroom for under ten minutes and left feeling "kinda stupid."

Defendant went back out into the living room while Thomas rejoined the woman in the bedroom. He heard Thomas and the woman arguing again; "[i]t sounded like they were wrassling or he was knocking her around or something." Defendant went to the hallway to listen in and the woman came charging naked out of the bedroom and ran into him. Thomas came out and pulled the woman back into the room by her throat and hair. Defendant returned to the living room. Within a matter of minutes, it got quiet and Thomas came out of the bedroom. Defendant went into the bedroom and saw the woman lying naked on the bed with multiple stab wounds on her back. He said he "was freaking out" and asked Thomas if he had killed her. Thomas said yes, but did not say why.

Observing that Thomas had been wearing leather gloves the entire time, defendant went to his car to get his gloves. When he returned he saw Thomas in the living room rummaging through a purse. Defendant attempted to wipe his fingerprints off any object he had touched. He and Thomas left through the patio door. Thomas handed defendant the knife defendant had had in his car. Defendant became angry that Thomas had used his knife to kill the woman. Thomas wanted to return to Chandler's house, but defendant told him, "we can't go back over there, you know, looking like we do." They walked toward the pond on the golf course. Defendant tossed the knife while Thomas, after taking what he wanted from the purse, threw it into the pond. Defendant gave some of his clothes

10

to Thomas while he went to get his car. When he returned for Thomas, his clothes were gone and Thomas told him, "I stashed 'em so they won't be found."

Defendant sought to be placed in a witness protection program because he was afraid of Doubting Thomas. He denied having stabbed the victim.

Later that day, defendant spoke to a deputy district attorney and an investigator. Defendant again expressed interest in the witness protection program. The district attorney declined to make any promises, rebuffed defendant's request for a plea bargain, and reminded him that what he said could and would be used against him. Defendant then essentially repeated the story he had told the police. Defendant told the district attorney that other women had offered themselves to him for sex before, explaining, "Sometimes it was party situations, sometimes it was just, um, what they call a pass-around chick."

A review of medications handled by Olsson revealed no shortages of any controlled substance. Police identified "Doubting Thomas" as Thomas Pillard. His fingerprints were obtained and submitted to the California Department of Justice along with defendant's.

### 2. Defense evidence

The defense called Sergeant Scott Robertson, who identified a pair of men's shoes recovered from a dumpster near the golf course as well as bedding items taken from the victim's bedroom. The defense also recalled criminalist Sharon Binkley regarding her examination of hair evidence taken from Olsson's bedroom. Binkley testified that all the hairs retrieved from the crime scene were consistent with Olsson's hair and inconsistent with defendant's hair, except for some reddish-brown hairs on a pillowcase (which evidently belonged to Olsson's daughter's dog) and two unidentified human hairs on a knitted blanket. The defense's only other witness was Charles Fraser, the deputy district attorney who

11

had interviewed defendant on March 30, 1987. He testified to his experience as a trial lawyer, particularly to the number of cross-examinations he had conducted prior to his interview with defendant.

*B. Penalty Phase*

### 1. Prosecution evidence

The prosecution presented evidence that defendant had been involved in two physical altercations while in jail. On January 7, 1988, defendant engaged in a fistfight with another inmate during mealtime. Defendant received a split lower lip that required a stitch, while the other inmate suffered no visible injuries. On September 26, 1991, Alameda County Deputy Sheriff Michael Perkins saw defendant and another inmate in a "wrestling hold" with each other. They had to be forcibly separated. Defendant had some bumps and bruises on his face. The other inmate was treated for an eye injury.

The prosecution also presented victim impact evidence in the form of testimony from Sandy Olsson's adult children, Sandra Walters and Elbert "Tripp" Walters III; her sister, Jan Dietrich; and Olsson's then 91-year-old father, Clifford Sandberg. Sandra Walters, 35 years old at the time of trial, testified that her mother was her "best friend," and "meant everything to me." She stayed with her mother once a month and called her every week. Her mother's death had left her feeling "lost" and "afraid." She "didn't know who was going to take care of me if my mom wasn't around." Her first thought about her mother "is the horror of how she died," and she could not see a knife without remembering the manner of her mother's death. She testified that she slept "with a night light" and a "hatchet underneath my bed." She knew her mother had had breast cancer "but if she would have died by cancer, [Walters] could have at least said good bye to her."

12

She remained angry because her mother had been taken from her and it had become hard for her to be close to anyone.

Tripp Walters testified that his mother was his "anchor," who had "unconditional love" for him even when he "a little bit wild" as a teenager and into his 20's. He described his mother as "happy" and "caring." Her death "turned [his] whole world upside down," was "devastating," and left him "very depressed." Since his mother's murder, he had married and he and his wife were planning to have a child. He would have understood if his mother had died from cancer but he could not understand that she was murdered.

Jan Dietrich, who lived in Washington, D.C., at the time of the trial, was Sandy Olsson's younger sister. They were each other's only sibling, and were close friends. They had travelled together in Europe and the United States. Dietrich testified that Olsson had planned to retire in three years and they had talked about Olsson's plans to travel. Dietrich had to tell her father about Olsson's death, and flew to Topeka, Kansas, so that she and her father could fly to California together. She and her father were at the airport at Topeka preparing to fly to California at about the same time Olsson's plane would have been arriving in Topeka for her father's birthday celebration. Dietrich felt no closure because of the manner of her sister's death.

Clifford Sandberg testified he and his daughter had planned to buy a car together after she retired and to use it to travel. At 91, he had experienced the death of many people, but the manner of his daughter's death still caused him difficulty.

### 2. Defense Evidence

Derek Mendoca, the inmate with whom defendant was fighting on January 7, 1988, testified that he threw the first punch because defendant had

13

wiped mustard or ketchup on Mendoca's shirt. He and defendant were friends before the fight and were friends afterwards.

Defendant's older siblings, Shirley Brown and Roger Tully, also testified. Brown testified that defendant was born in Turkey, one of five children their mother had by three different men. Defendant's father, Richard Ross Tully (Richard Ross), was Brown's stepfather; their mother's name was Louise. Richard Ross was in the Air Force and the family moved often. Richard Ross also received assignments that took him away from home for long periods of time. Once, when he was gone for six months, Louise began living with another man.

Richard Ross had a drinking problem, and he and Louise "were always fighting." Louise was the physical aggressor. She was very demanding of the children, "wors[e] than a drill sergeant." Brown was ashamed of her stepfather's constant drinking because she "didn't know what he was going to do." If he was at home "he was drinking." Richard Ross's drinking affected his career — he lost rank and was forced to enter a rehabilitation clinic. Once, when Brown was age 11, her stepfather came into her room, asked her if she wanted to learn how boys kissed, and tried to lay her down on her bed. She told her mother about the incident but Louise did nothing.

Defendant was a bed wetter. He was also the object of his mother's rage and she would call him stupid. Brown left home as soon as she graduated from high school, but continued to have emotional and psychological problems, for which she was hospitalized. She had visited defendant in jail and corresponded with him and she wanted to continue to do that.

Roger Tully, defendant's older brother, was adopted by Richard Ross Tully but was not his natural son. At the time of defendant's trial, Roger was a burglary detective in the Baton Rouge Police Department, where he had also served as a homicide detective.

14

During defendant's childhood, neither Richard Ross nor Louise was often at home, and responsibility for taking care of him fell to Roger and Shirley. Richard Ross was drunk most of the time he was at home, if he came home at all. Sometimes he drank to the point of hallucinating. Once, on a camping trip, he got so drunk he thought he was in a sinking boat in the lake where they were camped. He began screaming, "Get out, get out, get out. We're going down, we're going down." Roger tried to tell him they were not in the lake, but parked next to it. Richard Ross would also be brought home by the military police with black eyes and other injuries. Both he and Louise had affairs. Once Roger discovered his mother naked with another man. He also found incest pornography in his parents' bedroom.

Richard Ross and Louise fought over his drinking. Often she would rouse the children from sleep and they would be "hauled off to a friend's house or a neighbor's house." The fights were sometimes physical. One night Roger came home and found broken glass everywhere. Later, he saw Richard Ross on the kitchen floor with a skillet over his head; he had apparently been knocked cold. Richard Ross would leave, and then Louise channeled her anger at her children. Discipline was inconsistent and her rules were arbitrary. Louise hit her children with her hands and a belt. Defendant was a particular target of his mother's anger. Louise was "volatile" and had no close friends. Roger had had to intervene when his mother attempted suicide; it was the last time he saw her.

Roger reacted to the family's dysfunction by "act[ing] out." He experimented with drugs and ran away from home. When Roger was age 17, he became involved in a church. His mother threw him out of the house and he went to live with a family he had met through the church. For the first time, he experienced "what a normal life is." He tried to share his religious experience with defendant, but Louise would not allow defendant to go to church with Roger.

15

Roger said about defendant's actions, "The only thing between me being up here and him being there, was the fact that I had a religious conversion when I was 18 . . . . He's got to take his responsibility for his [actions], but as far as how it all came out . . . it's the most normal, natural result. I don't blame him."

Defendant's 18-year-old niece, Ursula — Shirley Brown's daughter — testified that she had begun to correspond with defendant while he was in jail on the present charges and she had come to feel comfortable confiding in him. She hoped to continue their relationship. Defendant's son Richard Anthony Tully, known as Tony, testified that he often spoke to his father on the phone and received letters from him. He wanted his father to live.

## II.  DISCUSSION

### A.  Suppression Motions

#### 1.  Motion to suppress asserting unlawful detention on March 7, 1987

Sandy Olsson was murdered on July 24 or 25, 1986; by March 1987, the police investigation had failed to yield a suspect. On March 7, 1987, however, defendant was detained for driving on a suspended license. This led to his arrest on drug charges and ultimately to his arrest for Olsson's murder. Prior to trial, defendant brought two motions to suppress the fingerprint evidence that linked him to the murder weapon and also statements he made to police during interrogations on March 27 and March 30, 1987. The first suppression motion asserted this evidence was the poisonous fruit of his illegal detention on March 7, 1987. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 484.)

##### a.  Evidence adduced at hearing

On March 7, 1987, Officer Scott Trudeau of the Livermore Police Department was conducting surveillance of the residence of Kenneth Perry, a known narcotics offender. Trudeau was alone in his unmarked patrol car. Two

16

other officers, Timothy Painter and Jeff Shweib, were nearby.  At about 8:00 p.m., Trudeau saw a Fiat Brava drive past him with two occupants.  He recognized the passenger as Ed Snyder.  He also recognized the driver — defendant — because he had stopped him two or three months earlier, but did not recall his name.  The Fiat passed Trudeau twice before parking near Perry's residence.  Trudeau described the occupants to Painter.  Painter identified the driver as defendant. Painter had taken a vandalism report a week earlier allegedly involving defendant. Painter told Trudeau defendant was driving on a suspended driver's license and that there was an arrest warrant out for Snyder.

Defendant got out of the car and went into the building where Perry lived, emerged 20 to 25 minutes later, and drove away.  Trudeau followed and stopped him.  Trudeau stopped defendant because of the license violation and Snyder's arrest warrant.  He approached defendant and asked him for his driver's license and his registration.  Defendant gave Trudeau his license but could not find his registration.  While Trudeau was talking to defendant about his license and registration, Painter and Shweib were at the passenger side of the car talking to Snyder.  Painter took Snyder to his own car where Shweib remained with him. Trudeau returned to his vehicle to write out the citation.  He completed most of the citation in his car, but defendant still had to sign it and there were some boxes on the citation which required further discussion with defendant.

While Trudeau was in his patrol car, Painter approached defendant, who was now standing outside his car.  Because of the vandalism incident, Painter knew defendant was a narcotics user who was normally armed and liked to use a knife.  Painter had been told by the victims that they and defendant had been involved in a drug deal "gone sour" and defendant had retaliated against them by damaging their car with a knife.  At that point, however, the vandalism incident was closed.  Defendant had not even been listed as a suspect because there was no

17

definite evidence of his involvement. Even if he had admitted vandalizing the car, Painter would not have arrested him because it was a misdemeanor that had not been committed in his presence. He could only have written up a report and asked for a complaint. Painter's purpose in talking to defendant was to obtain information that either confirmed or discredited what he had been told about defendant's involvement in the vandalism.

Painter told defendant "what had been said about him being a narcotics user and being armed" with a knife. He asked defendant if he could search him. Defendant said, "Sure, I don't have anything on me." Painter searched defendant by using a flashlight. He held the flashlight and peered in defendant's clothing and around him but did not want to "squeeze things too much" because he was afraid of being stuck by a needle.[6] Painter found a bindle in the coin pocket of defendant's left pants pocket. The bindle contained white power that Painter believed was methamphetamine. He turned it over to Trudeau.

As Trudeau returned to defendant's car to complete the citation, he heard Painter ask defendant for consent to search and defendant reply "[s]omething to the effect, you know, go ahead and knock yourself out, something like that." Trudeau heard Painter say he was concerned that defendant carried weapons but could not recall "[w]ord for word" what Painter said when he asked defendant if he could search him. After Painter gave Trudeau the bindle, Trudeau asked defendant for permission to search his car. Defendant said, "[S]ure, go ahead." Trudeau found three hypodermic syringes and a bent, burnt spoon. Defendant was

---

**6** At the suppression hearing, Painter testified that he told defendant he wanted to search him for "weapons and narcotics." He was confronted with his testimony at the preliminary hearing, at which he testified that he searched defendant because he thought he might have a weapon, but made no explicit mention of drugs. In response, Painter testified, "I believe it's more to that," but conceded he did not specifically recall asking defendant whether he could also search him for drugs as well as a weapon.

18

then arrested for possession of methamphetamine, possession of hypodermic syringes and driving on a suspended license. He was transported to the police station where a booking search revealed seven or eight bindles of methamphetamine secreted in his underwear.

Trudeau read defendant his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), which defendant waived. However, when Trudeau told defendant he "was going to ask [defendant] questions pertaining to the items that were found on him, [defendant] told [Trudeau] he didn't want to talk to [him]." Trudeau stopped questioning defendant. Defendant then "initiated [a] conversation about how he did not want to go to jail on that particular evening." Trudeau told him there were "ways for that not to occur," specifically that they could reach an agreement for defendant to "work off his offense," by becoming an informant. Defendant was interested and Trudeau went out to call a narcotics detective, Detective Jensen. While he and defendant were waiting for Jensen to arrive, they talked. Trudeau learned that defendant had been in the Marine Corps, was injecting himself with methamphetamine four or five times a day, and supported his habit by breaking into cars and houses and selling items he took from them. He also told Trudeau that he was being treated for stomach problems at a Veterans Administration hospital. Trudeau told defendant that what he had revealed about his drug habit and the way he supported it would not be used against him, and it did not appear in the police report. After Jensen arrived, Trudeau left the room. Jensen came out and said he and defendant had reached a deal. Defendant was released that night.

At this point, Trudeau knew very little about the Olsson investigation, although he had read an FBI profile of it. It "never entered [his] mind" that defendant might be a suspect in that crime. Trudeau was off work for a few days after the interview with defendant. When he returned he discovered he still had defendant's driver's license attached to his clipboard. He sought out Detective

19

Jensen, who told him the deal with defendant was off because defendant had failed to keep his end of the bargain. Jensen said he was going to file the drug case. Trudeau said he would return defendant's license to him. He drove to the residence listed on defendant's driver's license — 1572 Hollyhock — and realized it was only two houses from where Sandy Olsson had lived. He remembered defendant had told him he was being treated at a Veterans Administration hospital and that Olsson was a nurse at the Veterans Administration medical center. He also remembered that the FBI profile suggested that the suspect lived in the area of the crime scene and was probably a drug user. Trudeau went to the address but found no one home. He returned to the police station and talked to Sergeant Robertson about defendant. As he was leaving, he ran into another officer, John Leal. Leal told Trudeau that defendant was a suspect in an assault with a deadly weapon case. Trudeau conveyed this new information to Robertson. He suggested Robertson run defendant's fingerprints against the prints found on the murder weapon.

Sergeant Robertson and his men had canvassed between 150 and 200 houses around the crime scene. Defendant's name had not come up from this canvass. Between July 1986 and March 1987, Robertson had looked at around 30 potential suspects. He had sent fingerprint cards of potential suspects to the California Department of Justice in Sacramento to compare to the prints found on the murder weapon but there had been no matches. Defendant's fingerprints had been among those sent to Sacramento.[7]

As of March 17, 1987, when Trudeau approached him, Robertson had a new supervisor, Sergeant Jack Stewart, who had been assigned to the case in January 1987. He told Robertson he wanted to recanvass the entire neighborhood

_____

[7] The record is unclear why defendant's fingerprints were among those submitted to the Department of Justice.

to determine who owned each house, and who had been living in the houses, whether as renters or visitors, at the time of the murder. A plot map of the houses surrounding the murder scene indicated that 1572 Hollyhock, where defendant had lived, had been double-checked during the first canvass to verify that someone at the residence had been interviewed. Both Robertson and Stewart testified that the new canvass would have resulted in a triple check of that address. Stewart also testified that he planned to run a computerized address check to identify all residents at houses around the scene of the crime. He was also going to see if it was possible to run a computer check through the Department of Motor Vehicles to determine whose driver's licenses listed those houses as their residence.

Based on the information about defendant provided to Robertson by Officer Trudeau on March 17, 1987, Robertson took defendant's fingerprint card, from a 1973 juvenile offense, and hand-delivered it to the Department of Justice in Sacramento. Angelo Rienti, a latent fingerprint analyst, told Robertson that defendant's fingerprint matched the print on the murder weapon.[8] Defendant's palm print, taken after his arrest, was later matched to a partial palm print on the murder weapon.

Defendant was arrested on March 27, 1987, at the home of his wife's parents. Police went there with arrest warrants on drug charges. Sergeant Stewart and Detective Tart went to the front door of the residence while Sergeant Robertson and Detective Newton were deployed to the rear. Diane Holbert, Vicky Tully's mother, answered the front door. She told police defendant was not there, but let the police into her house to talk to her. Once inside, Stewart asked Holbert

---

[8]     Stewart testified that the earlier comparison of defendant's prints to the print on the knife had not yielded a match because the analyst performing the earlier comparison had looked only at the right middle finger for each print card; the match that was eventually made was to defendant's right ring finger.

21

if she knew where Vicky was. Holbert said no. However, as they were talking Stewart saw a woman in the hallway who he thought was Vicky Tully leaving one room and about to enter another. He asked her if she was Vicky Tully. She said yes and asked why he wanted to know. Stewart told her he was looking for defendant. Vicky looked at the door she was walking toward and told police defendant was asleep inside the room. She said she would get him because he did not have clothes on.

As she opened the door, Stewart went swiftly down the hall and told her the police would get him. At that point, the door was opened about a foot. Stewart saw a man lying on his stomach with his head on a pillow. Stewart entered the room, yelled at him to wake him and asked him if he was Richard Tully. Stewart identified himself as a police officer. Defendant woke slowly and identified himself as Richard Tully. Stewart told him the police had warrants for his arrest. Defendant was arrested, handcuffed and taken to jail wearing only a pair of blue jeans.

### b. Trial court ruling

Defendant's initial motion, filed on February 2, 1992, asserted that all evidence arising from defendant's initial detention on March 7, 1987, and from his subsequent arrest on March 27, 1987, should be suppressed as a product of an illegal search and seizure. Following the hearing on the motion, defendant was allowed to file a supplementary motion specifying the grounds for suppression. These included: (1) any consent by defendant to a search of his person in the course of the March 7 vehicle stop was invalid as the product of an unlawful interrogation because he was not given a *Miranda* warning; (2) even if valid, the search of defendant's person exceeded the scope of his consent; (3) statements he made after his arrest on March 7 on drug charges regarding his drug use and

22

criminal activity were involuntary; and (4) entry into the bedroom where he was arrested violated section 844's knock-notice requirement. The prosecution argued the stop was lawful but, even if it was illegal, the fingerprint comparison evidence connecting defendant to Olsson's murder was not tainted by such illegality. The prosecution also argued that the fingerprint comparison evidence would have inevitably been discovered in light of the new investigative measures that Sergeant Stewart intended to undertake.

The trial court concluded that the search of defendant's person did not exceed the scope of his consent. It found further, however, that the statements he made following his March 7 arrest about his drug use, his criminal activity to support his drug use — breaking into homes and cars — and that he was being treated at a Veterans Administration hospital were involuntary and must be suppressed because he had been told these statements would not be used against him.

Nonetheless, the court declined to suppress the fingerprint comparison evidence because it "was not tainted by the illegally obtained statements and is admissible." Specifically, "[a]t the time the involuntary statements were obtained, the officer had no reason to suspect or believe the conversation would turn up evidence of any crime other than the narcotics offenses. In the court's view, this was a case of investigatory serendipity." The court also found "the police would inevitably have again compared defendant's prints with those found on the knife found at the murder scene." On this point, the court found "credible" the prosecution's evidence that in the "normal course of the continuing murder investigation, [defendant] would have emerged as a prime suspect quite apart from the statements he gave to Officer Trudeau."

*c. Discussion*

"In reviewing a suppression ruling, 'we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 563.)

Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. "As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) We review its factual findings " ' "under the deferential substantial-evidence standard." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255.) Accordingly, "[w]e view the evidence in a light most favorable to the order denying the motion to suppress" (*People v. Manderscheid* (2002) 99 Cal.App.4th 355, 357), and "[a]ny conflicts in the evidence are resolved in favor of the superior court's ruling." (*People v. Limon* (1993) 17 Cal.App.4th 524, 529.) Moreover, the reviewing court "must accept the trial court's resolution of disputed facts and its assessment of credibility." (*People v. Valenzuela* (1994) 28 Cal.App.4th 817, 823.)

Because the Attorney General asserts that many of defendant's arguments on appeal are forfeited by his failure to have advanced them in the trial court, we must also briefly examine the question of when an argument not made to the trial court is, nonetheless, cognizable on appeal.

Constitutional claims raised for the first time on appeal are not subject to forfeiture only when "the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that

24

the trial court's act or omission, insofar as wrong for the reasons actually presented to the court, had the additional legal consequence of violating the Constitution." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, italics omitted; see *People v. Yeoman* (2003) 31 Cal.4th 93, 117.) However, "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Defendant contends he was unlawfully detained because the duration of the traffic stop was excessive in relation to its purpose. Additionally, he claims that Officer Painter's questions about defendant's involvement in the vandalism incident were unjustified by the purpose of the stop and lacked a separate "reasonable suspicion" of criminal activity. He concludes that because the detention was excessive and the questioning unjustified, his consent was involuntary. Additionally, he asserts his consent to search his person was involuntary because he was not given *Miranda* advisements before consent was sought.

Only the *Miranda* claim was argued below; the others are forfeited. The questions raised by these arguments — whether the duration of the stop was excessive and whether Painter's questions were proper — involve analyses the trial court was not asked to conduct and potentially required factual bases additional to those adduced at the hearing.[9] The claims are also without merit.

---

[9] Here, as elsewhere, defendant also argues forfeiture should not apply because his claim involves the deprivation of fundamental rights, citing *People v. Vera* (1997) 15 Cal.4th 269. In *Vera*, we observed that a defendant "is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights." (*Id.* at p. 276.) But none of the narrow class of such rights — a plea of once in jeopardy and the right to jury trial (*id.* at pp. 276-277) — is implicated here. Moreover, that dictum in *Vera* was not intended to provide defendants with an "end run" around the forfeiture rule, thus eviscerating it. We therefore reject defendant's reliance on *Vera* here and at every other point at which he invokes it to avoid forfeiture.

25

" 'As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. (*Whren v. United States* (1996) 517 U.S. 806, 810 [135 L.Ed.2d 89, 116 S.Ct. 1769].) If there is a legitimate reason for the stop, the subjective motivation of the officer is irrelevant." (*People v. Lomax, supra*, 49 Cal.4th at p. 564, fn. omitted; see *People v. Torres* (2010) 188 Cal.App.4th 775, 785-786.) "[T]he law contemplates that the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop." (*People v. McGaughran* (1979) 25 Cal.3d 577, 584 (*McGaughran*); see *People v. Brown* (1998) 62 Cal.App.4th 493, 496-497.) Those duties may "necessarily include the time required by the officer to write out the citation and obtain the offender's promise to appear . . . . [U]pon demand of a police officer every motorist must present for 'examination' both his driver's license [citation] and the registration card of the vehicle [citation]. . . . And although not specifically compelled by law, certain other steps customarily taken as matters of good police practice are not less intimately related to the citation process: for example, the officer will usually discuss the violation with the motorist and listen to any explanation the latter may wish to offer; and if the vehicles of either are exposed to danger, the officer may require the driver to proceed to a safer location before the investigation continues. [Citations.] [¶] Each of the foregoing steps, of course, requires a certain amount of time to accomplish." (*McGaughran, supra,* at p. 584, fn. omitted.)

Defendant argues that "once [the citation] process was completed, there was no cause to detain him for questioning, and any consent to search, which was obtained from [defendant] during the illegal questioning was tainted." This claim assumes that the citation process was completed when Officer Painter questioned defendant about the vandalism incident and asked to search him. Not so.

After Trudeau asked defendant for his license and registration, and discussed them with him — while Painter and Shweib were removing Snyder from defendant's car — Trudeau testified he went back to his car to write the citation, but still had to obtain defendant's signature and discuss with defendant some boxes on the citation form. *While* Trudeau was in his car working on the citation, Painter approached defendant, spoke to him about the vandalism incident and asked for his consent to search. Thus, defendant was not detained *after* the completion of the citation process to allow Painter to question him. As the factual predicate of his argument falls, the argument itself — that the detention was excessive in relation to the time required by Trudeau to complete the citation process — also collapses.

Moreover, Painter was permitted to ask defendant about matters unrelated to the traffic stop so long as the questioning did not prolong the stop beyond the time required to cite defendant. (See *McGaughran, supra,* 25 Cal.3d at p. 584 ["[i]f a warrant check can be completed" within the period of time necessary for the completion of the citation process, "no reason appears to hold it improper: because it would not add to the delay already lawfully experienced by the offender as a result of his violation, it would not represent any further intrusion on his rights"], fn. foll. quote; see *People v. Bell* (1996) 43 Cal.App.4th 754, 767 ["investigative activities beyond the original purpose of a traffic stop are permissible as long as they do not prolong the stop beyond the time it would otherwise take"].)

In *People v. Brown, supra,* 62 Cal.App.4th 493, the defendant was lawfully detained for riding a bicycle without a light or reflectors. While running a warrant check, the detaining officer asked the defendant about his probation status and, evidently, the contents of his fanny pack. A consent search of the pack yielded methamphetamine. On appeal, the defendant argued that it was improper for the

officer to have questioned him about matters unrelated to the vehicle stop. The reviewing court rejected the claim: "Questioning during the routine traffic stop on a subject unrelated to the purpose of the stop is not itself a Fourth Amendment violation. Mere questioning is neither a search nor a seizure." (*Id.* at p. 499; see *United States v. Shabazz* (5th Cir. 1993) 993 F.2d 431, 435-437 [where car stopped for speeding, police could question defendant about his travels and ask consent to search his car as long as they were waiting for results of computer check on his driver's license].)

In *People v. Bell*, *supra,* 43 Cal.App.4th 754, where a similar claim was raised, the court observed: "Defendant argues that . . . police cannot ask questions unrelated to the purpose of the traffic stop, regardless of whether those questions prolong the stop. The warrant check in *McGaughran*, [*supra*, 25 Cal.3d 577] however, was unrelated to the purpose of the traffic stop; nevertheless, the court held that a warrant check would be permissible as long as it did not prolong the stop." (*Id.* at p. 767.) Nor must questioning on an unrelated matter, which does not unduly prolong the traffic stop, be justified by reasonable suspicion of wrongdoing. (*People v. Gallardo* (2005) 130 Cal.App.4th 234, 238 [where, during traffic stop, police asked defendant whether he had anything illegal in his car, obtained his consent to search and found drugs, an articulable suspicion of wrongdoing preceding search request was not required "as long as the detention [was] not unreasonably prolonged as a result of the request to search"].)

Accordingly, we reject defendant's claims that the traffic stop detention was unduly prolonged, that Painter's questions about the vandalism incident were improper because they were unrelated to the traffic stop, or that a separate reasonable suspicion of wrongdoing was required before Painter could inquire or seek consent to search, or that defendant's consent was obtained in the course of an illegal detention.

28

Defendant claims that his consent to search his person was improper because Painter did not give him his *Miranda* rights before questioning him about the vandalism incident. In *Berkemer v. McCarty* (1983) 468 U.S. 420 (*Berkemer*), the Supreme Court held that a routine traffic stop, although a detention, is not tantamount to a formal arrest, and, therefore, questions asked during such detentions do not constitute a custodial interrogation requiring *Miranda* warnings. (*Id.* at pp. 435-440.) The court characterized routine traffic stops as similar to *Terry* stops (*Terry v. Ohio* (1968) 392 U.S. 1), which permit police to briefly question individuals about whom the police entertain a reasonable suspicion of criminal activity that falls short of probable cause. "[T]his means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." (*Berkemer*, at pp. 439-440, fns. omitted.)

Here, defendant was lawfully detained for a traffic violation during which Officer Painter asked him questions about the vandalism incident either to confirm or dispel his information that defendant had been involved. While defendant was not free to leave until the citation process was completed, he was under no obligation to answer Painter's questions. Unless his answers had provided Painter with probable cause to arrest him for vandalism — which, in any case, Painter testified he could not have done — he would have been free to leave once the

29

citation was completed.  Accordingly, pursuant to *Berkemer,* Painter was not required to give defendant *Miranda* warnings before questioning him and his failure to do so did not invalidate defendant's consent to search.  We reject defendant's assertions to the contrary.[10]

Next, defendant argues that the search of his person exceeded the scope of his consent because he consented only to a search for weapons, not drugs.  He claims "Painter exceeded the scope of any consent when he forced his fingers in[to] the *coin pocket* of [defendant's] jeans in hopes of finding narcotics, under the pretext of searching for a knife, which could not possibly fit in that pocket." "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (*Florida v. Jimeno* (1990) 500 U.S. 248, 251.)  "Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances.  [Citation.]  Unless clearly erroneous, we uphold the trial court's determination." (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408; see *United States v. Sierra-Hernandez* (9th Cir. 1978) 581 F.2d 760, 764.)

Defendant's argument focuses on a perceived discrepancy about what Officer Painter said he told defendant.  At the suppression hearing, Painter testified that he told defendant he wanted to search him for weapons and narcotics,

---

**10**     We also reject defendant's related claim that his statement was involuntary because he was not told he could refuse to consent.  The argument is forfeited because it was not raised below.  It is also without merit.  The circumstances surrounding Painter's request for consent to search are such that the search was not rendered involuntary because he did not tell defendant he had a right to refuse to consent.  (See *United States v. Drayton* (2002) 536 U.S. 194, 207 [in assessing validity of consent "the totality of the circumstances must control, without giving extra weight to the absence of this type of warning"].)

while at the preliminary hearing Painter testified he searched defendant because he thought he might have a weapon, but made no mention of narcotics. Defendant also cites testimony by Officer Trudeau who, when asked whether he heard Painter say something to defendant about weapons but not drugs, replied, "He said weapons, correct."

Defendant's focus is too narrow. The question is what a reasonable person would have understood from his or her exchange with the officer about the scope of the search. To answer that question, we look at the totality of the circumstances. Here, Painter testified that he told defendant about his information that defendant used drugs and carried a knife. When he asked defendant if he could search him, defendant said, "Sure, I don't have anything on me." When Painter was confronted by his seemingly inconsistent testimony about whether he had asked to search for both a weapon and drugs, he responded, "I recall mentioning the weapon and I recall mentioning the narcotics use. But I — apparently made reference in the transcript of searching for weapons. But I don't recall exactly narrowing my scope of my search at that point." As for Trudeau, his response was, at best, ambiguous and, in any event he also testified that he did not remember what Painter said to defendant "[w]ord for word," in asking his consent to search.

Thus, Painter knew defendant was an armed drug user, and communicated his awareness to defendant before he asked to search him. It is therefore reasonable to conclude — as evidently the trial court did — that defendant understood Painter was asking to search for both drugs and weapons. It appears, moreover, that the trial court found Painter to be a credible witness. We do not second-guess the trial court's credibility findings nor, on the record before us, can we conclude its implied determination that defendant understood the search to be for both drugs and weapons was clearly erroneous. For this reason, we reject

31

defendant's further claim that the consent search of his car, his arrest, and the search of his person at the police station were tainted by the illegality of the initial search.

Defendant asserts that his statements to Trudeau that were suppressed by the trial court because they were induced by Trudeau's promise not to use them against defendant — a promise broken when he repeated them to Sergeant Robertson — should also have been suppressed because they were taken in violation of *Miranda*. From this premise, he argues that all further evidence connecting him to Olsson's murder should have been suppressed as the fruit of the *Miranda* violation. Not so. Trudeau advised defendant of his *Miranda* rights. Defendant invoked those rights by declining to speak about the events surrounding his arrest. At that point, Trudeau ceased his questioning. Defendant reinitiated the conversation when he told Trudeau he did not want to go to jail that night, after which Trudeau suggested defendant might "work off" his offense by becoming an informant. Defendant indicated his interest, and a narcotics detective was summoned. While he and Trudeau waited for the detective, defendant made the statements at issue here. Thus, it was defendant who reinitiated the conversation of his own volition after Trudeau had acceded to his initial invocation of his right to remain silent. There was no *Miranda* violation. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485; *People v. Mickey* (1991) 54 Cal.3d 612, 648-649.)

As noted, although the trial court suppressed defendant's statements to Trudeau on the ground they were induced by Trudeau's promise not to use them against defendant, it went on to find that the fingerprint evidence need not be suppressed either because it was the result of "investigative serendipity," or would inevitably have been discovered. Defendant contends the latter rulings were error. The Attorney General contends it was the trial court's initial finding that defendant's statements were involuntary that is the error here. The Attorney

32

General argues that there is no substantial evidence those statements were induced by Trudeau's promise not to use them because defendant spoke voluntarily before Trudeau made that promise. We agree.[11]

"In general, a confession is considered voluntary 'if the accused's decision to speak is entirely "self-motivated" [citation], i.e., if he freely and voluntarily chooses to speak without "any form of compulsion or promise of rewards . . . ." [Citation.]' [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (*People v. Boyde* (1988) 46 Cal.3d 212, 238.) "A confession is 'obtained' by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation. . . . The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient." (*People v. Benson* (1990) 52 Cal.3d 754, 778.) "This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?" (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.) To answer these questions " 'an examination must be made of "all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

---

[11]   " '[T]he People may, on an appeal by the defendant and pursuant to the provisions of section 1252, obtain review of allegedly erroneous rulings by the trial court in order to secure an affirmance of the judgment of conviction.' [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1076-1077, quoting *People v. Braeseke* (1979) 25 Cal.3d 691, 701, italics omitted; § 1252 ["On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General"].)

Officer Trudeau testified that defendant made the statements in question while he and Trudeau were conversing as they awaited the arrival of the narcotics detective with whom defendant was going to work out an agreement that would allow him to be released that night in exchange for becoming a police drug informant. When asked specifically whether "this information about the use of methamphetamine and how [defendant] supported his habit" was made "in response to something . . . you said to him," Trudeau testified, "No, it was not." Rather, Trudeau testified these statements were made "after [defendant] had agreed to work his case off." Moreover, it was only after defendant made these unsolicited statements that Trudeau told him those statements would not be used against him in the drug case.

Trudeau's uncontroverted testimony establishes that defendant's statements about his drug use and burglaries were made *after* defendant had already agreed to "work off" his arrest, were not solicited by Trudeau, and were not part of any inducement for defendant to become an informant. Furthermore, Trudeau's testimony shows that the promise he made to defendant not to use those statements — the very promise that the trial court ruled rendered those statements involuntary — was not given until after the statements had been made. There is simply no evidence in the record, much less substantial evidence, to support the trial court's ruling that Trudeau's promise induced the statements. Rather, the statements were gratuitous and untethered to any promise made by Trudeau.

Accordingly, we conclude that the trial court erred when it suppressed defendant's statements as involuntary. Those statements should have been admitted and it was unnecessary for the trial court to justify admission of the fingerprint evidence as having been purged of the taint of the involuntary statement or as admissible under the inevitable discovery doctrine. Likewise, it is unnecessary for us to address the propriety of those justifications.

34

Inasmuch as we conclude that the fingerprint comparison evidence was not the fruit of any illegal police conduct, we necessarily reject defendant's further claim that his eventual arrest for the Olsson murder and statements he made to police on March 27 and March 30, 1987, were likewise tainted.

**2. Motion to suppress defendant's statements on March 27 and March 30, 1987**

*a. Evidence adduced at hearing*

Shortly before trial began, defendant moved to suppress the statements he gave to police on March 27 and March 30, 1987. During the March 27 interrogation defendant admitted to having lived at John Chandler's residence two houses from Olsson's residence. He otherwise denied knowing Olsson or having any involvement in her murder. During the March 30 interrogation, however, he claimed he had been taken to Olsson's house by a man he knew as "Doubting Thomas" to purchase drugs from her. Defendant admitted he had had sexual intercourse with Olsson but blamed "Doubting Thomas" for her murder.

Defense counsel argued the statements were obtained in violation of defendant's *Miranda* rights and were also involuntary.

Sergeant Robertson testified that defendant was taken into custody on March 27, 1987, at about noon. When arrested, he was wearing only a pair of blue jeans, but no shirt or shoes. Robertson could not recall if defendant was given clothing at the police station. At the same time defendant was arrested, his wife, Vicky Tully, was instructed to come to the police station because she was being investigated for writing checks on insufficient funds. The check investigation had originally been assigned to Robertson but was reassigned to Detective Jacobs, to whom Vicky Tully spoke. She admitted the charges, but she was not arrested because it was the policy of the Livermore Police Department to refer such cases to the district attorney for a misdemeanor complaint.

35

The police interrogation of defendant on March 27 began about 6:00 p.m. The interrogation was conducted initially by Sergeant Robertson and Detective Newton. Toward the end of the session, however, Officer Trudeau came in and Detective Newton left. At first, the police used a concealed microphone but, because the quality of the recording was poor, they replaced it with a microphone that they put on the table at which they and defendant were sitting. The interrogation ended at 12:05 a.m.

At the outset of the interrogation, defendant was advised of, and waived, his rights. During the interrogation, defendant was supplied with candy bars, pizza, and soft drinks and allowed cigarette and bathroom breaks. At one point, he was put into an ankle shackle because the officers were in and out of the room. Toward the end of the interview, Robertson asked defendant if he would take a polygraph test. Defendant asked, "Do I have a choice?" Robertson replied with a series of rhetorical questions about whether defendant was being coerced, e.g., "Do I have a rubber hose?" "Hot lamp?" "Water dripping on your face?" "[A] gun to your head?" Defendant replied in the negative. Robertson continued, "There's your choices."

"A. Well this charge you placed on me and the accusations, to say the least are serious, I think it would be —

"Q. In the State of California there is nothing more serious than murder.

"A. Okay.

"Q. Period.

"A. Then I think it would behoove me to consult a lawyer.

"Q. Okay. Before submitting to a polygraph examination?

"A. Um, yeah. Before submitting to any questions I wouldn't want to answer."

36

After some further discussion about polygraph machines and their fallibility, defendant said, "I think it best that if, if I wanted to face, I think it'd be best if I consult a lawyer." He and Robertson discussed whether defendant knew how the machines worked. Defendant said, "I don't know [so] that's why I'd like to talk to somebody who does." There was a short break in the interrogation. When it resumed, Robertson said, "When we last left this tape, we were talking about polygraph and you mentioned talking to a lawyer. Do you want a lawyer now? [¶] A. No. I'm all right. [¶] Q. You're sure? [¶] A. Yeah."

At the conclusion of the interrogation, Vicky Tully and defendant spoke for about five minutes. Afterwards, defendant was transported to the county jail.

On Sunday, March 29, Vicky Tully called the police station and asked to speak to Robertson or Newton about information she had regarding the case. Neither officer was on duty that day, so Roberson did not talk to her until Monday, March 30. Vicky Tully came to the police station and told Robertson defendant had been present at the murder but that "Doubting Thomas" had killed Sandy Olsson. She and Robertson talked about the witness protection program because she was afraid of Doubting Thomas. Robertson told her if the information she had given him was true, and if she qualified, arrangements could be made for her to go into the program but that the final decision rested with the district attorney.

Robertson and Newton then went to the jail to talk to defendant. Vicky Tully followed in her own car. The taped portion of the March 30 interview began at 8:08 p.m. Before the taping began, the officers told defendant about the information his wife had given them. Defendant did not respond. Robertson thought that defendant "was thinking," because he might be frightened of Doubting Thomas. He told defendant that he and his family might possibly qualify for the witness protection program. Less than a minute passed between the time Robertson initially confronted him with what Vicky had said and when he

37

told him about the witness protection program.[12] Defendant asked about the program and there was some further discussion about it, after which he wanted to speak to his wife. She entered the room and she and defendant spoke privately. After she left, the taped portion of the interview began. Defendant was again advised of and waived his rights. After acknowledging and waiving his rights, defendant asked, "Can you add in the part about the Witness Protection program[?]" Newton replied, "Ok, prior to this tape being come on [*sic*] . . . we've discussed with [defendant] and with [defendant's] wife Vicky that some testimony that might be given or furnished by [defendant] might involve . . . the Witness Protection Program, be it the Federal and [*sic*] the State level. . . . I've assured [defendant] that in the event that the testimony and what information that he has meets that criteria then we would work on the Witness Protection Program and get he and his wife involved in that program. This testimony may be involving . . . the Hells Angels. Is that correct Richard? [¶] [A]: Yes it is."

Defendant also testified at the suppression hearing. According to defendant, his family's participation in the witness protection program was the "key part" in his decision to talk to police. He also testified that the police told him unless he cooperated his wife would go to jail on "the check charges" and his children would be placed in foster homes. Detective Newton, who was also called by the defense, denied any such threats were made.

---

[12]     Defendant asserts that he remained silent for 30 minutes after Robertson told him about his wife's statement. The only citation he provides in support of this assertion is to a page in the reporter's transcript that records some discussion between the court and counsel prior to the hearing  It contains nothing about the length of defendant's silence. By contrast, Sergeant Robertson specifically testified that defendant's silence was "momentary."

### b.  Trial court ruling

Defense counsel argued that defendant's March 27 interrogation was taken in violation of *Miranda* because his statement "Then I think it would behoove me to consult a lawyer" was an invocation of his right to counsel.  Counsel argued defendant's March 30 interrogation violated *Miranda* because his lack of response when initially confronted by police with the information given them by his wife was an invocation of his right to remain silent.  Defense counsel also argued that the statement was involuntary because it was induced by the promise of placing defendant and his family in the witness protection program.

The trial court denied the motion in its entirety.  The court found that defendant did not "unambiguously invoke his right to counsel" during the March 27 interrogation, nor did his failure to immediately respond to the officers at the beginning of the March 30 interrogation constitute an invocation of his right to remain silent.  The court also concluded, based on "the totality of the circumstances," that discussions of the witness protection program did not render defendant's statement on March 30 involuntary.

### c.  Discussion

Defendant contends that his March 27 statement was obtained in violation of *Miranda* because the police continued to question him after he had invoked his right to counsel.  "In *Edwards v. Arizona,* 451 U.S. 477 (1981), we held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." (*Davis v. United States* (1994) 512 U.S. 452, 454 (*Davis*).)  In *Davis*, the Court had held that such invocation must be unambiguous.  "As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.'  [Citation.] . . . [A] suspect . . . must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the

39

statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (*Davis,* at p. 459.) Moreover, the court "decline[d] to adopt a rule requiring officers to ask clarifying questions." (*Id.* at p. 461.) "Consistent with *Davis*, a reviewing court . . . must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant. [Citation.] In reviewing the issue, moreover, the reviewing court must 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. [The reviewing court] independently determine[s] from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

Applying these standards to the facts before us, we uphold the trial court's ruling. The context in which defendant referred to an attorney was not a request for counsel for purposes of the interrogation then occurring, but an indication that, if required to submit to a polygraph test, he would first want to consult with a lawyer. This interpretation of his initial remark is reinforced by further statements he made in the context of the fallibility of polygraph machines and his lack of understanding of how they operated, i.e., "I think it best that if, if I wanted to face [it], I think it'd be best if I consult a lawyer," and "I don't know [so] that's why I'd like to talk to somebody who does." Finally, any ambiguity regarding his meaning was dispelled when, after a short break, Sergeant Robertson, referring to his earlier mention of lawyer while discussing the polygraph test, asked him pointblank, "Do

40

you want a lawyer now?" to which defendant replied, "No. I'm all right." Robertson pressed him, asking, "You're sure?" Defendant replied, "Yeah." Thus, defendant did not unambiguously invoke his right to counsel during the March 27 interrogation and the police were not required to cease their questioning.

We also conclude that defendant's momentary silence when confronted by police with his wife's statements to them at the beginning of the March 30 interrogation was not an invocation of his right to remain silent. "As *Miranda* itself recognized, police officers must cease questioning a suspect who exercises the right to cut off the interrogation. . . . 'Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all the circumstances . . . .' [Citation.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238.) The standard of review is the same as set forth above with respect to whether a defendant has invoked his or her right to counsel. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 128-129.)

Sergeant Robertson testified, "We informed [defendant] that Vicky had come to see us and had told us what he had told her regarding the homicide scene [and] Doubting Thomas." Thus, defendant was not accused of the murder himself nor asked any questions about it. Indeed, the information the police told him had been provided by his wife exonerated him of the murder. When defendant failed to immediately respond, Robertson, thinking he might be apprehensive about Doubting Thomas, explained that he and his family might qualify for the witness protection program. Defendant asked about the program and then to speak to his wife. It appears that the entire exchange was relatively brief. Defendant's ultimate response — asking about witness protection and to speak to his wife — indicates not that he was invoking his right to remain silent but that he was nonplussed to learn his wife had talked to the police. He seems simply to have been absorbing the information when he failed to immediately respond to

41

Robertson's statement. Therefore, defendant's momentary silence was not an invocation of the privilege against self-incrimination.

Defendant maintains that both his March 27 and March 30 statements were involuntary. The Attorney General contends that defendant did not specifically argue involuntariness with respect to the March 27 statement and has thereby forfeited the claim on appeal. Defendant responds by citing evidence adduced during the hearing that he claims shows that the statement was involuntary. Even if there was evidence that could have supported such an argument, the argument was not made. The only argument trial counsel made to the court regarding the March 27 interrogation was that the statement was taken in violation of defendant's invocation of counsel. Thus, with respect to the March 27 interrogation, trial counsel never mustered evidence in support of an involuntariness claim and the trial court was never asked to undertake a voluntariness analysis. Accordingly, the argument is forfeited.[13]

---

**13**      In any event, the argument fails on its merits. "[A] statement is involuntary if it is the product of coercion or, more generally, 'overreaching'; involuntariness requires coercive activity on the part of the state or its agents; and such activity must be, as it were, the 'proximate cause' of the statement in question, and not merely a cause in fact." (*People v. Mickey, supra,* 54 Cal.3d at p. 647.) As evidence of coercion defendant cites the following: (1) he was interrogated wearing only a pair of pants; (2) he was deceived regarding the purpose for which he was arrested — on a drug charge, rather than for the Olsson murder; (3) he was implicitly threatened that, unless he talked, his wife would be arrested on check charges; (4) Officer Trudeau, with whom he had a prior relationship, was brought in to keep defendant talking; and (5) the police used his wife as their agent when they allowed her to speak to defendant after they finished their interrogation of him. In his reply brief, he also cites the fact that he was shackled. Because these facts themselves and the inferences to be drawn from them were disputed below, we view them in the light most favorable to the trial court's ruling. (*People v. Manderscheid, supra,* 99 Cal.App.4th at p. 357; *People v. Limon, supra,* 17 Cal.App.4th at p. 529.) Applying that standard, we find there was no definitive evidence that defendant was interviewed wearing only a pair of pants or whether clothes were supplied to him at the jail. Also, defendant *was* arrested on two

Defendant renews his claim that his March 30 statement was involuntary because it was induced by the promise he and his family could enter the witness protection program. As a corollary, he claims the police manipulated Vicky Tully into getting him to incriminate himself. He also asserts the police acted deceptively when they suggested defendant and his family might qualify for the witness protection program because, at the time they made the suggestion, they already believed defendant was guilty of the Olsson murder. Defendant also maintains police threatened to prosecute his wife on the check charges and put his children into foster care.

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied." (*People v. Jimenez* (1978) 21 Cal.3d 595, 611.) "In terms of assessing inducements assertedly offered to a suspect, ' "[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily

---

narcotics charges. Moreover, at the time he was arrested on those outstanding warrants, probable cause also existed to arrest him for the Olsson murder. Thus, his arrest was not a ruse nor was he deceived as to why the police were questioning him. There was no evidence defendant was threatened that, unless he talked to the police, his wife would be arrested. While defendant testified this threat was used with respect to the March 30 interrogation, Detective Newton specifically denied that charge. We accept the trial court's implicit credibility finding on this point. There was no evidence of a prior relationship between Trudeau and defendant other than that Trudeau had arrested defendant on March 7, nor does the evidence support defendant's claim that his wife was acting as an agent for the police. While at one point police placed an ankle shackle on defendant because they were in and out of the interview room, there was no evidence he was continuously shackled. There was also evidence that, during the interrogation, defendant was supplied with candy bars, pizza, and soft drinks and allowed cigarette and bathroom breaks. Viewed under the totality of the circumstances standard, we conclude that defendant's March 27 statement was not the product of coercion and therefore was not involuntary.

made.  [Citation.]' " (*People v. Howard* (1988) 44 Cal.3d 375, 398.)  "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.  [Citations.]  In determining whether a confession was voluntary ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." '  [Citation.]  Whether the confession was voluntary depends upon the totality of the circumstances.  [Citations.]  ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." '  [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.)  " '[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record.  [Citations.]' " (*People v. McWhorter, supra,* 47 Cal.4th at p. 357.)

Defendant bases his involuntariness claim on interpretations of the evidence and questions of the credibility of witnesses that the trial court implicitly rejected.  Because substantial evidence supports those factual determinations, we rely on them and, therefore, independently reject defendant's claim that his March 30 statement was the result of either threats or promises.

Defendant claims that the police promised him they would place him and his family into a witness protection program if he spoke to them.  The record dispels the assertion.  Robertson testified that he told both Tullys the same thing: if they were being truthful, they might qualify for witness protection, but the final decision would be made by the district attorney.  Deputy District Attorney Fraser, who interviewed defendant after the police, confirmed that he could make no promises to defendant.  Fraser repeated this statement at the end of the interview, reminded defendant that everything he had disclosed could and would be used

44

against him, and admonished him that Fraser would compare defendant's statement against the physical evidence. Even defendant's own testimony fell short of asserting that explicit promises were made to him by the police about witness protection. He testified that the police "explained" the program and "talk[ed]" to him about it but, when asked whether he had pressed Detective Newton about any promises, he acknowledged he did not do so.

To the extent there was conflict in the evidence about whether the police promised defendant protection, the trial court resolved it in favor of the prosecution. The record provides substantial evidence in support of its finding and we are bound by it. Thus, the evidence shows only that defendant was told if his statement was truthful and he otherwise qualified, he and his family could be placed into a witness protection program if the district attorney approved. Therefore, the police did no more than permissibly point out a possible benefit that might accrue from his " ' "truthful and honest course of conduct. " ' " (*People v. Howard*, *supra*, 44 Cal.3d at p. 398.) Accordingly, his statement was not induced by a promise to place him and his family into witness protection.

We also reject his claim that the police manipulated his wife into persuading him to make a statement. The trial court found credible the police officers' testimony that they did not engineer Vicky Tully's initial discussion with defendant at the end of the interrogation on March 27, where he evidently told her the "Doubting Thomas" story. Moreover, it is undisputed that Vicky Tully contacted the police on her own and asked to speak to Robertson or Newton about what defendant had told her. Finally, the trial court evidently rejected defendant's testimony that the police threatened to prosecute his wife on the check charges and place his children into foster care if he did not speak to them. Again, we are bound by the trial court's resolution of conflicts in the evidence and its credibility determinations. Finally, and for the same reason, we reject defendant's assertion

45

that the police had already concluded he was the murderer before they spoke to him on March 30 and, therefore, their offer of protection was a deception to induce him to speak to them. When defense counsel asked Sergeant Robertson whether he had believed defendant's account of the murder, Robertson testified that he had not known what to believe and wanted to "gather more information . . . [to] continue the investigation."

On this record, we conclude that defendant's March 30 statement was not involuntary.

### B. Excusal of prospective jurors for cause

#### 1. Overview

Defendant contends the trial court erred in removing for cause five prospective jurors who expressed reservations about the death penalty, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution.[14]

"A prospective juror in a capital case may be removed for cause if his or her views on capital punishment 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Because prospective jurors 'may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to

---

[14]    In *People v. Velasquez* (1980) 26 Cal.3d 425, we held that an appellate challenge to a *Witherspoon/Witt* excusal (*Wainwright v. Witt, supra,* 469 U.S. 412; *Witherspoon v. Illinois* (1969) 381 U.S. 510) is not forfeited by a failure to object at trial. (*Witherspoon,* at p. 443.) In *People v. McKinnon* (2011) 52 Cal.4th 610, we overruled *Velasquez*'s no-forfeiture rule. (*McKinnon*, at p. 643.) "Nevertheless . . . because at the time of this trial we had not expressly held that an objection is necessary to preserve *Witherspoon/Witt* excusal error on appeal, we do not apply this rule here." (*Ibid.*)

hide their true feelings' (*id*. at p. 425), 'deference must be paid to the trial judge who sees and hears the juror' and must determine whether the 'prospective juror would be unable to faithfully and impartially apply the law' (*id*. at p. 426). We have adopted this standard for determining whether excusing for cause a prospective juror in a capital case based on the prospective juror's views on capital punishment violates the defendant's right to an impartial jury under article I, section 16 of the California Constitution. [Citations.] [¶] 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous. [Citations.]' [Citation.] 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts. [Citations.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 462-463.)

" ' "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." [Citation.] "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. " ' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 497-498.)

Initially, defendant argues that the trial court improperly "excluded jurors who could not promise they would vote for death based solely on the [trial court's

47

description of the] bare facts of the capital offense." Defendant failed to object to the trial court's description of the offense and, therefore, his claim is forfeited. Moreover, in his opening brief defendant fails to identify which jurors were improperly dismissed based on the trial court's summary of the offense. In his *reply* brief, defendant argues, "it was the trial court's jury selection protocols, admonitions, and questions that led to the systematic exclusion of the five jurors, and others, as raised in the Opening Brief."[15] As we demonstrate, however, the trial court's excusal of those five prospective jurors was entirely correct and, therefore, no error can be attributed to the trial court's description of the offense. In the same vein, defendant argues the prospective jurors excused by the trial court were improperly excused because of their attitudes toward the particular facts of this case, rather than their abstract inability to impose a death sentence. Again, however, our conclusion that the five prospective jurors were properly excused subsumes and rejects this complaint.[16]

---

[15] Defendant faults the trial court for failing to follow what he characterizes as death-qualification "protocols" purportedly set forth in *People v. Heard* (2003) 31 Cal.4th 946, 966, fn. 9.) Defendant's failure to object to the manner in which the trial court conducted voir dire forfeits any claim on appeal that it erred. In *Heard*, we concluded that the trial court erred in excusing a prospective juror for cause following an inadequate voir dire examination by the court. (*Id.* at pp. 963-966.) In the footnote defendant cites we directed trial courts to treatises and handbooks that might help them avoid the errors made by the trial court in *Heard*. By pointing out these resources, we did not intend to limit the trial court's discretion, much less impose rigid rules that trial courts were thenceforth required to follow. Moreover, defendant's trial was conducted 11 years before *Heard* was decided and before any of the treatises and handbooks therein referenced had been published.

[16] Defendant contends at length that our decisions permitting case-specific questions during the death-qualification process, starting with *People v. Fields* (1984) 35 Cal.3d 329, are based on an erroneous interpretation of *Wainwright v. Witt, supra,* 469 U.S. 412, and should be reconsidered. We are not persuaded by his argument and decline his invitation to revisit our decision.

## 2. Specific challenges[17]

### a. Prospective Juror M.D.

On his juror questionnaire, Prospective Juror M.D. wrote about his general feelings regarding the death penalty, "I do not feel that it works very well as a deterrent to crime, but in some cases it is necessary and perhaps the best solution." He wrote he was "[m]oderately in favor" of the death penalty and held no religious, moral or philosophical views that would affect his ability to vote for the death penalty. As to whether he would vote for a death penalty law were it to appear on the ballot, he wrote, "I just don't want to make that choice until I have to."

The court asked M.D. whether he could listen to the penalty phase evidence and consider both death and life without possibility of parole after having found beyond a reasonable doubt that "the defendant, either alone or with somebody else, had burglarized the house of the woman by the name of Shirley Olsson. That she had been intentionally killed by way of multiple stab wounds, perhaps as many as 25 of those. You may also have found that she was assaulted with an intent to commit rape." M.D. replied, " I think I could." Under questioning by defense counsel, however, M.D. acknowledged he entertained some "ambivalence" about the death penalty. Defense counsel continued: "[The prosecutor] is going to ask you, in effect, to sentence this man to death. If you get to the appropriate stage of the proceeding, he's going to ask you to decide by signing a verdict or raising your hand or being polled." He reminded M.D. he would taking the first step of putting defendant "in the gas chamber" and asked whether M.D.'s ambivalence "would be so great as to impact upon that decision?" M.D. replied: "Honestly, I would have

---

**17**     Pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1, prospective jurors were individually questioned outside the presence of other prospective jurors, first by the trial court and then by the parties, after which the court entertained challenges for cause.

to say that that's a possibility. Because I've always had to deal with the death penalty in a theoretical context. I never had to apply it." He added, "I would tend against the death penalty, but that doesn't mean I would definitely vote against the death penalty." However, he then said that, given the special circumstances in this case — what defense counsel called "a burglary" that "went awry" — "I would be very hard pressed to decide on the death penalty."

M.D. told the prosecutor that on a scale of 1 to 10, he was a three and a half in favor of the death penalty. He repeated that where the special circumstance was felony-murder involving burglary, he would not be open to imposing the death penalty. The prosecutor asked him again whether the "[d]eath penalty is out of the door" and he would "always go for life without possibility of parole in this type of case." M.D. replied: "Based only on the information I've gotten today, yes. I don't know what other information might sway my mind, but based on what you've told me today and what I've heard up to this point, I would have to say I would be inclined not to." The prosecutor asked a third time whether, in this case, "I could stand up here and ask you for the death penalty and I've got a shot?" M.D. replied, "I would have to say no, based on what I know now . . . but that's the only way I could answer the question because I don't know all the evidence." He added, "something may come up which would sway me. I don't know what it would be, I don't know where it would come up, but based on what I know now, I'd have to say no, that I can't." The prosecutor said: "If we're talking about a case of a person breaking into a home, and in the course of a burglary gone awry, as defense counsel says, a single person is killed. [¶] Given this type of fact situation, the death penalty is not a viable penalty here for you?" M.D. replied: "No, so long as the other option is available, life without possibility of parole."

The prosecutor challenged M.D. for cause. Defense counsel asked no further questions and submitted the matter. The trial court excused the juror.

50

The trial court did not abuse its discretion in excusing M.D. on the ground that his voir dire answers demonstrated that his "views would prevent or substantially impair the performance of his duties as a juror." M.D.'s responses indicated he would not consider the death penalty in a case like this where the special circumstance alleged was burglary murder. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 917 [prospective juror properly excused where he "concluded that he would never vote for the death penalty in a burglary-murder case unless the killing were in fact premeditated"].)

We are not swayed by defendant's claim that M.D.'s responses indicated he might have been able to consider both penalties based on further evidence that might emerge at trial. He was told the case involved a brutal murder by the multiple stabbing and possible sexual assault of a victim in the course of — as defense counsel described it — a burglary gone awry. This was an accurate overview of the case. We are not persuaded acquainting him with further details would have changed his mind and made him more inclined to consider death. Moreover, while he said he might be swayed by additional information, he added, "I don't know what it would be," indicating there was no further circumstance he could think of that would allow him to consider the death penalty in this case.[18] Additionally, defense counsel had every opportunity to attempt to rehabilitate M.D. but made no effort to do so and submitted without argument on the

---

[18] Defendant contends that the trial court's error in granting the cause challenge as to M.D. is underscored by its denial of his challenge for cause to Prospective Juror D.dR. Defendant claims M.D. and D.dR. were "virtually identical on the strength of their views" on the death penalty, though on different sides of the question. D.dR. admitted he had strong views on the death penalty and he would worry that those views might affect his judgment. However, he also consistently maintained that he would strive to keep an open mind and to follow the law. Unlike M.D. he never ruled out one or the other penalty in a felony-murder case. Accordingly, we reject the analogy defendant attempts to draw between the two.

51

prosecutor's challenge for cause. Finally, to the extent M.D.'s answers were equivocal, we defer to the trial court's evaluation of his state of mind. (*People v. Thomas, supra,* 51 Cal.4th at pp. 462-463.)

### b. Prospective Juror E.H.

Prospective Juror E.H. indicated on her questionnaire that the death penalty "in some cases is necessary," described her view toward it as neutral and wrote she would have to "research" before she could decide how to vote were the death penalty law on the ballot. (Subsequently, she told defense counsel she would vote for a death penalty law.)

She told the court she could consider both penalties. But when defense counsel asked her whether the death penalty would be appropriate where a "man broke into a house to commit a burglary . . . and killed a lady who lived there, stabbed her to death 25 times," E.H. replied, "Based on that outline, I wouldn't think so." Even after he introduced the possibility of the perpetrator's intent to commit rape, E.H. indicated it was not the kind of crime where she would consider the death penalty, as opposed to "a mass murder." She maintained her position when again questioned by the court.

The prosecutor challenged E.H. for cause. The defense submitted without argument and she was excused.

E.H.'s responses clearly show she would not consider the death penalty in a burglary-murder case because in her view it was not the kind of serious crime — as opposed, for example, to a mass murder — where the penalty was appropriate. Accordingly, she was properly excused.

### c. Prospective Juror M.K.

Prospective Juror M.K. wrote on her questionnaire that she "believe[d] in the death penalty." She explained that her views about the death penalty had

52

changed after the Robert Alton Harris case because she "became aware of the death penalty and the need for a death penalty." She described herself as moderately in favor of it. She wrote she would vote in favor of a death penalty ballot measure because of overcrowded prisons and the costs of supporting them.

Under questioning from the court, M.K. indicated she would be open to both penalties. However, when the prosecutor asked her how she felt when she first heard from the trial judge "that this case might involve the death penalty," she replied, "I felt like I'd rather not have to make that decision." The prosecutor suggested there was a difference between abstract support of the death penalty and actually imposing it on a "real person," and asked whether she had "thought about the idea of being asked to impose the death penalty?" She responded: "I thought I would get to know this person for six weeks and it probably won't be an easy thing to do." When the prosecutor asked her whether she could "vote death for that person over there," she said, "I don't know. Saying I believe in the death penalty and then knowing the person involved are two different things as far as I'm concerned." The prosecutor then asked M.K. a long hypothetical that ended: "Let's assume further that you're the foreperson of this jury, and part of the job of the foreperson is to sign the verdict form . . . . Can you sign your name on that death warrant, appreciating the fact that that is the first step that will carry this man onto a bus to be taken across the bay to San Quentin, put into eventually that green gas chamber which we saw time and time again over all this publicity regarding Harris, and he will at that point in time breathe in poisonous gas until he's dead. [¶] Can you do that?" M.K. replied, "No."

The prosecutor challenged her for cause. Defense counsel declined to question her and submitted without argument. The trial court, however, asked her twice if what she meant was that she could not impose the death penalty even if

53

she concluded it was warranted by the evidence. M.K. replied, "Yes, that's correct," and "Yes, I could not do that."

"[W]e previously have held it permissible to excuse a juror who indicated he would have a 'hard time' voting for the death penalty or would find the decision 'very difficult.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 697.) Here, M.K. stated unequivocally that, notwithstanding her support of the death penalty in the abstract, she could not actually impose it. She was so clear that defense counsel did not attempt to rehabilitate her. The court properly granted the prosecutor's cause challenge.

Defendant claims the prosecutor's hypothetical question about whether M.K. could sign the verdict form was improper. Trial counsel did not object to the question and any claim of error at this point is forfeited, whether of prosecutorial misconduct or abuse of discretion by the trial court in permitting the question. Moreover, defense counsel had used a similar gambit when he asked M.D. if he could sign the verdict that would be the first step toward putting defendant "in the gas chamber." Like defense counsel's use of that imagery, the prosecutor's reference to M.K. signing the verdict form was a way of impressing upon her the gravity of a juror's role in imposing the death penalty so as to gauge her ability to assume that role. There was neither misconduct by the prosecutor nor an abuse of discretion by the trial court.

### d. Prospective Juror B.D.

Prospective Juror B.D. wrote on her questionnaire that she believed the death penalty "is appropriate in certain cases — although it is heartbreaking." She wrote she was moderately in favor of the death penalty and would vote for a death penalty ballot measure because "it is appropriate in some cases."

When asked by the court whether she would be able to impose either penalty, she replied that it would be "very difficult" to vote for the death penalty and that she had "some anxiety" on the subject. She added, "[I]t's one thing to think about these things in theory and then to actually . . . . Part of me . . . wonders if I really could impose a death penalty." When asked for her "best opinion" about whether she could do so, she replied, "I don't think I could say an unqualified yes. I think I could, but there's, you know, maybe 80 percent yes, and there's still maybe 20 percent — I apologize. I've been sorting this stuff out."

B.D. told defense counsel that this case was "bad enough" for the death penalty, "but I don't want to be the one to make that decision." The prosecutor asked her the same hypothetical question he had asked M.K. about whether she could sign the verdict form if the jury imposed death. She replied, "I don't think so." Seeking clarification, he asked, "I'm talking about voting for the death penalty, this is not something you could personally do; is that correct?" B.D. replied, "Well, I have serious doubts about my ability to do that." In response to further questioning, she said, "Well, the more I'm sitting here, the more I'm realizing that . . . I don't think I could. I couldn't sign the paper, and if I can't sign the paper, how can I, you know, vote." The court asked whether she could impose the death penalty even if she determined death was warranted. She replied, "I don't think so."

The prosecutor challenged her for cause. Defense counsel submitted and declined the court's invitation to ask further questions. The court indicated it would take the matter under submission. This led to further questioning by both the prosecutor and the defense. While B.D. indicated there was some possibility she might be able to vote for death, she also said, "I don't think I could do it. I don't think I could make that decision." Ultimately, the prosecutor asked, "Is the death verdict one you couldn't return in this case?" B.D. replied, "No." The court

asked, "[W]here are we in terms of procedure?" The prosecutor replied, "Basically, the question was . . . could she return a death verdict in this case, and her answer was 'No.' " The defense submitted without argument and the challenge was granted.

Although B.D.'s answers about whether she could impose the death penalty were somewhat equivocal, we defer to the trial court's assessment of her state of mind. Defendant again complains about the prosecutor's hypothetical but, again, he failed to object, forfeiting any claim and we find no error in the question. He also asserts that the prosecutor's last question, because it contained a double negative, was ambiguous and that, by answering "no," what B.D. meant was "yes," she could return the death penalty. Just moments later, however, when the prosecutor interpreted her reply to mean she could not vote for death, neither B.D. nor defense counsel corrected him. We conclude the trial court properly granted the challenge for cause.

### e. Prospective Juror T.L.

In response to the question about his general feeling toward the death penalty, Prospective Juror T.L. wrote on his questionnaire that it was "[n]ot really a big problem for me." He wrote he was neutral toward the death penalty and not sure how he would vote on a death penalty ballot measure.

Under questioning by the court, T.L. initially said he could consider both penalties. When asked directly whether he could vote to impose death, he replied, "No." Neither the prosecutor nor defense counsel asked any questions of T.L. The prosecutor challenged him for cause. Defense counsel submitted without argument. The challenge was granted.

We find no abuse of discretion in the trial court's ruling. While T.L.'s voir dire was brief, he clearly indicated he could not vote to impose death in this case.

56

The fact that neither the prosecution nor the defense asked him questions suggests that his position was so plain neither side believed it worthwhile to attempt to rehabilitate him. While T.L.'s answers were somewhat inconsistent, this is classically a situation that calls for deference to the trial court's evaluation of the prospective juror's mental state and demeanor. (*People v. Mayfield* (1997) 14 Cal.4th 668, 727.)

Defendant complains that the court failed to ask clarifying questions and cut T.L. off, and that the record is incomplete. T.L. said he could not vote to impose the death penalty. His position was sufficiently clear that not even defense counsel attempted to rehabilitate him. Under these circumstances, we find no error in the trial court's acceptance of his answer as definitive and its decision not to question him further. Nor is the record incomplete because it indicates T.L. shook his head in the negative instead of verbally replying when the court pressed him whether he could impose the death penalty. The gesture is widely understood to indicate the negative. Nor did the court cut off T.L. when it interrupted him and asked if he understood its question about his ability to consider both penalties. In response, T.L. said, "Yeah." The court then essentially repeated its original query, to which T.L. responded, "You mean deciding one way or the other." The court said, "Exactly, right." Thus, any confusion T.L. had about the question was clarified.

Accordingly, we reject defendant's claim that the trial court erred when it excused these jurors for cause. We add, however, a note of caution. Defendant's complaint in this case is that the trial court's summary of the offense was too truncated to allow it to assess whether the prospective jurors who expressed qualms about the death penalty could nonetheless have been able to apply it. In other words, he apparently would have had the trial court provide additional details about aggravating factors. We, on the other hand, are concerned that the

57

trial court's summary of the offense here may have been too detailed. As we observed in *People v. Cash* (2002) 28 Cal.4th 703, death-qualification voir dire "must avoid two extremes." While "it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors," neither should it be "so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented." (*Cash,* at pp. 721-722.) We advise trial courts against the kind of overly detailed summary of the offense the court used in this case.

## C. Exclusion of witnesses from court

Defendant contends that the trial court abused its discretion under former section 1102.6 when it refused to exclude members of the victim's family — her father, Clifford Sandberg, sister, Jan Dietrich, and son and daughter, Elbert Walters III and Sandra Walters — from the guilt phase.[19] The trial court permitted Dietrich and Elbert Walters to remain in the court based on the prosecutor's representation that they would not be testifying at the guilt phase. It appears that both Sandberg and Sandra Walters also attended some sessions of the guilt phase after they had testified and been excused.

---

**19** Defendant contends the trial court's ruling also violated his due process rights, and his rights to a fair trial, to confront and cross-examine witnesses and to a reliable death penalty determination pursuant to the Sixth, Eighth and Fourteenth Amendments to the federal Constitution. He did not raise these claim in the trial court. While we may entertain these claims to the extent they are consistent with the exception to the no-forfeiture rule we set forth earlier (see pp. 24-25, *ante*; *People v. Boyer, supra,* 38 Cal.4th at p. 441, fn. 17), our rejection on the merits of the claim actually raised in the trial court "necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*Ibid*.)

Former section 1102.6, subdivision (a), provided that either the "victim" — defined as the crime victim or, if she or he was unavailable, up to two members of the victim's family — "shall be entitled to be present and seated at the trial," unless the "court finds that the presence of the victim would pose a substantial risk of influencing or affecting the content of any testimony," in which case, "the court shall exclude the victim from the trial entirely or in part so as to effect the purposes of this section." (Former § 1102.6, subd. (a), as enacted by Stats. 1986, ch. 1273, § 2, p. 4448, and repealed by Stats. 1995, ch. 332, § 2, p. 1824.) However, in this case, the prosecutor did not seek to permit Olsson's family members to be present at trial under section 1102.6. Rather, the defense moved to exclude them. Although the defense did not specify its authority, the motion was presumably based on Evidence Code section 777. Under that statute, the court "may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." The standard of review of a trial court's ruling under both statutes is abuse of discretion. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1053 [§ 1102.6]; *People v. Griffin* (2004) 33 Cal.4th 536, 574 [Evid. Code, §777].)[20]

---

[20] Because it was a defense motion, it is understandable that the trial court made no specific reference to section 1102.6. Nonetheless, seizing on this omission, defendant claims the trial court failed to perform the balancing required by section 1102.6, subdivision (a) between the victim's right to be in the courtroom and the risk of influencing or affecting the content of any testimony. The argument is entirely without merit. It is clear from the record that the basis of the defense's motion was its concern that permitting the victim's family members to remain in the courtroom might in some way affect their testimony. In fashioning its ruling —excluding two members from the guilt phase and declining to exclude any of the witnesses from the penalty phase without a further showing of potential harm — the trial court was, in effect, performing the balancing required by section 1102.6, whether or not the words of the statute passed its lips.

At the hearing on the defense request, the prosecution objected to the proposed exclusion as it related to Sandy Olsson's sister and son because they would not be testifying at the guilt phase. The trial court asked defense counsel if his motion encompassed only the guilt phase. Defense counsel replied that his motion extended to the entire trial "[a]s long as the circumstances of the crime under [section] 190.3 are circumstances in aggravation."

The trial court granted the motion to exclude, limited to guilt phase witnesses. This permitted Olsson's sister and son to remain in the courtroom. The court's ruling, however, was without prejudice to a renewed objection to particular witnesses or testimony. When defense counsel complained it would be difficult to anticipate such objectionable testimony, the court replied, "If you contemplate with a particular witness, even a possibility, then we will interrupt the proceedings and you can make your representations." The defense did not make any such further objections, nor evidently did the defense object when the victim's father and daughter remained in the courtroom for some period after they testified at the guilt phase.

Defendant contends the trial court abused its discretion because, contrary to section 1102.6, it permitted four family members, rather than two, to be present at the trial.[21] He asserts, further, that the "presence of these witnesses created a substantial risk of influencing or affecting the content of their penalty phase testimony." He argues the trial court's ruling failed to properly balance his rights to a fair trial and due process "against the prosecutor's need for his penalty phase victim impact witnesses" to attend the guilt phase. Finally, he claims that the

---

[21] Defendant is wrong. The trial court's ruling permitted only the victim's sister and son to remain in the courtroom during the guilt phase portion of the trial. Although apparently the victim's father and daughter also attended some sessions of the guilt phase, defense counsel did not bring this violation of the court's order — if it was a violation — to the court's attention.

60

court unfairly placed the burden upon the defense of anticipating guilt phase testimony during which the victim's family members should be excluded.[22] His arguments are entirely without merit.

The purpose of section 1102.6 is not, as defendant implies, to allow the prosecutor to engage the jury's sympathy by exhibiting crime victims, but to advance the interests of victims of crime. When it enacted the statute in 1986, the Legislature declared that section 1102.6 embodied the "public policy of this state" that "a victim of a criminal offense be afforded a reasonable opportunity to attend any criminal trial for that offense," and "not be excluded . . . merely because the victim has been or may be subpoenaed to testify at the trial" because permitting the victim such access is "essential to the fair and impartial administration of justice." (Stats. 1986, ch. 1273, § 1, reprinted at Historical and Statutory Notes, 50B West's Ann. Pen. Code (2004 ed.) foll. § 1102.6, p. 370.)

The statute is clear that the victim is "*entitled* to be present" subject only to the finding that his or her presence would pose "a *substantial risk* of influencing or affecting the content of any testimony." (Former § 1102.6, subd. (a), italics added.) This language — and the Legislature's statement of intent — suggests that any balancing begins with a preference in favor of the victim's right to be present. Our decisions support this interpretation of the statute in their emphasis that the substantial risk referred to be real, not speculative or hypothetical.

For example, in *People v. Bradford* (1997) 15 Cal.4th 1229, where the defendant claimed the trial court abused its discretion under section 1102.6 by permitting family members of the victims to remain in the courtroom during

---

[22] In effect, the trial court's ruling allowed defendant to renew his motion to exclude at any point at which he thought or even suspected there might be testimony the victim's family members should not be permitted to hear. We fail to see how defendant was injured by this favorable ruling, nor does he demonstrate any such injury.

opening statements, we said:  "Defendant's mere assertion that the victims *could or would be* influenced by the opening statements was insufficient to establish that the victims' presence posed 'a substantial risk of influencing or affecting the content of any testimony.' " (*Bradford*, at p. 1322, original italics.)  In *People v. Griffin*, *supra*, 33 Cal.4th 536, we held the trial court did not abuse its discretion when it allowed the victim's mother and sister to be present during penalty phase.  "Nothing before the trial court at the time it made its ruling suggested that [the victims'] presence posed a substantial risk that either woman would craft or shape her own testimony, or cause any other witness to do so, as a result of her presence. . . .  [D]efense counsel asserted only that such a risk existed, but an assertion of this sort is insufficient to support a claim that the trial court abused its discretion." (*Id.* at p. 574.)

Here, too, defendant asserts formulaically and without specificity that the presence of the victim's family members at the guilt phase posed the substantial risk referred to in the statute but fails to point to anything in the record to support this assertion.  This is simply not enough to show an abuse of discretion by the trial court.

*D.  Sufficiency of the evidence*

Defendant contends the evidence is insufficient to support his guilt phase convictions of first degree murder with burglary-murder special circumstances and assault with intent to commit rape.  The claim is without merit.

" 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.] . . .  The standard

of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' " [Citation.]' " (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) The same standard applies to special circumstance allegations. (*People v. Kelly* (2007) 42 Cal.4th 763,788.)

Defendant asserts there was insufficient evidence to support the first degree murder conviction based on a burglary-murder theory or to support the burglary-murder special-circumstance allegation because the evidence failed to prove that defendant entered the victim's home to commit either theft or rape, the target offenses of the burglary.[23] Notably, defendant does not discuss the evidence in any detail — and certainly not in light of the applicable standard of review — but relies on the fact that neither burglary nor rape was charged as a separate offense. This is a red herring. We are not concerned with whether there was sufficient evidence to prove offenses that were not charged. The question is whether the evidence was sufficient to prove the offenses that were charged. It was.

The evidence showed defendant, armed with a knife, forcibly entered Sandy Olsson's house late at night or in the early morning hours of July 24 or 25, 1986. The open bathroom window, with its screen removed and discarded, indicated that he first attempted to enter her residence surreptitiously through this

---

[23] The jury was instructed it was not required to unanimously agree on which particular crime defendant intended to commit.

window but, for whatever reason, failed to do so. The broken chain-lock on the front door was another sign of forced and unconsented-to entry. Defendant told police he went to Olsson's house with "Doubting Thomas" because Thomas wanted to buy drugs that Olsson obtained from the hospital where she worked. Coincidentally, Olsson lived only two houses away from where defendant had lived with John Chandler. Defendant's statement shows that he knew Olsson worked at a hospital where she would have access to drugs. It is a reasonable inference that he learned about her job and that she lived alone while he was living at Chandler's residence. Olsson's purse was taken from her residence and found discarded in the pond on the golf course. Defendant told police he had seen Doubting Thomas rummaging through the victim's purse in her living room after he stabbed her; a receipt indicated she had received $3.95 from a purchase on July 24, but no money was found in her purse or at her home. The jury could easily have discarded defendant's implausible invention of Doubting Thomas's role in the crime and concluded that defendant himself went to Olsson's residence and broke in to steal drugs or property. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 ["We have explained that when presented with evidence that a defendant killed another and took substantial property from the victim at the time of the killing, a jury ordinarily may reasonably infer that the defendant killed for the purpose of robbery"].)

There is also substantial evidence that defendant entered the victim's residence with the intent to commit rape. This conclusion would have been consistent with his late night attempt to surreptitiously enter the residence of a woman who he knew lived alone. Defendant, furthermore, admitted he had sexual intercourse with the victim but did not ejaculate. His admission that he did not ejaculate is consistent with testimony from the prosecution's criminalist that the absence of semen did not rule out the possibility of intercourse if there was no

64

ejaculation. The pathologist also testified that the absence of trauma to the victim's genitals did not mean she had not been forced to submit to sexual intercourse. Defendant was armed with a knife. The jury could reasonably have concluded defendant forced the victim to have sex with him at knifepoint and not, as he claimed, consensually.

Thus, there was substantial evidence to support the felony-murder theory of first degree murder and the burglary-murder special circumstance. Our assessment of the evidence also demonstrates there was substantial evidence to support defendant's conviction of assault with intent to commit rape.[24]

*E. Evidence that defendant was unemployed*

Defendant contends the trial court abused its discretion when it admitted testimony that he was unemployed, to show motive to steal. "Ordinarily it would be unfair to persons in difficult financial circumstances to permit general evidence of their poverty to be introduced for the purpose of establishing a motive for theft

---

[24] In light of our conclusion, we do not discuss in detail defendant's further claim that there was insufficient evidence to support a first degree murder conviction based on a premeditation and deliberation theory. We note, however, there was strong evidence of planning that includes the manner and timing of defendant's entry into the victim's residence, the fact that he was armed, the care he took to eliminate his fingerprints from the residence and also evidence of motive — fear that Olsson recognized him as a former neighbor. The manner of killing — defendant had time to wipe his knife on the sheets as he was stabbing the victim — also constitutes substantial evidence of premeditation and deliberation. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [evidence of planning, motive and manner of killing are nonexclusive factors that may support a finding of premeditated and deliberate killing].) "Contrary to defendant's suggestion, *Anderson* does not require that these factors be present in some special combination or that they be accorded a special weight nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

or robbery. The risk of causing suspicion of indigent persons generally outweighs the probative value of such evidence." (*People v. Cornwell* (2005) 37 Cal.4th 50, 96; but see *People v. Castaneda* (2011) 51 Cal.4th 1292, 1325 [based on evidence of the defendant's sporadic employment combined with evidence of his drug addiction, "a rational trier of fact could conclude that defendant had a motive to steal" and formed the intent to do so before the victim's death].) Such evidence may, however, be admissible for other purposes, "such as to refute a defendant's claim that he did not commit the robbery because he did not need the money." (*People v. Wilson* (1992) 3 Cal.4th 926, 939) or to " 'eliminate other possible explanations for a defendant's sudden wealth after a theft offense.' [Citations.]" (*Cornwell, supra,* 37 Cal.4th at p. 96.)

In this case, the prosecutor asked John Chandler, at whose residence defendant had been living off and on in the six months before Sandy Olsson's murder, whether "the defendant had a hard time keeping a job." Defense counsel objected on relevance grounds. The prosecutor responded, "Motive." The trial court overruled the objection. In his closing argument, the prosecutor, referring to this testimony, said, "[Defendant's] using drugs. Well, where do you get money for that if you can't keep a job. How do you support that? I mean we're not talking about keeping a roof over your head."

Assuming, without deciding, that the testimony should not have been admitted, we find its admission harmless under any standard. The testimony was brief, as was the prosecutor's reference to it in argument, and, as demonstrated in the previous section, there was more than ample evidence, quite apart from this testimony, to support a finding that defendant broke into Olsson's residence to steal drugs or money.

66

*F. Erroneous admission of "victim impact" evidence at guilt phase*

Defendant contends that, through a combination of prosecutorial misconduct and trial court error, evidence was improperly placed before the jury during the guilt phase resulting in a verdict tainted by sympathy for the victim. Defendant characterizes this evidence as "victim impact" evidence.

" 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]  In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 960.)  "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.  [Citation.]  Also, a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury.  [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)[25]

" 'Only relevant evidence is admissible (Evid. Code, § 350; [citations]), and, except as otherwise provided by statute, all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d) . . .).'  [Citation.]

---

[25]     Defendant repeatedly cites as instances of prosecutorial misconduct actions to which he failed to object on this ground.  In his reply brief, he asserts that he should be exempt from the forfeiture rule because of the prosecutor's repeated pattern and course of misconduct.  We discern no such pattern and, as we have in the past, we reject the suggestion that the forfeiture rule is inapplicable to capital cases.  (*People v. Dykes* (2009) 46 Cal.4th 731, 757.)

'Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.  [Citations.]'  [Citation.]  [¶] Defendant placed all material issues in dispute by pleading not guilty." (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117.)  "[T]he trial court has broad discretion to determine the relevance of evidence." (*People v. Cash, supra,* 28 Cal.4th at p. 727.)  This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1149.)  " 'Under California law, error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .* " (Evid. Code, § 353, subd. (a), italics added.)  "In accordance with this statute, we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' " (*People v. Nelson* (2011) 51 Cal.4th 198, 223.)

Bearing these principles in mind, we review defendant's specific claims of prosecutorial misconduct and trial court error.

## 1.  Voir dire

Defendant contends the prosecutor committed misconduct during voir dire when, "[w]hile questioning juror [J.W.], the prosecutor stated '. . . [i]t's not fair to the family members of the woman who was murdered if people can't impose either of the two penalties.' "  Defendant's contention is based on a factual error. The prosecutor did not ask this question of Prospective Juror J.W., who ultimately

sat on the jury, but of Prospective Juror J.B. J.B. was questioned just before J.W. and did not sit on the jury. Although defendant asserts that J.W. "heard the comment," he fails to provide any citation in the record that would support his claim. Furthermore, defendant fails to show in the record that the prosecutor made the remark to any other prospective juror. Thus, even if we assumed this fleeting comment was misconduct, defendant could not have been prejudiced since J.B. was not a juror in his case. Moreover, his failure to show that the comment was repeated to any other juror belies his assertion that there was a pattern of prosecutorial misconduct during voir dire.

**2. Prosecutor's opening statement**

Defendant complains that the prosecutor committed misconduct in his opening statement (1) when he contrasted the intended family gathering for which the victim was preparing on the weekend before her death— her visit to Topeka for her father's 85th birthday — to the family gathering that actually occurred — her funeral; (2) by discussing her nursing career; and (3) by discussing her habits and routines.

Defendant failed to object to any of these remarks at the time they were made. He subsequently referred to them when he objected, not to the opening statement, but to the actual evidence of these matters. Indeed, defense counsel conceded that the prosecutor "has a right to refer to any evidence he expects in good faith to be admitted during the course of the trial," but went on to question the relevance of evidence of Olsson's background and the birthday reunion. Defendant did not move to strike the opening statement. Instead, he asked the court to make a substantive ruling on his relevance objection. Thus, the specific claim he advances here — misconduct during the opening statement — is forfeited. We take up his substantive objection in the following section.

69

**3. Admission of evidence**

Defendant asserts the prosecutor committed misconduct by presenting evidence about the family reunion, Olsson's nursing career, and her habits and routines, as well as eliciting assertedly improper testimony from Olsson's coworkers and her daughter.

### a. Background

After the prosecutor's opening statement and before any testimony, there was a lengthy hearing outside the presence of the jury during which defense counsel demanded that the trial court rule on its objections to prospective evidence of the victim's nursing career, her plans to attend her father's 85th birthday celebration on the weekend she was killed, and her habits and routines. Defense counsel argued the evidence was more prejudicial than probative. (Evid. Code, § 352.) Later, counsel said he was also objecting on relevance grounds.

The prosecutor responded as follows: evidence of the victim's professional background was relevant because it demonstrated she was not a docile person and, thus, her submission without resistance to defendant indicated that "he had her under complete control at the point of a weapon," and that, having complete control, he committed a gratuitous murder; evidence of her plans to attend a family reunion was relevant to the concern of her coworkers when she failed to appear at work the day before she was to have left; and evidence of her habits and routines, particularly after she came home from work, was relevant to whether — as defendant's statement to the police had suggested — she would have entertained late night male visitors on a work night. Defense counsel argued that what the prosecution called habit and custom evidence was really impermissible character evidence; that the family reunion evidence was irrelevant because there would be no dispute that Olsson's coworkers were concerned by her failure to appear at

70

work; and that the prosecutor should not be permitted to show that "she stayed at home at night" by "proving she was a wonderful person at work."

The trial court told defense counsel, "I'm going to agree with you in part and not in totality." "[I]n terms of what her duties at the hospital might have been, I will overrule that objection . . . I've engaged in 352, the weighing process. I see some relevance, certainly not at the risk of undue prejudice." Furthermore, "[i]n terms of whether there was . . . a trip contemplated for July 26th, again, I'm going to overrule that objection. I can see some relevance to that, and I certainly don't see the risk of undue prejudice." "With regard to what I'll describe as personality evidence I'm going to sustain your objection. That, based on the offer of proof, as I understand it, I think there is a limited relevance to that. . . . Now, it's not inconceivable to me that, based on cross-examination or based on possible defense presentation of evidence, that something like that could become relevant. . . . At this point, based on the offer of proof. . . it does not appear to be relevant direct testimony."

### b. Prosecutorial misconduct claims

Defendant claims the prosecutor committed misconduct by eliciting testimony about the purpose of Olsson's planned trip to Topeka — to celebrate her father's 85th birthday — in violation of the trial court's ruling limiting such evidence to whether a trip was contemplated, but omitting any mention of its purpose. Defendant misreads the record. The trial court did not impose any such limitation. The court simply overruled the defense's objection to testimony that a trip was planned. It said nothing further that could be construed as requiring the prosecutor to omit any mention of the purpose of the trip. Indeed, defense counsel did not object to the questions about the birthday celebration, suggesting that he

71

did not believe the questions violated the court's ruling. His failure to object also forfeits the claim. (*People v. Crew, supra*, 31 Cal.4th at p. 839.)

Defendant next contends the prosecutor committed misconduct when questioning Barbara Green. Specifically, he argues the prosecutor impermissibly asked Green a series of questions about when and why she became concerned after Olsson failed to appear for work. Two of those questions— involving Green's inability to sleep the night before Olsson was killed and her pact with Olsson that the two women would be with each other if one was dying — did not draw an objection, thus forfeiting any claim of misconduct.[26] (*People v. Crew, supra*, 31 Cal.4th at p. 839.) Defendant did object to other questions about Green's concern. Following an unreported bench conference, the trial court ultimately sustained an objection when the prosecutor asked Green, "What was it about this set of circumstances that caused you to leave your work and go out to a coworker's home?" It did so, however, only as to the form of the question. Thus, even if we

---

[26] Defendant cites other instances of Green's testimony, as well as the testimony of Olsson's father and sister, which he characterizes as "impermissible" but to which he did not object at trial. He concedes he did not object to this testimony, but says he presents it as part "of the factual background of the claim to show context, to show prosecutorial misconduct, and to show how the prosecutor violated the court's orders violating notice." We deem his explanation to be a concession that any argument based on this testimony is forfeited and we do not consider or address further whether this unobjected-to testimony was improper.

Also threaded through defendant's claim is an assertion that the prosecutor violated a court order requiring him to notify both the court and trial counsel in advance when he was going to elicit testimony that the defense might find objectionable. The court, however, simply instructed the prosecutor to notify the court and counsel in advance when he "anticipate[d]" he might be getting into areas the court characterized, "for lack of better description," as "victim impact." Plainly the ruling left much to the prosecutor's judgment. Nowhere does defendant cite an objection on defense counsel's part that the prosecutor had violated the court's instruction, much less any ruling by the court on the issue. The claim is therefore forfeited.

assume that the basis of defendant's objection at the bench conference was prosecutorial misconduct, the trial court's ruling implicitly rejected that ground.

Nonetheless, defendant asserts all the testimony regarding Green's concern was impermissible because it only served to show the impact of Olsson's murder on her. We disagree. Green's concern and her subsequent decision to go to Olsson's house to check on her well-being helped provide a context and to establish a time line for the prosecution's case-in-chief. Moreover, Green's decision to go to the home of a coworker simply because she missed work *was* unusual; to have forced her to omit any mention of the cause of her concern may have raised unnecessary questions about her credibility. (See *People v. Box* (2000) 23 Cal.4th 1153, 1202 [references to the fact victim was murdered on his third birthday "helped place the testimony of prosecution witnesses in context and assisted the jury in assessing their credibility"].) Finally, we are unpersuaded that these relatively brief references to Green's concern had a significant emotional impact on the jury.

Defendant next claims the prosecutor committed misconduct when he elicited from Green testimony that she had never heard Olsson use profanity. Defense counsel objected to the question and his objection was sustained. Defendant fails to demonstrate that the remedy was inadequate to the impropriety.

Defendant claims two other questions to Green were intended to elicit impermissible "victim impact" evidence. The prosecutor asked Green whether her description of the coldness in the bedroom referred only to the temperature or also Green's feelings. Green replied, "It could be a combination of both." Later, he asked her if she ever had flashbacks to "what you found in Sandy Olsson's bedroom on July 25, 1986?" Green replied, "Yes, I do, twice a month or more. I know that it's been at least that frequently since the death of Sandy." Defendant failed to object to these questions, thus forfeiting his claim of prosecutorial

73

misconduct on appeal. (*People v. Crew, supra*, 31 Cal.4th at p. 839.) Even if he had not, we would find no grounds for reversible misconduct based on these brief exchanges.

Next, defendant claims the prosecutor engaged in misconduct during his questioning of Clifford Sandberg, Sandy Olsson's father. While questioning Sandberg about Olsson's habit of locking the front door after she came home from work, he asked if Sandberg remembered "ever having someone come over to the house and her opening the door when the chain was on the door?" Sandberg replied there was a "special case" when a man came and pounded on the door saying that his wife was ill and had fallen to the floor. Defense counsel objected "to narrative." The trial court replied: "All right. The answer up to this point can remain. Next question." When the prosecutor then asked whether Olsson had gone to help the neighbor, defense counsel objected on relevance grounds and the objection was sustained, although not before Sandberg answered, "Yes."

Contrary to defendant's current claim, his initial objection to Sandberg's response was not sustained and, therefore, the prosecutor did not commit misconduct when he asked a followup question. In any event, the basis of the objection was not prosecutorial misconduct but that the answer was a narrative. The court sustained defendant's second objection on relevance grounds. He complains that the answer was not stricken and the jury not admonished to disregard it. Defense counsel, however, did not request either remedy and, in any event, we are unpersuaded that Sandberg's single-word answer — "Yes" — was "highly prejudicial," as defendant now maintains.

Defendant cites as misconduct a series of questions by the prosecutor to Olsson's daughter, Sandra Walters, about her relationship with her mother, the subjects of their conversations and whether, from these conversations, Walters knew whether her mother enjoyed much of a social life and if she knew whether

74

Olsson ever slept in the nude. Defendant failed to object to two of the nine questions, resulting in forfeiture. None of his objections to the remaining questions were for prosecutorial misconduct. Rather, they were largely technical objections such as inadequate foundation and hearsay. Moreover, defense counsel's objections were repeatedly sustained. Thus, even assuming that his claim is not forfeited by his failure to have objected to these questions on the ground of prosecutorial misconduct (*People v. Crew, supra*, 31 Cal.4th at p. 839), he fails to demonstrate the inadequacy of the remedy he did receive when his various objections were sustained.

Moreover, we reject his underlying claim that the evidence the prosecutor sought to elicit from these questions "was only relevant to the impermissible consideration of victim impact." The questions directed to Walters were also relevant to show — contrary to the implication of defendant's statement to the police — that Olsson was a modest woman who led a quiet life.

Defendant also contends the prosecutor engaged in misconduct during closing argument when he argued: "It is time to put a halt to the brutality and viciousness of this defendant. And it is time to give Sandy Olsson back her good name and reputation." Defense counsel objected that the prosecutor was attempting to "inflame the jury" and that his comment was "irrelevant." The court replied: "I indicated to the jury now that this is argument. These are the arguments of the attorneys. The arguments are not evidence in the case." The prosecutor continued: "The evidence in this case establishes this man tried to take everything in the world that Sandy Olsson had and he did take everything, except for her good name and reputation, and he tried to take that and steal that like everything else he took on the morning of July 25, 1986."

The prosecutor's comments about the victim's good name and reputation were undoubtedly allusions to defendant's statement to police about the murder.

75

In that statement, he suggested that Sandy Olsson stole drugs from the hospital where she worked and sold them to people like "Doubting Thomas," who, according to defendant, was a Hell's Angel. Defendant also suggested that Olsson was the kind of woman who entertained late night male visitors and engaged in sex with strangers. Defendant's statement was in evidence. There was no misconduct. (*People v. Panah* (2005) 35 Cal.4th 395, 463 [prosecutor has a right to comment on the evidence in closing argument].)

Defendant also claims the prosecutor committed misconduct during his rebuttal argument but he failed to object to the comments he asserts were improper. The claim is therefore forfeited.

In any event, we would find no misconduct. During the defense argument, defense counsel repeatedly maintained that defendant was telling the truth in his statement to the police about the circumstances of the murder. He suggested that Olsson had, in fact, taken drugs from the hospital to sell to "Doubting Thomas." The implication of that argument is that testimony by Olsson's friends and family that she was a modest woman who lived quietly was not credible. It is in this context that the prosecutor made the statement defendant now claims was misconduct: "He [defense counsel] attacked the victim. He even attacked the victim's family. Isn't it outrageous that these folks are here. Isn't it so outrageous that they're in this courtroom with some of her friends. Terrible thing. Terrible thing, because the only person who has to lie is the defendant over there." In context, the prosecutor's argument was permissible rebuttal on the issue of witness credibility.

### c. Trial court error

In addition to charging the prosecutor with misconduct for eliciting improper victim impact evidence, defendant faults the trial court for rulings that

76

allegedly abetted the misconduct.  Specifically, he claims the trial court failed to limit evidence and argument to relevant and material matters and erred by admitting into evidence a photograph of the victim while she was alive.  He also argues he was cumulatively prejudiced by the trial court's errors and the prosecutor's misconduct.

Defendant contends the trial court failed to issue "firm rulings" in response to defense objections.  As a result, he asserts that the prosecutor exploited the court's vague rulings to elicit improper victim impact evidence.

Defendant claims the trial court failed to adequately rule on his objection to the prosecutor's voir dire comment to Prospective Juror J.B. that it would be unfair to Olsson's family if a juror were unable to consider both penalties.  But defendant did not make a contemporaneous objection to the comment.  Instead, he waited until both that prospective juror and the next prospective juror, J.W., had been questioned and excused.  Only then did defense counsel argue the comment was "inappropriate."  The trial court, after hearing from both sides, observed, "I've only heard that reference on one occasion . . . .  I think we could spend a fair amount of time whether it's an appropriate subject . . . .  I would simply ask you at this time to note our conversation for the record.  If the situation arises again, you may react appropriately and I'll react as I feel appropriate."

In short, the trial court declined to rule on the propriety of the prosecutor's comment to a single prospective juror, to which defendant had failed to object at the time it was made.  The court's action was entirely reasonable.  There was no need for the court to make a definitive ruling unless the situation recurred, which it did not.

Defendant contends the trial court's ruling was inadequate on his objection to prospective evidence of the victim's nursing career, her plans to attend her father's 85th birthday celebration, and her habits and routines.  He cites the court's

remark that the prosecutor had agreed to give the court and defense counsel advance notice if "he anticipates that any of the areas may be the subject of direct testimony," at which point the court would hear and rule on any objections. Defendant asserts the court failed to clarify the "areas" over which the prosecutor was to tread lightly. Neither defense counsel nor the prosecutor, however, found it necessary to request clarification. This is because it was clear in context that the "areas" to which the court was referring were those areas of anticipated testimony by prosecution witnesses that defendant had just objected to: Olsson's career, the family reunion evidence, and evidence of her habits and routines.

Defendant complains that the prosecutor "[took] advantage of [the court's] inadequate ruling by asking objectionable questions and eliciting improper testimony before drawing an objection." Clearly not. The court's instruction to the prosecutor to advise it and defense counsel of questions he anticipated might tread into potentially objectionable areas committed those decisions to the prosecutor's judgment. That the prosecutor and defense counsel might disagree on this issue was to be expected. The prosecutor asked questions he thought were permissible and, when the defense disagreed and objected, the trial court ruled on the specific question, sustaining some objections and overruling others. Defendant argues that by requiring objections to specific prosecution questions, the court made it look as though his counsel was "bullying" witnesses. He cites nothing in the record to support this speculation. Moreover, the trial court's instructions to the jury made clear that objections were simply a normal part of a trial. We discern no error by the trial court or misconduct by the prosecutor.

Defendant renews his claim that the prosecutor's reference in closing argument to the victim's good name and reputation were improper and faults the trial court for not sustaining his objection but simply admonishing the jury that arguments are not evidence. As we have concluded that the argument was a

78

permissible comment on the evidence, we find no error in the trial court's handling of defendant's objection.

Defendant contends the trial court erred by failing to sustain a defense objection to the prosecutor's remark in rebuttal argument that defendant had "smear[ed] the good name and reputation" of the victim. Defendant objected that the remarks invited the jury to speculate on matters outside the record and referred to a previous objection during opening arguments. Defendant had tried to prevent the prosecutor from arguing that defendant had attempted to sully the victim's good name and reputation because the trial court had sustained an objection when the prosecutor had asked Olsson's supervisor, Margaret Brick, about Olsson's reputation for honesty and integrity. The prosecutor replied that his argument was based on Brick's testimony that an audit had revealed no missing drugs from the hospital during the period Olsson had worked there, contrary to the implication of defendant's statement that Olsson sold drugs she had stolen from the hospital. Defense counsel also argued that the prosecutor could not base his argument on defendant's statement to police because the prosecutor had introduced that statement. The court rejected that argument. It also ruled that the prosecutor could support his argument with Brick's drug audit testimony.

The court did not err in overruling defendant's objection that the prosecutor's rebuttal argument referred to matters outside the record. Defendant's statement to the police and the drug audit testimony by Brick were in evidence and the prosecutor could comment on them.[27] For these same reasons, we reject

---

[27] Defendant renews the claim made by his trial counsel that the prosecutor was prohibited from commenting on defendant's statement to police because the prosecution introduced the statement. He cites no authority for this assertion. Moreover, as already noted, defense counsel relied on that statement in his own closing argument, suggesting that defendant had been truthful when he told police Olsson was a drug dealer and the murder was committed by Doubting Thomas or some other third party.

79

defendant's claim that the trial court erred when it denied his motion for a mistrial based on the prosecutor's rebuttal argument.

Defendant's remaining claims can be summarily disposed of. He renews his claim the trial court erred when it denied his request to exclude Olsson's family members from the courtroom during the guilt phase. We have already rejected his argument and, for the reasons previously given, do so again. (See pp. 58-62, *ante*.) Defendant renews his claim that the trial court's ruling regarding the scope of testimony about Olsson's planned trip to Kansas for her father's birthday was ambiguous in that it did not clearly preclude the prosecutor from presenting evidence of the purpose of the trip as opposed to the mere fact of it. We have already rejected this claim and, for the reasons previously given, do so again. (See pp. 71, 77-78, *ante*.) Defendant contends the trial court cut defense counsel off when he was attempting to object to the prosecutor's references to the victim's good name and reputation. Not so. The court had already heard extensive argument when it remarked to defense counsel, "I don't mean to cut you off, sir, but what I'd like to do at this time is . . . give you an opportunity . . . to memorialize the issue now because you brought it to my attention, I want to make sure we have a record about that which we do." The court made a preliminary ruling with respect to the kind of testimony the prosecutor could elicit from his first witness, Maxine Gatten. The parties then resumed their argument both at this session and in the next court session at even greater length than before the court's comment. In no way does the record support defendant's claim that the court prevented him from making a comprehensive argument on this issue.

Defendant contends the trial court abused its discretion when it admitted evidence that Olsson's coworkers were concerned when she failed to appear for work on July 25, 1986. We have previously rejected this argument and, for the reasons given, do so again. (See pp. 72-73, *ante*.) We have also rejected his claim

80

that the trial court erred when it admitted testimony by Barbara Green about her flashbacks to the crime scene and, for the reasons given, we do so again. (See p. 73, *ante*.) Defendant contends evidence of Olsson's duties at the medical center were irrelevant and, therefore, the court abused its discretion in admitting such testimony. We disagree.

A focal point of the prosecution's case was showing that Olsson's job was all consuming and accounted for her quiet lifestyle, which excluded the possibility of drug dealing and promiscuity. Thus, the nature and scope of her professional duties was relevant, and the trial court acted well within its considerable discretion when it admitted such evidence. Defendant contends the trial court erred when it overruled his foundational objection to testimony by Sandberg that his daughter slept in flannel pajamas based on his observations when he stayed with her from October to March. (Evid. Code, § 1105 ["Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom"].) "[T]he determination of the admissibility of [habit or custom] evidence rests in the sound discretion of the trial court." (*People v. Hughes* (2002) 27 Cal.4th 287, 337.) Here the court reasonably concluded that Sandberg's observations of his daughter's sleepwear and the fact that he regularly laundered her pajamas during the six months a year he stayed with her provided sufficient foundation for the prosecution's contention that she wore pajamas on the night she was murdered and was forced to remove them by her assailant.

Defendant contends the trial court abused its discretion when it admitted into evidence a photograph of Sandy Olsson in her work clothes while she was alive. Initially, the defense had offered to stipulate to identity, but the prosecution rejected the stipulation. The prosecutor showed the photograph to several witnesses to establish identity. Later, the defense objected to admission of the

81

photograph on grounds it was irrelevant and prejudicial. The trial court overruled the objection.

As defendant acknowledges, the prosecutor used the photograph for identification purposes while examining four different witnesses. "Our cases have permitted similar uses of photographs of victims while alive. [Citations.] We find no error in admitting [this] photograph[]." (*People v. Martinez* (2003) 31 Cal.4th 673, 692.) "The photograph, which was shown to three witnesses, was relevant to establish the witnesses' ability to identify the victims as the people about whom they were testifying. The possibility that it generated sympathy for the victims is not enough, by itself, to compel its exclusion if it was otherwise relevant." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.) Moreover, given that the jury was aware Olsson was a nurse, we reject defendant's claim that the photograph was particularly prejudicial because she was depicted in her work clothes.

Defendant contends that he suffered cumulative prejudice from the impact of the prosecutor's misconduct and the trial court errors discussed above. We have rejected his claim of errors or, if error, of individual prejudice, and therefore he could not have suffered cumulative prejudice.

## G. *Prosecutorial misconduct in closing argument*

Defendant contends the prosecutor engaged in misconduct in his guilt phase closing argument.

First, defendant contends the prosecutor impugned the integrity of defense counsel in his rebuttal argument when the prosecutor asked rhetorically, "[D]id you ever get the feeling [defense counsel] believed his client was telling the truth?" Defense objected that the remark was "improper" and requested an admonition. The court obliged, instructing: "The jury is advised to disregard this

82

comment." Subsequently, the defense sought a mistrial, claiming that court's admonition was inadequate. The motion was denied.

We presume the jury fully understood and applied the court's instruction. (*People v. Richardson* (2009) 46 Cal.4th 339, 356, fn. 13.)

Defendant contends the prosecutor engaged in misconduct when the prosecutor referred to him as "a despicable excuse for a man," a "despicable individual," "garbage," and "a sucker." Defendant failed to object to the last three remarks, thus forfeiting his claim of misconduct on appeal. (*People v. Panah, supra,* 35 Cal.4th at p. 462.)

In any event, we find no misconduct. We have observed that a prosecutor is not "required to discuss his [or her] view of the case in clinical or detached detail." (*People v. Panah, supra*, 35 Cal.4th at p. 463.) "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct." (*People v. Friend* (2009) 47 Cal.4th 1, 32 [defendant described as " 'living like a mole or the rat that he is' "].) "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.) We have repeatedly rejected claims of prosecutorial misconduct involving the use of such epithets in guilt phase arguments. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as " 'serial killing,' " and " 'terrorizing and killing' " people (italics omitted); *People v. Jones* (1998) 17 Cal.4th 279, 308-309 [no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to "[t]errorists"]; *People v. Pensinger, supra,* 52 Cal.3d 1210, 1250-1251 [no misconduct where prosecutor referred to defendant as a " 'perverted maniac' "].) Here, as in those cases, we conclude that these epithets,

83

which were but fleeting characterizations in the course of the prosecutor's very lengthy summations, did not constitute misconduct.

Defendant contends the prosecutor committed *Griffin* error (*Griffin v. California* (1965) 380 U.S. 609), when he argued that the jury should assess the credibility of defendant's statement to police using the same standards as applied to trial testimony. In *Griffin*, "the high court held the prosecution may not comment on a defendant's failure to testify." (*People v. Bennett* (2009) 45 Cal.4th 577, 596.) That did not happen here. As the trial court aptly observed when it denied defendant's mistrial motion on this ground, "There was no reference to the defendant's failure to testify." The Attorney General contends that the prosecutor's comments "simply urged the jurors to evaluate the credibility of [defendant's] out-of-court statements — which had been received into evidence under the hearsay exception for the admission of a party — under the same standards and criteria used to evaluate in-court testimony." We agree.

A hearsay declarant is subject to the same credibility standards as if "the declarant had been a witness at the hearing." (Evid. Code, § 1202.) Here, the prosecution argued that its evidence proved that defendant alone had murdered Sandy Olsson. This was inconsistent with defendant's statement to police that a third party committed the crime. Thus, the jury was confronted with a question of the defendant's credibility. The prosecutor did not err by arguing they should apply the same standards to that statement as they would to the testimony of a witness. That argument was plainly limited to defendant's statement to the police and did not implicate directly or indirectly defendant's decision not to testify at trial.

Defendant next contends that the prosecutor misstated the evidence and referred to facts not in evidence during his argument. Specifically, he cites the prosecutor's comment that Olsson felt safe in her neighborhood because "you

84

know this is a good neighborhood, I mean there are no bars on the windows."

Defendant contends there was no evidence of the neighborhood's safety or whether Olsson felt secure in her home. "[P]rosecutors have wide latitude to draw reasonable inferences from the evidence presented at trial. . . ." (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1153-1154.) The evidence showed that the victim lived in a quiet neighborhood of single-family dwellings that partly abutted a golf course. It showed further that she employed no special safety precautions in her own home beyond a chain lock on the front door that was easily broken. There was also Sandberg's testimony that when a neighbor had come knocking at Olsson's door one night, she simply opened it. The prosecutor's characterization of the neighborhood and the victim's sense of security was not impermissible.

Defendant contends the prosecutor misstated the law when he argued that the jury did not have to unanimously agree on the applicable theory of first degree murder — burglary murder or premeditated murder — by using an analogy to burglary: "Just like in the burglary where you can be divided as to why he entered, whether it was to steal, whether it was to rob, whether it was to do both. As long as you all agree that he had that intent or one of those intents, he's guilty of burglary. [¶] In this particular case, as long as you agree he either had all these things when he killed, or that it occurred during the course of a burglary." Defendant complains the argument was improper because defendant was never charged with either burglary or robbery; that the prosecutor conflated the intent requirement for premeditated burglary and burglary murder; and "he did not tell them what 'all these things' were that could lead them to a finding of premeditated, as opposed to felony, murder."

The prosecutor was correct that the jury need not agree on the same theory of first degree murder to convict defendant of that charge. (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.) He was also correct when, by way of analogy, he

85

pointed out that, similarly, there was no unanimity requirement for burglary. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132-1133.)   It is plain from the context that he was not speaking of burglary or robbery as separate crimes but, rather, alluding to burglary because the offense was before the jury for purposes of felony murder and burglary-murder special circumstances.[28]

The Attorney General argues that, when the prosecutor referred to "all these things" he was alluding to a chart on which the elements of willful, deliberate and premeditated murder had been itemized in contradistinction to burglary murder. The record lends some support to the Attorney General's assertion in that it is clear the prosecutor was using charts to illustrate legal concepts.  Chart or no, however, we agree that, in context, the prosecutor's reference to "all these things" was to the elements of premeditated murder which he had explained at some length to the jury before addressing burglary murder.  Thus, we conclude the phrase could not have led the jury to believe that the elements of premeditated murder and burglary murder were the same.

Finally, defendant argues that the cumulative effect of the prosecutor's misconduct requires reversal.  As we have found no misconduct in the prosecutor's summation, we necessarily find no prejudice, cumulative or individual.  (*People v. Stitely* (2007) 35 Cal.4th 514, 560.)

*H.  Jury unanimity*

Defendant contends that, in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466, his constitutional rights were violated because the jury was not instructed that it must unanimously agree on a theory of first degree murder, that

---

[28]    We think the prosecutor's reference to "rob" may have a slip of the tongue and that what he meant to say was "rape," which, as the jury was correctly instructed, was the other predicate crime for burglary murder.  In light of those instructions, we reject the notion that the reference could have confused or misled the jury.

is, whether it was premeditated murder or burglary murder.  Furthermore, he asserts *Apprendi* also required the jury to unanimously agree on which of the two possible target offenses — theft or rape — supported the burglary-murder theory of first degree murder.  We have previously rejected these arguments and do so again.

"[A]though the two forms of murder have different elements, only a single statutory offense of murder exists.  Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded.  [Citations.]  As for defendant's claim that a unanimity instruction should have been given, our cases have repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation.  [Citations.]  [¶]  We are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466.  There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt.  [Citation.]  We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder.  (See also *Ring v. Arizona* (2002) 536 U.S. 584, 610 [122 S.Ct. 2428, 2443-2444, 153 L.Ed.2d 556] [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment].)"  (*People v. Nakahara, supra*, 30 Cal.4th  at pp. 712-713, original italics; and see *People v. Taylor* (2010) 48 Cal.4th 574, 626  [rejecting contention that for purposes of felony murder the jury must unanimously agree on the target offense].)

87

*I. Instructional error claims*

### 1. Consciousness of guilt instruction

Defendant contends consciousness of guilt instructions given in this case (CALJIC Nos. 2.03, 2.06, 2.52) were contradictory and misleading and lessened the prosecution's burden of proof.[29]  These standard instructions explicitly state that any inference regarding guilt to be drawn from the circumstances described by them — a willfully false or misleading statement, destruction or suppression of evidence, and flight — is permissive and insufficient alone to prove guilt. Nonetheless, defendant claims the jury could have convicted him based on consciousness of guilt alone even if it was not otherwise convinced of his guilt beyond a reasonable doubt.  As defendant acknowledges, we have repeatedly rejected challenges to these instructions.  (See generally *People v. Zambrano, supra,* 41 Cal.4th at p. 1159; *People v. Jurado* (2006) 38 Cal.4th 72, 125-126.) We decline to revisit this authority.  We have also previously rejected the claim he makes here that such instructions are improper pinpoint instructions.  (*People v. Holloway* (2004) 33 Cal.4th 96, 142.)  We do so again.

### 2. Circumstantial evidence instructions

Defendant next contends that the circumstantial evidence instructions given in this case impermissibly lightened the prosecution's  burden of proof (CALJIC No. 2.01 [when one interpretation of circumstantial evidence appears reasonable

---

**29**    CALJIC No. 2.03 as given stated:  "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt.  However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination."  CALJIC No. 2.06 contained similar language regarding the destruction or concealment of evidence.  CALJIC No. 2.52 contained similar language regarding flight after the commission or accusation of committing a crime.

and the other unreasonable, jury must accept the reasonable interpretation]; CALJIC No. 2.02 [same standard, for circumstantial evidence of specific intent or mental state]; CALJIC Nos. 8.83, 8.83.1 [same standard, for special circumstance allegation and specific intent or mental state for special circumstance allegation].) "Defendant acknowledges that we have rejected similar arguments in prior cases. [Citations.] We find our reasoning in those cases to be sound." (*People v. Morgan* (2007) 42 Cal.4th 593, 621.)

### 3. Voluntary intoxication

Defendant contends the trial court erred when it failed to give a voluntary intoxication instruction as to the burglary-murder special circumstance. Defendant acknowledges that the court did give the instruction with respect to count 1 (murder) and count 2 (assault with intent to commit rape). The jury was instructed, in relevant part: "If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent or mental states, you must find that he did not have such specific intent or mental states." (CALJIC No. 4.21.) Defendant argues the court's failure to give this instruction as to the special circumstance may have led the jury to ignore whether intoxication prevented defendant from forming the specific intent required to establish the special circumstance, e.g., the specific intent to steal or commit rape.

"In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' [Citation.]"

(*People v. Jablonski* (2006) 37 Cal.4th 774, 831.)  The voluntary intoxication instruction informed the jury it could consider the effect of defendant's intoxication on his ability to form the required "specific intent or mental state" at "the time of the alleged crime."  This necessarily included all conduct and events that comprised the crimes and the special circumstance.  Indeed, the jury was further instructed that the special circumstance applied only if "[t]he murder was committed while the defendant was engaged in the commission or attempted commission of a burglary."

The jury could not have evaluated the effect of defendant's intoxication on his ability to form the required specific intent for purposes of burglary murder without also deciding the issue with respect to the special circumstance.  This is also true of count 2.  The jury could not have evaluated the effect of defendant's intoxication with respect to whether he formed the specific intent required for assault with intent to commit rape without also deciding that issue for the special circumstance allegation.  That is, the question of the effect of defendant's intoxication on his ability to form specific intent was the same whether it was for felony murder, assault with intent to commit rape, or the burglary murder special circumstance.  In resolving the issue for one purpose, the jury resolved it for all purposes.  Accordingly, we reject defendant's claim of instructional error.

We also reject defendant's further claim that, as given, the voluntary intoxication instruction was inadequate because it told the jury it "should" consider intoxication rather than it "shall or must."  The use of "should" did not give the jury discretion whether to consider defendant's intoxication.  The very next sentence informed the jurors that if they entertained a reasonable doubt regarding defendant's ability to form the requisite mental states because of his intoxication they "must" conclude that he did not.  There was no error.

90

*J. Cumulative guilt phase error*

Defendant contends the cumulative effect of guilt phase error requires reversal. "However, we either have rejected his claims and/or found any assumed error to be nonprejudicial on an individual basis. Viewed as a whole, such errors do not warrant reversal of the judgment." (*People v. Stitely, supra,* 35 Cal.4th at p. 560.)

*K. Admission of unadjudicated criminal activity in penalty phase*

Pursuant to section 190.3, factor (b), the prosecution presented evidence that defendant had been involved in two jailhouse altercations. Section 190.3, factor (b) allows the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." The court held a *Phillips* hearing (*People v. Phillips* (1985) 41 Cal.3d 29 (*Phillips*) to make a preliminary determination whether the evidence was admissible.

Defendant argues: (1) the court's *Phillips* hearing ruling was error; (2) admission of the evidence of the altercations violated state law because defendant was not the aggressor and did not use force or violence; (3) admission of the evidence violated federal due process guarantees because it "allowed the jury to punish [defendant] for prior bad acts of 'violence' that were wholly unrelated to any crimes proven at the guilt phase"; (4) admission of the evidence rendered section 190.3, factor (b) unconstitutional as applied in this case because it "allowed the introduction of conduct that had no bearing on any issue relevant to the penalty determination"; (5) admission of evidence of "such *de minimis* acts in aggravation" violates the Eighth Amendment's requirement of "heightened reliability" in capital cases; (6) in his closing argument the prosecutor committed misconduct by linking defendant to a defense penalty phase witness who had been convicted of rape.

"Both former and present section 190.3, factor (b) . . .) provide that in making the penalty determination, the trier of fact is to consider, if relevant, ' "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." ' [Citation.] . . . [E]vidence admitted under this provision must establish that the conduct was prohibited by a criminal statute and satisfied the essential elements of the crime. [Citations.] The prosecution bears the burden of proving the factor (b) other crimes beyond a reasonable doubt." (*People v. Moore* (2011) 51 Cal.4th 1104, 1135.) The other crimes evidence may be conduct amounting to either a felony or a misdemeanor. (*Phillips, supra,* 41 Cal.3d at p. 71.) Whether the other crimes evidence is significant enough to be given weight in the penalty determination is a question for the jury. (*People v. Smith* (2005) 35 Cal.4th 334, 369.)

"In *Phillips,* we admonished that 'in many cases it may be advisable for the trial court to conduct a preliminary hearing before the penalty phase to determine whether there is substantial evidence to prove each element' of other violent crimes the prosecution intends to introduce in aggravation under section 190.3, factor (b). . . . 'Moreover, a trial court's decision to admit "other crimes" evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient.' [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 225.)

At the *Phillips* hearing in this case, the prosecution called the two correctional officers who witnessed the jailhouse altercations. Deputy Sheriff Robert Pinkerton testified that, while he was supervising dinner at the Santa Rita county jail on January 7, 1988, his attention was drawn to defendant and another inmate, Derek Mendoca. Pinkerton testified the two men were "involved in a fistfight, throwing punches at each other." Pinkerton did not recall if any of the

92

punches landed, nor did he see who started the fight. He immediately separated the two men. Mendoca was uninjured but defendant had a cut lip that required treatment at a hospital.

Deputy Sheriff Michael Perkins testified about the second incident, which occurred on September 26, 1991. About 4:00 p.m., he heard a commotion and saw defendant and Robert McKinney "clutched in a wrestling match." The two men "threw a couple of punches" at each other and again "grasped each other and started wrestling around." Perkins did not see any punches land, nor could he remember who threw the first punch. Defendant was treated for "bruises and bumps" to his face and McKinney was treated for an injured eye.

The trial court denied defendant's motion to exclude evidence of these incidents. The two deputy sheriffs testified for the prosecution at the penalty phase, essentially repeating the testimony they had given at the *Phillips* hearing. Derek Mendoca testified for the defense that he threw the first punch at defendant after defendant wiped mustard or ketchup on Mendoca's shirt. He testified further that he and defendant were friends before and after the fight. On cross-examination, Mendoca testified he had been convicted of kidnapping, robbery and rape.

On the other crimes issue, the jury was instructed that before it could consider the two batteries as an aggravating circumstance, it must find beyond a reasonable doubt that defendant committed them. The jury was also instructed on the presumption of innocence, the burden of proof and the elements of misdemeanor battery. The latter instruction informed the jury that "[t]he use of force and violence is not unlawful when done in lawful self-defense. The burden is on the People to prove that the use of force and violence was not in lawful self-defense. If you have a reasonable doubt that such use was unlawful, you must not consider that evidence for any purpose."

93

The trial court did not abuse its discretion when it admitted the evidence of the jailhouse altercations. The testimony by Deputies Pinkerton and Perkins constituted substantial evidence sufficient to prove misdemeanor battery. Defendant asserts the first incident did not constitute battery because Pinkerton did not see defendant land a blow and without touching there is no battery. However, Pinkerton testified that the "fight had started" before his attention was drawn to it. He saw the men "throwing punches" at each other and, after they were separated, noted that defendant was injured. Pinkerton's testimony established that the men were involved in mutual combat — as opposed to Mendoca unilaterally attacking defendant — and that the fight had already started when Pinkerton's attention was drawn to it and blows had been thrown with sufficient force to injure defendant. It was a reasonable inference from this testimony that defendant had also struck Mendoca. Defendant cites Mendoca's trial testimony that he started the fight and threw the only punch. This testimony, however, was not before the trial court when it ruled on the *Phillips* motion.

As to the second incident, there was obviously touching, given Perkins's testimony that defendant and McKinney were "clutched in a wrestling match." Defendant asserts that this "touching was consensual." This characterization is unsupportable in light of the record as a whole. Perkins testified that the altercation took place at meal time and that the two men separated and threw punches at each other before again grabbing each other. Plainly, this was a fight, not horseplay or sport. Again, the trial court did not abuse its discretion by admitting evidence of this altercation.

Defendant contends that admission of the altercation evidence violated his right to due process under state law because he "was not the aggressor and did not use force or violence." The claim is forfeited because defendant failed to raise it below. It is also without merit. The evidence before the trial court at the *Phillips*

94

hearing indicated that, at minimum, each altercation involved mutual combat rather than a unilateral attack on defendant. The evidence, as we have explained, also constituted sufficient evidence that defendant used force or violence to put the issue before the jury. Therefore, the factual predicate of defendant's claim collapses and it fails on its merits.

Defendant next contends that the other crimes evidence admitted in this case renders section 190.3, factor (b) unconstitutional as applied because (1) it allowed the jury to punish him for acts of violence unrelated to the crimes of which he was convicted; and (2) his conduct was minimal. In a related claim, he contends admission of the other crimes evidence violated the Eighth Amendment's requirement of "heightened reliability" in capital cases.

The purpose of 190.3, factor (b) "is to enable the jury to make an individualized assessment of the character and history of a defendant to determine the nature of the punishment to be imposed." (*People v. Grant* (1988) 45 Cal.3d 829, 851.) We have repeatedly held that the statute does not violate any federal constitutional guarantees. (See, e.g., *People v. Smith, supra,* 35 Cal.4th at p. 368 [admission of adjudicated violent acts does not violate Eighth or Fourteenth Amend.]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1054 [rejecting the defendant's claim that "use of evidence of unadjudicated criminal activity in aggravation pursuant to section 190.3, factor (b), renders his death sentence unreliable and violates the Fifth, Sixth, Eighth and Fourteenth Amendments of the federal Constitution"].) Like his state law claim, defendant's "as applied" federal claim is based entirely on his tendentious view of the jailhouse altercations as "minor" and as to which he was not the aggressor. We have concluded the trial court did not err in submitting the evidence to the jury. Whether defendant's use of force was legally justified and the weight, if any, to be given to these incidents for purposes of the individualized assessment of his character and history were matters for the

95

jury to decide in light of the instructions given to it. We find no violation of defendant's federal constitutional rights under the Eighth or Fourteenth Amendment in either the submission of the evidence to the jury or the jury's consideration of it.

Defendant next argues that the prosecutor committed misconduct during closing argument when, referring to defense witness Mendoca, he said: "How many of you would have guessed [Mendoca] is a rapist? But he is a friend of the defendant's." Defendant failed to object to the remark, and his claim of misconduct is forfeited. In any event, there was no misconduct. The prosecutor's statement was made in the context of questioning Mendoca's credibility because of his convictions for rape and his acknowledged friendship with defendant, both facts that were in evidence.

In summary, we find no error in the admission of the section 190.3, factor (b) evidence in this case.

*L. Trial court's admission of victim impact evidence*

Defendant challenges the trial court's admission of victim impact evidence on both constitutional and evidentiary grounds. His arguments are without merit.

"The introduction of victim impact evidence in capital cases does not violate any rights guaranteed by the United States Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808. In *Payne*, the United States Supreme Court explained that ' "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." ' [Citation.] 'We have followed the high court's lead [citation] and have also found such victim impact evidence admissible as a

96

circumstance of the crime pursuant to section 190.3, factor (a) [citation].'
[Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 211.) " 'Unless it invites a
purely irrational response from the jury, the devastating effect of a capital crime
on loved ones and the community is relevant and admissible as a circumstance of
the crime under section 190.3, factor (a).' [Citation.] 'The federal Constitution
bars victim impact evidence only if it is "so unduly prejudicial" as to render the
trial "fundamentally unfair." ' [Citations.]" (*People v. Bramit* (2009) 46 Cal.4th
1221, 1240 *(Bramit)*; see *People v. Stitely, supra,* 35 Cal.4th at p. 565.)
" '[V]ictim impact testimony is not limited to the victims' relatives or to persons
present during the crime . . . .' [Citation.]" (*Mills, supra,* 48 Cal.4th at p. 213.)
Nor is victim impact evidence "limited to circumstances known or foreseeable to
the defendant at the time of the crime." (*Bramit, supra,* 46 Cal.4th at p. 1240; see
*People v. Pollock* (2004) 32 Cal.4th 1135, 1183 ["We have approved victim
impact testimony from multiple witnesses who were not present at the murder
scene and who described circumstances and victim characteristics unknown to
defendant. [Citation.]")

When defendant murdered Sandy Olsson in 1986, victim impact evidence
was inadmissible in capital cases. But, prior to defendant's 1992 trial, the United
States Supreme Court in *Payne v. Tennessee, supra,* 501 U.S. 808, overruled its
earlier decision in *Booth v. Maryland* (1987) 482 U.S. 496, and held that the
Eighth Amendment "erect[ed] no *per se* bar" to victim impact evidence. (*Payne*,
at p. 827.) Thereafter, in *People v. Edwards* (1991) 54 Cal.3d 787 (*Edwards*), we
revisited the issue of victim impact evidence in light of *Payne* and held, contrary
to our earlier decision in *People v. Gordon* (1990) 50 Cal.3d 1223, that "factor (a)
of section 190.3 allows evidence and argument on the specific harm caused by the
defendant, including the impact on the family of the victim." (*Edwards,* at
p. 835.) "*Payne* and *Edwards* apply even where, as here, the murder occurred

while *Booth*, *supra*, 482 U.S. 496, was in effect.  [Citation.]"  (*People v. Stitely, supra,* 35 Cal.4th at p. 565.)

Defendant urges us to overrule *Edwards, supra,* 54 Cal.3d 787; we decline. Next, defendant contends that admission of victim impact evidence violates the Eighth and Fourteenth Amendments.  Clearly, in light of *Payne* it does not. Defendant's suggestion that *Payne* has been undermined by subsequent decisions of the United States Supreme Court is a claim that should be addressed to that body.  Defendant contends further that admission of victim impact evidence in this case violated ex post facto principles and due process because the crime was committed pre-*Payne*.  Assuming defendant did not forfeit this objection by failing to raise it below, we have previously rejected it and do so again.  (*People v. Roldan*, *supra,* 35 Cal.4th at p. 732 ["applying the rule in *Payne* in a case where the crime preceded that decision does not violate ex post facto principles"].) Defendant also contends that admission of victim impact evidence not limited to facts or circumstances known to the defendant is unconstitutional.  Assuming defendant did not forfeit this claim by failing to raise it below, we have rejected it. (*Bramit, supra,* 46 Cal.4th at p. 1240; *People v. Pollock, supra*, 32 Cal.4th at p. 1183.)  We do so again.

Defendant also argues the victim impact testimony in this case was unduly prejudicial and inflammatory.  Specifically, he complains about testimony from the victim's family that she died before her children could give her grandchildren; that she had been an "anchor" to her son; that, following Olsson's murder, her daughter had become fearful for her personal safety and of emotional intimacy; that her sister had feared news of his daughter's death might have given her father a heart attack; her sister's guilt at not having been with the victim when she died; and her father's belief that Shirley Olsson had been tortured.

98

"This court previously has rejected arguments 'that victim impact evidence must be confined to what is provided by a single witness [citation], that victim impact witnesses must have witnessed the crime [citation], and that such evidence is limited to matters within the defendant's knowledge.' " (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 690.)  Indeed, the "People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death." ' " (*People v. Garcia* (2011) 52 Cal.4th 706, 751.)  The People are also entitled to present the full impact of the victim's death on his or her survivors. (See, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 466-467, 494-495 [victim's father testified he could not stop thinking about what the victim endured before she died; victim's sister, brother and brother-in-law testified to their residual fear following the murder]; *People v. Booker* (2011) 51 Cal.4th 141, 193 [testimony by victim's mother about her suicide attempt and hospitalizations "was relevant victim impact evidence"]; *People v. Cowan* (2010) 50 Cal.4th 401, 485 [testimony by victims' daughter and granddaughter about what they imagined the last moments of victims' life were like "was relevant to the witnesses' own states of mind and the effect that the murders had upon them personally, and therefore was permissible victim impact testimony"; *People v. Ervine* (2009) 47 Cal.4th 745, 793 [victim impact testimony is not limited "to expressions of grief" but "encompasses the spectrum of human responses, including anger and aggressiveness [citation], fear [citation], and an inability to work [citation]"].)  We have carefully reviewed the victim impact evidence in this case.  Far from being unduly inflammatory and prejudicial, "[t]he evidence admitted here was 'typical' of the victim impact evidence 'we routinely have allowed.'  [Citation.]" (*People v. Scott, supra,* 52 Cal.4th at p. 494.)

Finally, defendant contends that the victim impact evidence should have been excluded because of inadequate notice.  "As here relevant, section 190.3

99

provides that in a capital case the prosecution may present evidence in aggravation only if it has given the defendant 'notice of the evidence to be introduced . . . within a reasonable period of time as determined by the court, prior to trial.' [Citation.] To be timely, the notice must be given 'before the cause is called to trial or as soon thereafter as the prosecution learns the evidence exists.' [Citation.] To be sufficient as to content, the notice must afford the defendant ' "a reasonable opportunity to prepare a defense to the allegation[]." ' [Citation.]" (*People v. Mayfield, supra,* 14 Cal.4th at p. 798.)

Here, the prosecution filed its notice of intent to present victim impact testimony before the trial began. The notice listed the names of all the family members — the victim's father, sister, daughter and son — who ultimately testified, as well the names of coworkers who did not. The trial court conducted a pretrial hearing on the admissibility of victim impact in light of the then recent *Payne* and *Edwards* decisions. Later, in denying defendant's motion to exclude the evidence on grounds of inadequate notice below, the trial court ruled: "[T]here is no evidence on the victim impact issue anticipated that was not already adduced at the guilt phase or is not within the range of evidence that is to be reasonably anticipated based on the notice given with respect to the death and loss of the family member . . . ." The court referenced its pretrial ruling, noting: "That matter was discussed at the commencement of the guilt phase of this trial, and the record is clear as to how the court addressed or was prepared to address that issue as the trial progressed."

Defendant nonetheless claims the court erred. He asserts the prosecution's notice was "inadequate because it did not contain any information as to the substance of the proposed victim impact testimony." Not so. Given the prosecutor's notice of intent to call family members, the extensive pretrial discussion about the scope of permissible victim impact evidence, and the actual

100

testimony of two of those witnesses at the guilt phase, defense counsel could not have failed to understand that the prosecutor intended to call the victim's family members to testify to their relationships with her and the effect of her death on them. This was sufficient to afford the defense an opportunity to prepare a defense. No further specification of what the evidence would be was required. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 734.)

*M. Prosecutorial misconduct: victim impact evidence*

**1. Defendant's claims that the prosecutor elicited inadmissible testimony and violated court orders; the court erred by denying defendant's two mistrial motions**

Defendant contends the prosecutor engaged in misconduct during the examination of his victim impact witnesses by eliciting testimony the trial court had specifically ruled inadmissible. He also asserts that the prosecutor violated the trial court's order that the prosecutor ask only leading questions of his victim impact witnesses to avoid having them stray into areas the court had ruled inadmissible. As a result, he contends, he was compelled to repeatedly object to the prosecutor's examination of his witnesses. Finally, he claims the trial court erred when it denied his two motions for mistrial. Defendant's claims are without merit.

As noted, at the time of defendant's 1992 trial, victim impact evidence had only recently become admissible in capital trials as a result of the *Payne* and *Edwards* decisions. (*Payne, supra,* 502 U.S. 808; *Edwards, supra,* 54 Cal.3d 787.) Thus, as the trial court observed, regarding the scope of permissible victim impact evidence there "are very few guidelines in this area," and it "is a very difficult area for everybody." Before the penalty phase began, the prosecutor made a lengthy offer of proof as to every victim impact witness he intended to call. Afterwards, both sides argued their position regarding the proper scope of

101

such evidence.  Defense counsel argued for a narrow interpretation of the case law:  "[I]t's a simple statement of my sister, my daughter, my mother is gone, and I miss her very much . . . .  A quick glimpse into the victim's life, I think that's the key phrase again."

The prosecutor disagreed.  He cited the observation in *Payne* that it was unfair to allow virtually limitless evidence in mitigation but to bar the state from then " 'either offering a glimpse of the life which the defendant chose to extinguish or demonstrating the loss to the victim's family and to society which [has] resulted from the defendant's homicide.' "  The prosecutor continued, "[*Payne*] doesn't limit it to well, I love this person and I miss him, as counsel would have it . . . . [¶]  [T]hat is not what is envisioned by the cases, and that is not the type of thing that would offset the type of mitigating evidence that the defense can get in."

Ultimately, the trial court ruled admissible evidence of the victim's "profession and such details about her job, which have already been received [in the guilt phase] . . . that she was a caring individual which seems to be implicit[] in the information previously admitted, and that she looked forward to retirement; [¶]  Inadmissible victim impact evidence would include . . . evidence as to her military service, leisure time pursuits and financial sacrifices which may have been made toward retirement."

As to the impact of her death on her family, the court ruled admissible "that a family member enjoyed a close relationship with the victim and that she was loved and is missed, that the reality of her death was brought home while packing belongings and making other arrangements, that a son or daughter married and had children after her death, the impact of the loss of a child on a parent as a general matter, and the loss of her companionship during her anticipated retirement, but not the specific plan or details of that travel."  Also ruled admissible was "the

impact [on her survivors] of the nature of her [violent] death here as distinguished from" the impact had she died an "accidental death or [from] natural causes . . . and the impact of having to tell a family member of the victim's death;  [¶] Inadmissible victim impact evidence . . . would include a family member's difficulty with alcohol abuse, fear for personal safety or that of another family member, guilt feelings because of failure to contact the victim . . . on the night of her death, a sense of suspicion as to other people, or testimony about what the victim's thoughts may have been immediately prior to her death."**30**

In view of the possibility a witness might wander into excluded areas, the trial court told the prosecutor, "I would be inclined to allow you some latitude with regard to leading questions in this area subject, of course, to objection." Later, when defense counsel asked the court to instruct the prosecutor to ask leading questions, the court told the prosecutor only "to utilize that form of question *whenever possible*, and be as specific as possible with respect to the questions that are articulated."  The prosecutor pointed out that the problem with asking leading questions "where we get 'yes' and 'no' answers" was that a question's form "has a significant impact on the evidence itself," while "the reason you ask open-ended questions or direct forms of questions is so that the information comes from the witness not from me."  The court responded by again

---

**30**     We have subsequently held admissible certain victim impact evidence that the trial court excluded in this case, including, for example, a survivor's feelings of fear (*People v. Scott, supra,* 52 Cal.4th at p. 494), testimony by survivors about how they imagined the victim's last moments of life (*People v. Cowan, supra,* 50 Cal.4th at p. 485), and testimony about a survivor's substance abuse following the victim's murder (*People v. Panah, supra,* 35 Cal.4th at p. 495).  Of course, we cannot fault the trial court for not anticipating these decisions, but that we have concluded such evidence is admissible must certainly factor into any prejudice analysis.

"requesting that you ask leading questions whenever possible, subject to objection by the other side."

" 'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citation.] Such misconduct is exacerbated if the prosecutor continues to elicit such evidence after defense counsel has objected." (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated. (*People v. Valdez* (2004) 32 Cal.4th 73, 125.)

We turn to the specific instances where defendant claims the prosecutor elicited inadmissible testimony.

### a. Sandra Walters

Defendant contends the prosecutor attempted to elicit inadmissible evidence from the victim's daughter, Sandra Walters, when he asked her, "Tell us about your mother." Defense objected on grounds the question called for a narrative. The court sustained this objection and directed the prosecutor to ask more specific questions. The prosecutor asked a series of questions about Walters's relationship with her mother before the next defense objection, when he asked Walters, "When you say that she made you the person you are today, what did you mean by that?" The objection was again that the question called for a narrative; it was sustained.

The defense next objected when the prosecutor asked about Olsson's "thoughts" regarding the possibility of Walters having children. Walters replied, "I have one guilt, that I never provided my mom with a grandchild, something she always wanted." The defense successfully objected as to form and asked that the answer be stricken. Another objection was sustained when the prosecutor asked

104

Walters whether her mother's death had had any impact on Walters's relationship with other people.  The objection was sustained as to form.  The prosecutor then asked essentially the same question.  After Walters answered that her mother's death had had "a big impact on me being intimate with anybody," the prosecutor asked, "Why is that?"  The defense objected, without stating grounds; the objection was sustained.

The prosecutor asked a series of questions about how Walters learned of her mother's death.  When she answered that she was told by a detective about an "accident" involving her mother, the prosecutor asked, "How did that make you feel?"  The defense objected, stating no grounds; the objection was sustained.  Walters's boyfriend drove her to her mother's house.  When asked whether her boyfriend told her "anything about what happened to your mother," the defense objected on hearsay grounds; the objection was sustained on that ground and also on relevance.  The prosecutor asked whether, on the drive to her mother's house, she received any information about what had happened to her mother.  She replied, "Yes, [my boyfriend] told me he had called and talked to the detective."  The defense objected to the form of the question and on hearsay grounds.  The objection was sustained and the answer stricken.

Following a series of questions about the impact of her mother's death on her, Walters was asked, "What are the hardest times of the year for you?"  The defense objected, without stating grounds; the objection was sustained.  The court next sustained an objection to a question by the prosecutor about how her mother's earlier cancer diagnosis had "[brought] home her mortality to you."

In addition to these questions, defendant contends the prosecutor improperly elicited testimony from Walters about the fear she continued to experience as a result of her mother's death and about her plans to have children.  Defendant failed to object to these questions; his claim of misconduct is forfeited.

(*People v. Valdez, supra,* 32 Cal.4th at p. 122.)[31] Moreover, as noted, we have since held that testimony by a victim impact witness about the fear he or she has continued to experience as a result of the murder is permissible. (*People v. Scott, supra,* 52 Cal.4th at pp. 466-467, 494.) Similarly, Walters's testimony that she did not want to have children because she was afraid they, too, might have to experience the same loss of their mother as she had related to the lasting effects on her of her mother's murder. Thus, the testimony was not impermissible

By our count, five of the defense's objections to Walters's testimony were to the form of the prosecutor's questions because they called for a narrative response. This would be misconduct only if we agreed with defendant that the prosecutor was under orders to ask only leading questions, but he was not. Initially, the court simply told the prosecutor it would allow him some latitude to ask leading questions because such questions are ordinarily not permitted on direct examination. (Evid. Code, § 767, subd. (a)(1); see *People v. Williams* (2008) 43 Cal.4th 584, 631 ["Evidence Code section 767 vests a trial court with broad discretion to decide when to permit the use of leading questions on direct examination"].) Even after the defense complained the prosecutor was not asking leading questions, the court directed him to use leading questions "*whenever possible.*" This left the prosecutor with some discretion as to the form of his questions. Under these circumstances, we decline to find misconduct simply

---

**31** Citing *People v. Hill* (1998) 17 Cal.4th 800, defendant contends that his failure to object to any question he cites as misconduct should be excused. In *Hill,* we concluded that the prosecutor's egregious misconduct, coupled with the trial court's hostility toward defense objections, rendered such further objections futile. "Under these unusual circumstances, we conclude [defense counsel] must be excused from the legal obligation to continually object, state the grounds of his objection, and ask the jury be admonished." (*Id.* at p. 821.) Those "unusual circumstances" are not present in this case where defense repeatedly and successfully objected. Thus, *Hill* does not excuse defendant's failure to object to questions he now contends were misconduct.

because the prosecutor elected to ask direct or open-ended questions. Defendant's remedy in such cases was to object to the form of the question. As we have seen, he did so vigorously and the court sustained his objections.

On four occasions the defense objected without any stating any grounds. Ordinarily, the failure to object specifically on grounds of misconduct and to seek an admonition forfeits the claim unless an admonition would not have cured the harm. (*People v. Valdez, supra,* 32 Cal.4th at p. 125.) In each case, defendant's objection was sustained. Defendant fails to demonstrate that the remedy was inadequate.

Moreover, defendant's remaining objections were also sustained. Again, defendant fails to demonstrate that this remedy was inadequate.

We realize, of course, that defendant's position is that the prosecutor had a pattern of eliciting inadmissible evidence, but no such pattern emerges. In context, the prosecutor was attempting to elicit then novel victim impact evidence consistent with the trial court's guidelines for admissible testimony through a combination of leading and open-ended questions, as he was permitted to do. The defense, which understandably wanted to narrow the amount of victim impact evidence the jury heard, objected to some questions. The trial court appropriately ruled on those objections. There was no prosecutorial misconduct in the prosecutor's examination of the victim's daughter.

### b. Elbert "Tripp" Walters III

Defendant contends the prosecutor elicited inadmissible testimony from the victim's son. The first instance he points to is Tripp Walters's response to a question about going into his mother's house after her death. In passing, he mentioned dolls she had collected when "she was stationed over in Japan and Korea in the service." The trial court specifically excluded testimony regarding

107

the victim's military service, but defendant failed to object on this ground and the claim of misconduct is forfeited. In any event, the prosecutor neither solicited nor could have anticipated the reference to military service, and there was no misconduct. (*People v. Valdez, supra,* 32 Cal.4th at p. 125.)

Defendant objected, on relevance grounds, to two questions about the number of times the witness and his family moved when he was a child. The objections were sustained. While irrelevant, the questions did not broach areas of victim impact evidence ruled inadmissible by the trial court. Thus, even assuming the claim is not forfeited by reason of defendant's failure to object on the grounds he now asserts, there was no misconduct.

Defendant claims the prosecutor asked questions of this witness deemed objectionable by the trial court during Sandra Walters's testimony. Those objections, however, were to the form of the question, not their content. We have rejected defendant's claim the prosecutor committed misconduct by sometimes asking open-ended questions. In any event, to the extent defendant's objections were sustained, he suffered no prejudice.

Finally, defendant cites as misconduct the witness's response to a question regarding his feelings about his mother's murder as opposed to how he would have felt had she died of natural causes. The witness replied, in part, "For her to be murdered, I cannot understand that . . . . [I]t's absolutely asinine." Defendant failed to object, forfeiting the claim. In any event, the testimony was within the guidelines of admissible testimony set forth by the trial court, which included "the impact of the nature of her death here as distinguished from accidental death or natural causes . . . ."

### c. Jan Dietrich

Defendant cites as evidence of prosecutorial conduct the prosecutor's open-ended questions of Jan Dietrich, the victim's sister. Again, we decline to find misconduct based on the form of the prosecutor's questions. Defendant contends further that the prosecutor "made no attempt to control the witness," requiring the defense to object, and that the witness "had to be interrupted numerous times by the defense or the trial court when she gave nonresponsive or narrative answers to questions." A witness's nonresponsive answer cannot be the basis of a claim of prosecutorial misconduct. (*People v. Valdez, supra,* 32 Cal.4th at p. 125.)

Defendant contends that the prosecutor impermissibly questioned Dietrich about her father's reaction to his daughter's death. He claims he "objected to this line of questioning." Not so. He objected to a single question at the end of the prosecutor's examination of the witness on this point and his objection — on relevance grounds — was sustained. His claim of misconduct is, therefore, forfeited and to the extent his one objection was sustained, even before the witness answered, he was not prejudiced. Moreover, we have since held that "[t]here is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members." (*People v. Panah, supra,* 35 Cal.4th at p. 495.) Nor did defendant object to the next question and answer he claims involved misconduct, about the events surrounding the departure of Dietrich and her father from Kansas after she informed him of the victim's death. The claim is therefore forfeited. In any event, the testimony was not impermissible because it dealt with the impact of the victim's death on her sister and father, who found themselves waiting at the airport to fly to California at the same time Sandy Olsson had been expected to arrive in Kansas for a family celebration.

109

Defendant refers us to series of questions the prosecutor asked at the end of his examination of Dietrich involving the impact of her sister's death on her. To one question —"Given the manner in which she died, are there any thoughts that constantly reoccur?" — the witness responded, "The terror." A defense objection was sustained. To a question about how the impact on the witness was different because the victim was murdered rather than dying from cancer or accidentally, Dietrich replied in part, "[B]ut to worry about her last fifteen or twenty minutes, as I do all the time, when I wasn't there to help her." An objection was sustained. A few questions later, the prosecutor asked, "Has the manner of her death impacted you in such a fashion that when you think of your sister, you think of what was happening to her the last fifteen minutes of her life." The witness answered, "Yes. And the guilt that I wasn't there to help her." The defense objected that the question called "for a 'yes' or 'no' answer, and I would ask anything after the 'yes' gets stricken." The court granted the request. When the prosecutor then asked whether the witness thought about what was going through the victim's mind the last fifteen minutes of her life, the defense objected that "this is specifically something the court ruled on." The objection was sustained and the witness's answer — "Yes" — was stricken. The court also sustained and struck the witness's answer "Yes" to the prosecutor's question about whether the witness thought about "at what point [the victim's] spirit actually left her body."

Defendant contends these questions violated the court's specific prohibition against questioning witnesses about the victim's thoughts just before her death. The defense subsequently moved for mistrial. The prosecutor explained that he had not been attempting to elicit from the witness the victim's last thoughts, but whether the witness thought about her sister's last moments. Although defendant derides this explanation, in fact we have subsequently held that testimony by survivors about what they imagined were a victim's last moments of life is

110

"relevant to the witnesses' own states of mind and the effect that the murders had upon them personally, and therefore [is] permissible victim impact testimony." (*People v. Cowan, supra,* 50 Cal.4th at p. 485.) Here, the court concluded that the prosecutor had not deliberately disregarded its order by asking these questions. The court also noted it had sustained the defense's objection, not because the prosecutor had elicited impermissible evidence, but "because of the *possibility* of overlap into areas" that were prohibited. Accordingly, the court found no misconduct in this line of questions. Nor do we. For this reason, we also reject defendant's claim that the trial court abused its discretion when it denied his mistrial motion on this ground. (*People v. Dement* (2011) 53 Cal.4th 1, 39-40 [" '[T]he trial court is vested with considerable discretion in ruling on mistrial motions . . .' "].)

Finally, defendant cites questions as to which objections were sustained on relevancy and hearsay grounds. He fails to demonstrate the remedy was inadequate.

### d.  Clifford Sandberg

Defendant focuses on two questions asked of the victim's father:  when the prosecutor asked about details of travel plans Sandberg had made with his daughter and when he asked, "With regard to losing [Sandy] has her death been different in its effect on you, given how she died[?]"  The court sustained the defense's objection to the first question before Sandberg could respond. To the second question, Sandberg answered, "Yes, sir. Yes, sir, because I know she was tortured to death." The trial court sustained the defense's objection, struck the answer and directed the jury to disregard it. Nonetheless, Sandberg's reference to torture became the basis for the defense's renewed motion for a mistrial. The defense complained that the prosecutor's question had violated the trial court's

111

order on the scope of victim impact evidence. The trial court denied the motion, observing that the question posed to Sandberg was within the court's ruling and "also an area that was taken up with the previous witnesses." Furthermore, the court noted it had immediately sustained the objection, struck the answer and admonished the jury to disregard it.

Since the defense objection to the first question was sustained before Sandberg could answer it, defendant was not prejudiced even if the prosecutor's question strayed into an area prohibited by the court about the "specific plan or details of her travel." The prosecutor's second question involved the difference in impact between a murder and a death by accident or natural causes, which was permissible. He did not solicit, nor could he have anticipated, Sandberg's testimony about torture, and thus committed no misconduct. (*People v. Valdez, supra,* 32 Cal.4th at p. 125.)[32] Moreover, the trial court did not abuse its discretion by denying defendant's motion for mistrial when it found, in effect, that sustaining the objection, striking the testimony and directing the jury to disregard it cured any prejudice. (*People v. Dement, supra,* 53 Cal.4th at pp. 39-40.)

In conclusion, the record does not support defendant's claim that the prosecutor engaged in a pattern of misconduct in his presentation of victim impact evidence. Accordingly, we reject the claim.

**2. Defendant's claim of misconduct in opening statement and closing argument**

Defendant contends that the prosecutor committed pervasive and prejudicial misconduct during his opening statement and closing arguments.

---

[32] In the trial court and on appeal, defendant insinuates that the prosecutor may have been aware Sandberg and his other witnesses would stray into areas the trial court had banned and did nothing to prevent them from doing so. This is mere conjecture unsupported by the record.

### a. Opening statement

" 'The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present. . . .' [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 168.) Defendant contends the prosecutor's opening statement failed to present such an overview of his evidence but, instead, dwelt on guilt phase evidence and instructions the jury might later hear and misled the jury as to its task.

Defendant failed to object to the two statements by the prosecution that he claims misled the jury as to the purpose of the penalty phase — "what brings us here today is for you to decide whether this man should die for what he did to [Sandy] Olsson or spend the rest of his life in prison," and "in this phase you will hear evidence to make that determination as to what the penalty should be: death in the gas chamber or . . . by lethal injection . . . or life without possibility of parole." Therefore, his claim on appeal is forfeited. (*People v. Clark*, *supra*, 52 Cal.4th at p. 960.)

Even were his claim not forfeited we would find no misconduct. We deem these remarks to have been no more than colloquial, shorthand descriptions of the purpose of the penalty phase. (See *People v. Millwee* (1998) 18 Cal.4th 96, 138 [no misconduct by prosecutor who referred to killing as an "execution" because "the challenged term simply served as a shorthand means of describing an intentional and premeditated murder"].) As the prosecutor made clear in his further remarks, the jury's verdict was to be based on its assessment of the evidence in aggravation and mitigation. Thus, contrary to defendant's claim, his first remark did not mislead the jury about its duty to make an individualized assessment of defendant and his second remark did not steer them toward irrelevant considerations of the method of execution.

113

The chief factor in aggravation upon which the prosecution relied at the penalty phase was the circumstances of the crime. (§ 190.3, factor (a).) Such circumstances include guilt phase evidence relevant to "the immediate temporal and spatial circumstances of the crime," as well as such additional evidence, like victim impact evidence, that " 'surrounds materially, morally, or logically' the crime." (*Edwards, supra,* 54 Cal.3d at p. 833.) Thus, it was not misconduct for the prosecutor to have referred to the guilt phase evidence relevant to the circumstances of the crime as well as the victim impact evidence he intended to produce. Similarly, we find no misconduct in the prosecutor's brief reference to the court's prior instruction to the jury about the purpose of the penalty phase or his even briefer reference — cut off by objection — about further instructions the jury could expect.

### b. Closing argument re circumstances of the crime

Defendant claims that the prosecutor's arguments regarding the aggravating factor of the circumstances of the crime was intended to inflame and prejudice the jury because it was based on facts not in evidence. "The prosecutor should not, of course, argue facts not in evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 698.) However, "the prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to decide." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) " 'When [a prosecutorial misconduct] claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by the juror to state or

114

imply nothing harmful, they obviously cannot be deemed objectionable.' [Citation.]" (*People v. Cox* (2003) 30 Cal.4th 916, 960.)

Defendant summarizes his claim of misconduct as follows: "The prosecutor urged the 'enormity' of the crime was aggravated beyond the basic fact of burglary murder and assault with intent to commit rape by arguing over and over that [defendant] forced Ms. Olsson at knifepoint to remove her clothes, that she made an intentional decision not to fight back because she hoped he would only rape her, that he told her he would not hurt her if she complied with his wishes, that she bargained with him to spare her life, that she did not resist or struggle, that he tortured her by playing with the knife on her body, that he 'actually' and brutally raped her, and that she was still alive when he left her bedroom to go through her purse. No evidence was introduced to support any of these assertions."

In order to assess this claim, we briefly review the relevant evidence. The only signs of struggle in Olsson's house were two photographs askew on the wall in the front entryway and a photograph that had fallen to the ground in the master bedroom. There were grapes on the living room floor; the same kind of grapes were later found in the victim's purse. Otherwise, according to Sergeant Robertson, "[n]othing really appeared out of order" in the house. Specifically, apart from the fallen photograph, there was no sign of a struggle in the victim's bedroom. The victim's pajamas were found on the bed beneath her body. While there was no evidence of semen or of forcible sexual intercourse, both the pathologist and the criminalist testified that the absence of such evidence did not mean the victim had not been forced to have sexual intercourse before her death. Defendant admitted to police that he had sexual intercourse with the victim, but said he did not ejaculate, a statement consistent with the criminalist's view that there would be no semen had there been no ejaculation. The pathologist testified

115

that the victim may have survived as long as an hour after she was stabbed and strangled. The victim was attacked with a knife that defendant admitted to police belonged to him. The victim's purse was removed and tossed into a pond in the golf course behind the victim's house. A receipt in the victim's kitchen indicated she had received $3.95 in change from a purchase earlier that evening but no money was found in her purse or in the house.

From our review of the prosecutor's argument regarding the circumstances of the crime evidence, we conclude that the bulk of the complained-of remarks were based on permissible inferences and conclusions he drew from this evidence. Specifically, we conclude the prosecutor did not commit misconduct when he argued, at various points, that the victim submitted to defendant because, by doing so, she may have hoped or believed she would not be killed. This was an arguable inference from the absence of evidence of a struggle in the victim's bedroom, coupled with defendant's admission he had sexual intercourse with the victim and the testimony of the pathologist and criminalist that the absence of semen or traumatic injury did not mean the victim had not been forced to have sexual intercourse before her death. It was a matter for the jury to decide whether the inference was faulty or illogical and, as defendant acknowledges, the court repeatedly reminded the jurors that argument was not evidence. Similarly, we reject defendant's claim that the prosecutor committed misconduct when he argued that, as the victim lay dying, defendant did not assist her but was going through her purse looking for money.[33] This was an arguable inference from the

_____

[33] In connection with this argument, defendant complains of the prosecutor's remark: "Another aggravating factor is his callousness at the scene and his failure to show any remorse at the scene of that crime. Totally callous. [In]different to what she was going through, totally and completely." Defendant failed to object to this remark, thus forfeiting his claim on appeal. In any event, it was a fair comment on the evidence that defendant acted in a callous manner, which was relevant to the circumstances of the crime. We do not believe his brief

116

fact that grapes found on the living room floor were also found in the victim's purse when it was ultimately recovered, defendant's statement that he saw "Doubting Thomas" rummaging through her purse in the living room after she had been stabbed, that the $3.95 in change the victim had received on the evening before she was murdered was not found in her purse or anywhere in her house, and that the victim may have lived as long as an hour after she was attacked. Regarding the victim's state of mind and the hopes she may have entertained for herself and her family, these comments were also drawn from victim impact evidence about her relationships with her children and father and her postretirement plans.

We also reject defendant's claim that it was misconduct for the prosecutor to urge the jury to put itself in the victim's place and to use a chart to illustrate that point. To the extent defendant failed to object to this line of argument, his claim is forfeited. In any event, such argument is not misconduct. "We repeatedly have held that it is proper at the penalty phase for a prosecutor to invite the jurors to put themselves in the place of the victims and imagine their suffering. [Citations.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212.) Nor do we deem it misconduct that the prosecutor argued "maybe [defendant] is an animal." "Argument may include opprobrious epithets warranted by the evidence. [Citation.]" (*People v. Zambrano, supra,* 41 Cal.4th at p. 1172 [prosecutor permissibly characterized the defendant as a " 'dangerous sociopath' " and " 'especially evil' "].) Given the circumstances of the crime, the prosecutor's use of the epithet was "within the range of permissible comment regarding egregious conduct on defendant's part." (*People v. Thomas* (1992) 2 Cal.4th 489, 537

characterization of callousness as an aggravating factor, which he did not repeat, could have in any way misled the jury about the relevant factors it was required to consider.

117

[prosecutor's characterization of defendant as " 'mass murderer rapist,' " " 'perverted murderous cancer' " and " 'walking depraved cancer' " permissible].)

Defendant also complains that the prosecutor committed misconduct when he discussed the characteristics of a knife. "[W]ith a knife you point. You can run it down the side of a face. You can play with buttons with a knife. You can put the knife in places that are terribly intimidating and threatening . . . ." "With a knife you can indicate you can do more than simply kill. You can maim. You can disfigure." Contrary to defendant's claim, the prosecutor did not argue that defendant engaged in these actions with knife before killing the victim — although, as the Attorney General correctly points out, the injuries he ultimately inflicted on her as he stabbed her 23 times could be fairly characterized as mayhem and disfigurement — but made these remarks in the context of his contention that the victim submitted without resistance hoping to survive. In any event, even if these remarks did fall just beyond the pale, they did not constitute the kind of misconduct for which reversal is required under either federal or state standards.

### c. Closing argument re other matters

Defendant perceives misconduct in a number of other remarks made by the prosecutor in his closing and rebuttal arguments.

The prosecutor quoted Roger Tully's testimony, in which he said that defendant's actions were "his responsibility." The prosecutor commented: "It's his responsibility. What is it that was ticking in Roger that he sees in that defendant, that he doesn't say, 'spare my brother.' " Defense counsel objected that the remark "ask[ed] the jury to speculate." The trial court reminded the jury that statements of counsel are not evidence and "you are not to speculate about evidence that was not presented to you." Assuming the prosecutor's comment was

118

objectionable as calling for speculation, defendant's objection was, in effect, sustained and the jury admonished not to speculate. Defendant fails to demonstrate that the trial court's swift action was inadequate.

Next, defendant complains about comments by the prosecutor regarding the prospect of defendant being sentenced to life without possibility of parole. Some of these arguments were directed at future dangerousness. For example, after referring to evidence of defendant's jailhouse altercations, the prosecutor asked, "What does that tell you about this defendant and his future violence or his violence in the future? . . . [W]hat happens when he gets a life sentence." Defense counsel objected. The trial court reminded the jury that statements of counsel were not evidence and that it would instruct the jury on the law after argument. The prosecutor continued in this vein, arguing, "you have to keep [defendant] on death row where he is isolated [from] all the other prisoners, because [if] he gets on the main line with all the other prisoners, with his life sentence, he has an American Express Platinum card to do violence at will. Because what can they do to him? They can't give him another day, he's got life. And some other prisoner, some other guard, some hospital or some jail prison [*sic*] nurse, or social worker does something that he doesn't like, and he acts out violently, hits, maims, hurts, he can do it at will." The defense did not renew its objection.

Assuming the claim is not forfeited by defendant's failure to renew his objection, we find no misconduct. "[W]e have repeatedly declined to find error or misconduct where argument concerning a defendant's future dangerousness in custody is based on evidence of his past violent crimes admitted under one of the specific aggravating categories of section 190.3. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 353.)

Here, the prosecutor's argument was based on evidence of other criminal activity admitted pursuant to section 190.3, factor (b). Defendant maintains that

119

this evidence of his two jailhouse altercations was trivial, but the prosecutor was entitled to advance a different view of the evidence. Nor was the argument misconduct because the prosecutor's reference to "death row" was unsupported by evidence "concerning the level of isolation afforded death row prisoners compared to life prisoners." It is a matter of common knowledge that inmates on death row are separated from the general prison population; indeed, the very term "death row" signifies as much.

Nor was the argument misconduct because the prosecutor gave as examples of people a life prisoner might encounter "a prison nurse, or social worker." In context, the meaning of the argument was simply that, in the general population, a violent inmate might have access to potentially more victims than an inmate on death row. We do not believe the jury would have understood the example to have been a request to the "jury to impose death so that [defendant] would not *again* hurt or maim a prison *nurse* or *social* worker, where there was no evidence he had ever done so before." (See *People v. Cox, supra,* 30 Cal.4th at p. 960 [when the claim of prosecutorial misconduct is based on remarks to the jury " 'a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror.' "].)

Next, defendant argues that the prosecutor's remarks about the kind of existence a life prisoner might experience in prison constituted irrelevant and impermissible comments on the conditions of confinement. We do not understand them as such, nor would have a reasonable juror. The prosecutor's references to resources and amenities to which a life inmate might have access — food, shelter, access to medical care, phone calls, television, radio or stereo, films — was in service of his argument that, in view of the crime, life in prison was "too good for [defendant]." We have held that a prosecutor may "assert that the community, acting on behalf of those injured, has the right to express its values by imposing

the severest punishment for the most aggravated crimes," so long as those comments were "not inflammatory," did not "seek to invoke untethered passions," and did not "form the principal basis of his argument." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1179.) "This case, the prosecutor was at pains to suggest, was one of those that deserved such severe punishment. No misconduct occurred." (*Ibid.*)[34]

Defendant next complains that the prosecutor misstated the law. First, he cites the prosecutor's argument that any sympathy the jurors might harbor had to be directed at defendant rather than his family. The argument was not improper. (*People v. Bennett, supra,* 45 Cal.4th at p. 601 ["The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation"]; *People v. Smithey, supra,* 20 Cal.4th at p. 1000 [" 'sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation . . . .' "].)

Defendant contends the prosecutor improperly urged the jury to disregard evidence in mitigation in the course of his argument that the circumstances of the crime alone were sufficient to warrant the death penalty. We have carefully

---

[34]    Defendant complains that the prosecutor's passing reference to the availability of conjugal visits for life inmates was improper because, at the time of his trial, the availability of such visits for life prisoners was a privilege, not a right, and it has since been rescinded. If, at the time of trial, a life prisoner might be granted the privilege, the reference was not improper, nor does a *later* revocation of the privilege render it so. Similarly, the prosecutor's comparison between defendant's life in prison and the predicament of the homeless and the unemployed does not render his argument misconduct; it simply reinforced his point that, in light of the factors in aggravation, defendant did not "deserve hope . . . [or] the simple pleasures of life. The only thing he deserves is your verdict of death and that's what justice demands." Finally, to the extent that the prosecutor's brief speculation that a life prisoner could entertain the hope of a cataclysmic event that might free him — "an earthquake and the jail falls apart" — the trial court sustained defendant's objection and instructed the jury to disregard it. We presume the jury followed the trial court's instruction. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.)

reviewed the complained-of remarks and, while they are no model of clarity, we fail to see how a reasonable juror could possibly have understood the prosecutor to be urging him or her to disregard the evidence in mitigation. (See *Donnelly v. DeChristoforo* (1973) 416 U.S. 637, 647 ["[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations"]; see *People v. Cox, supra,* 30 Cal.4th at p. 960.) For the same reason we reject defendant's claim that the prosecutor's remarks about the absence of postcrime remorse "was a backhanded and highly effective means of misleading the jury into thinking the absence of remorse was an aggravating factor . . . ." The point of the prosecutor's argument was that there was no evidence of remorse for purposes of mitigation. Indeed, he said just that: "You haven't heard any evidence that this defendant has demonstrated any remorse, so it's not present as a mitigating factor." There was no misconduct. (*People v. Ochoa* (2001) 26 Cal.4th 398, 449 ["The prosecutor properly argued defendant's lack of remorse showed the potential mitigating factor was inapplicable"].) We also reject defendant's claim that the prosecutor misled the jury, and thus lowered the prosecution's burden of proof, by suggesting that defendant's uncharged rape of the victim was a section 190.3, factor (b) consideration rather than a factor (a) consideration. Indeed, the prosecutor explained to the jury that the rape was to be considered a circumstance of the crime and not uncharged criminal activity: "We don't double dip. We're talking about something else, other acts beyond . . . what he did to Sandy Olsson, other acts of violence, and then whether or not he had any felony convictions."

Finally, defendant contends the cumulative effect of prosecutorial misconduct requires reversal. We have found either no impropriety by the

122

prosecutor or minor impropriety from which defendant could not have sustained any prejudice.  Accordingly, we reject his assertion of cumulative prejudice.

*N.  Biblical and religious references in closing arguments*

Defendant contends that the prosecutor impermissibly "relied on the Bible, religious law and biblical authority to convince the jurors to return a death verdict."  Defendant devotes considerable ink to what were relatively brief and minor digressions in the prosecutor's lengthy argument.  These remarks occupy perhaps three pages in two arguments that exceed 120 pages in the reporter's transcript.  Some were in rebuttal to religiously themed arguments by the defense.  As we explain, defendant's claims are forfeited, but even if they were not, he fails to demonstrate that any arguable impropriety was prejudicial.

Defendant failed to object to the prosecutor's references to the Bible or to his use of a chart quoting biblical passages in support of the death penalty. [35] "Because we cannot assume that an objection and admonition would have been futile or ineffective, [he has] forfeited [his] appellate claim[s] of misconduct." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 201 (*Letner and Tobin*).)  In any event, we conclude that certain of the remarks defendant now finds objectionable were not misconduct.  In the other instances, even assuming, for the sake of argument, that the prosecutor overstepped proper bounds, we find that

---

[35]     The chart, captioned "The Bible Sanctions Capital Punishment," contained four quotations:  "Who shed the blood of man by man shall his blood shed, for in his image did God make man," attributed to Genesis, chapter 9, verse 6; "He that smiteth a man so that he die, shall be surely put to death," attributed to Exodus, chapter 21, verse 12; "And if he strike him w[ith] an instrument of iron so that he die, he is a murderer: the murderer shall surely be put to death," attributed to Numbers, chapter 35, verse 16; and "And you shall not take reparations for the soul of a murderer who deserves to die but he shall be put to death," attributed to Numbers, chapter 35, verse 31.

123

defendant suffered no prejudice warranting reversal. (*Ibid.*; *People v. Zambrano*, *supra*, 41 Cal.4th at p. 1170 (*Zambrano*).)

In his opening argument, while apparently displaying the chart, the prosecutor argued that defendant had done nothing "decent" in his life to merit compassion. By contrast, he pointed to Roger Tully's religious conversion: "You've heard Roger tell us about what a difference in his life his religious conversion had. Have you heard anything like that about the defendant? Roger said he's different now, there's been this intervention. You know Roger puts it in the terms of, but for this woman, I wouldn't have been converted to God, but the reality is it takes two to tango. [¶] Now, you can hit somebody over the head all day long, but if they're not willing, if they're not receptive, it's not going to [] happen."

The prosecutor then briefly turned to the issue of religion and what role, if any, it should play in the jury's determination of defendant's sentence. He reminded the jury that religious belief "is not something that is to be used in aggravation at all, what the Bible or the Koran or anything has to say." Nonetheless, he argued, "one thing that is universal throughout all religions is this idea that murderers are to be punished, and that the death penalty is sanctioned and that it is appropriate." Addressing any juror who might have last minute religious scruples about imposing the death penalty, the prosecutor argued that "the Bible does, in fact, sanction capital punishment." To illustrate his point, he quoted the scriptural passages on his chart: " There is one that is just so right on point: [¶] 'He who strikes him with an instrument of iron so that he die, he is a murderer, and the murderer will surely be put to death. And you shall take no reparations for the soul of a murderer who deserves to die, but he shall be put to death. [¶] He who sheds the blood of man by man, shall his blood be shed. For in his image did God make man. His blood or his life will be shed by man.'" He concluded, "I just

want to clear the air there that religion does not stand in the way, and that's not supposed to enter into your evaluation." The prosecutor devoted the rest of his lengthy argument to demonstrating why in this case the factors in aggravation outweighed any factors in mitigation and justified imposition of the death penalty.

Following the prosecutor's opening argument, defendant's counsel, Mr. Strellis, gave his closing argument. As part of his argument, Strellis putatively quoted the New Testament: "Jesus at one point in time said, 'Hate the sin, but love the sinner.' " He also argued that, contrary to the prosecutor's assertion that all religious traditions condone the death penalty, "I don't think Buddhism does." In an effort to counter the prosecutor's use of quotations from the Old Testament, he cited the Talmud on capital punishment, arguing that it was an infrequently used punishment under Jewish law.

The prosecutor then gave a rebuttal argument, followed by Defense Cocounsel Wagner's closing argument. Wagner also elected to briefly address the prosecutor's reference to religious themes and imagery. He noted that in the Old Testament, God did not execute Cain for taking the life of his brother, Abel, but "banished him." He pointed out that major religious dominations "have taken rigorous stands against the death penalty."

The prosecutor began his rebuttal argument by briefly responding to Strellis's remarks questioning religious support for the death penalty.[36] In the course of those comments, he distinguished between biblical law and the secular law the jurors were required to apply. "The Old Testament, when God spoke, he made it very clear. Very clear. Murderers shall die," but "when man gets into the act he starts softening up the rules a little bit and that's okay." The prosecutor

---

[36] It is not clear from the record or the briefing whether the biblical quotation chart was still on exhibit or at what point it may have been taken down. The prosecutor did not refer to it during his rebuttal argument.

pointed out that secular law provided defendant with various due process protections including counsel and the two-tiered trial procedure and that, in the penalty phase, the law required the jurors to weigh the factors in aggravation against those in mitigation. He explained: "And then we get to this [penalty] phase where we start talking about aggravating and mitigating and he gets to bring in anything that could cause you to have some sympathy that shows something about his character. His record that causes you to say that the aggravating circumstances don't substantially outweigh the mitigating and that the proper penalty is not death. You have to do all that."

Somewhat later in his rebuttal argument, the prosecutor alluded briefly to the crucifixion of Jesus and the two thieves who were crucified on either side of him. He said: "And we've labeled them the good thief and the bad thief. Why? They're both thieves. But what makes the difference is one of them repented, one of them said, 'Forgive me Lord, I believe in you.' The other one just, you know, cussed at Christ, turned his nose, whatever. Christ said to the good thief, you know, you'll be with me in heaven. He was saved. The good thief was saved. The bad thief wasn't. [¶] Well, the moral of that story was that the good thief was not cut down off that cross until he was dead and his soul was saved in heaven. But Caesar law [*sic*] was completed. And the good thief died along with the bad thief."

We have held "[i]t is misconduct for a prosecutor to argue that biblical authority supports imposing the death penalty, because it suggests to the jurors that they may follow an authority other than the legal instructions given by the court. [Citation.]" (*People v. Cook (2006)* 39 Cal.4th 566, 614.) "On the other hand, we have suggested it is not impermissible to argue, for the benefit of religious jurors who might fear otherwise, that application of the death penalty according to secular law does not *contravene* biblical doctrine [citations], or that

126

the Bible shows society's historical acceptance of capital punishment."
(*Zambrano, supra*, 41 Cal.4th at p. 1169; original italics.)  Because the line
between permissible argument and misconduct in this area is difficult to draw, we
have often focused on whether, assuming misconduct for purposes of argument
only, the defendant was prejudiced.  (See, e.g. *Letner and Tobin, supra,* 50 Cal.4th
at p. 202 [Even if the prosecutor's argument overstepped proper bounds reversal is
not required where his comments " ' "were part of a longer argument that properly
focused upon the factors in aggravation and mitigation" ' "]; *Zambrano, supra*, 41
Cal.4th at p. 1170 [same]; *People v. Viera* (2005) 35 Cal.4th 264, 298 [same].)

     With this background in mind, we turn to defendant's specific claims.  He
asserts that the prosecutor's comparison of defendant with his brother, who
underwent a religious conversion, suggested to the jury that defendant was
"unworthy of mercy because he had neither repented nor converted."  We
disagree.  The prosecutor's point was that defendant, unlike his brother, had not
availed himself of any opportunity to change his life.  A rational jury could not
have understood otherwise.  Accordingly, we find no misconduct.

     Next, defendant maintains that the prosecutor's use of biblical authority,
buttressed by his chart, in his opening argument was intended to "give the jurors
the strength to impose the death penalty."  Initially, however, the prosecutor
explicitly directed his comments to the juror who might be troubled by religious
scruples that would prevent the juror from imposing the death penalty.  To the
extent the prosecutor's argument merely admonished that a juror's religious
beliefs need not stand in the way of imposing death, the argument was
permissible. *(People v. Letner and Tobin, supra,* 50 Cal.4th at p. 201.)

     Defendant contends, however, that by using a chart containing biblical
quotations supporting the death penalty, which he then orally repeated, the
prosecutor went beyond arguing that the Bible permits the death penalty by

suggesting that in this particular case the Bible mandated it.  However, even if we assume there was misconduct, defendant was not prejudiced.

These remarks occupy fewer than two pages in an argument that spans over a hundred pages of reporter's transcript and went on for a day and half.  Thus, they were a minor point in an extensive argument devoted primarily to a discussion of why the aggravating factors outweighed any in mitigation, circumstances which we have found to render any improper religious argument nonprejudicial.  (*People v. Viera*, *supra*, 35 Cal.4th at p. 298.)  The remarks also came at the beginning of the argument which would have further diminished their impact.  (Cf. *People v. Letner and Tobin*, *supra*, 50 Cal.4th at pp. 202-203 ["the biblical reference in the present case came at the end of the prosecutor's argument and therefore might have been somewhat more prominent in the minds of the jurors than if it had fallen somewhere in the middle of the argument"].)  Thus, regardless of any impropriety we find no basis for reversal.

The prosecutor briefly returned to the issue of religious support for the death penalty in his rebuttal argument, in response to claims made by defendant's counsel, Strellis, that called into doubt biblical support of the death penalty. Defendant finds impropriety in these remarks as well, particularly in the prosecutor's statement that in the Old Testament, "when God spoke, he made it very clear.  Very clear.  Murderers shall die."  But, having made that statement, the prosecutor immediately contrasted the law of the Old Testament with the secular law.  This law, he made clear, required the jurors to first determine the defendant's guilt, then reach a penalty determination only after listening to and balancing the evidence in aggravation and mitigation.

Even if the prosecutor overstepped by referring to the "very clear" Old Testament rule, we are satisfied that reversal is not required.  These remarks occupy a half a page in a 20-page argument.  Additionally, by immediately

128

explaining that secular death penalty law was different and must prevail, the prosecutor negated any prejudicial effect his initial comments might have had. Moreover, the prosecutor did not have the last word. That went to Cocounsel Wagner, whose plea for defendant's life was the last thing the jury heard before it was instructed. For these reasons, we conclude that, even assuming the prosecutor's Old Testament remarks crossed the line, defendant suffered no reversible harm.

We reach the same conclusion with respect to the prosecutor's reference to the crucifixion scene later in his rebuttal argument. The remarks came at the beginning of the argument and consist of two paragraphs of transcript. They were therefore not the main focus of the prosecutor's argument, nor did he return to this imagery or make any further allusions to biblical or religious support for the death penalty as an appropriate punishment for murder. Moreover, in an analogous circumstance, we found no misconduct and no prejudice. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1128-1130 (*Lenart*).)

In *Lenart*, a penalty phase defense witness apparently involved in a prison ministry repeatedly referred to the Bible and God during direct examination. On cross-examination, the prosecutor, after eliciting from the witness that God forgave one of the thieves crucified along with Jesus, asked, without objection: " 'Didn't stop the punishment, did he? . . . [T]he crucifixion?' " The witness answered, " 'No.' " On rebuttal, defense counsel questioned the witness about Cain's punishment for the murder of Abel, to which the witnessed replied: " 'It was life.' " (*Lenart, supra*, 32 Cal.4th at p. 1128.) Regarding these exchanges, we observed: "Here, both sides asked questions of Stewart, a witness who described his job as teaching men about Jesus. That questioning highlighted biblical passages in which one wrongdoer was punished for life and one was punished by death. [¶] We emphasize that this is not a case of improper prosecutorial

129

argument. Even in such a case, we have considered whether the defense itself relied on biblical text in assessing prejudice. [Citation.]" (*Id.* at p. 1130.)

Here, as in *Lenart*, the prosecutor adverted to the "good thief" story in rebuttal to defense arguments that attempted to undercut biblical support for the death penalty. Thus, *Lenart* lends support to our conclusion that the prosecutor's brief allusion to the crucifixion, even assuming misconduct, was not prejudicial.

Accordingly, we find no basis for reversal in the prosecutor's references to biblical and religious authority.[37]

*O. Future dangerousness*

Defendant contends that the trial court erred by permitting the prosecutor to argue that defendant posed a threat of future danger. "[T]he prosecutor may not present expert evidence of future dangerousness as an aggravating factor, but he may argue from the defendant's past conduct, as indicated in the record, that the defendant will be a danger in prison. [Citations.]" (*People v. Zambrano, supra,* 41 Cal.4th at p. 1179.) In this case, the prosecutor's argument was grounded in evidence of defendant's jailhouse altercations. As such, it was permissible and the trial court did not err in overruling defendant's objection to it. Defendant's argument on appeal merely rehashes his assertion that the trial court erred in permitting the prosecutor to present the evidence of the jailhouse altercations and that the prosecutor's argument was inflammatory. We have rejected both claims.

---

[37] We also reject defendant's claim that the prosecutor invoked the principle of "an eye for an eye" as a justification for imposing the death penalty in this case. The prosecutor told the jury that our system had "evolved beyond the rule of [Hammurabi] talking about an eye for an eye," and went on to discuss notions of proportionality in crime and punishment. Nowhere in this brief discussion do we perceive an invocation of scriptural authority as a basis for the death penalty.

130

*P. Prosecutor's use of charts*

Defendant contends that the trial court erroneously permitted the prosecutor to use six charts during his closing argument that defendant characterizes as "inflammatory." "The six charts were: Chart 1. 'Factors for Consideration'; Chart 2. 'Battery'; Chart 3. 'Aggravating Factor, Increases Guilt/Enormity/Injurious Consequences'; Chart 4. 'What Didn't You Hear About Richard Christopher Tully'; Chart 5. 'What Have You Heard about Richard Christopher Tully'; and Chart 6. 'The Bible Sanctions Capital Punishment.' "

The Attorney General contends that defendant has forfeited his claim as to any chart other than charts No. 3 and No. 4 because those were the only charts as to which defendant lodged specific objections. We agree.

The prosecutor displayed the charts at the beginning of his closing argument without having shown them to the court or defense counsel. Defense counsel objected: "The [prosecutor] is using charts and presenting them to the jury without showing them to us first." Following the noon break, the court and counsel met outside the presence of the jury to discuss the issue. Defense counsel lodged his "objection to some of the entries" on the charts, but the only specific objections he made were to entries on chart No. 4, captioned, "What Didn't You Hear About Richard Christopher Tully." The defense objected to various statements on that chart, including: "That this violence is out of character for him"; "He's remorseful, sorry for what he did"; "That he is not violent in a prison setting"; "That he has done one decent thing in his life, that he found God and repented." Counsel argued, "[T]hese are all items that would be appropriate as items in mitigation, and the inference is that the absence of these items are [*sic*], therefore, aggravation" and also potentially constituted *Griffin* error.

The trial court ordered the prosecutor to strike the four statements set forth above. It otherwise overruled the defense objections without prejudice.

131

Defense counsel later also objected to an entry on chart No. 3 (". . . Increases Guilt/Enormity/Injurious Consequences") about whether the victim attempted to bargain with defendant. The trial court sustained the objection and admonished the jury that argument of counsel was not evidence.

We agree that defendant has forfeited any claim other than the specific objections he made to charts No. 3 and No. 4.[38] (*People v. Riggs* (2008) 44 Cal.4th 248, 324 [failure to object to chart used at trial on specific ground advanced on appeal forfeits the claim].) Moreover, defendant fails to show with any specificity how the prosecutor's use of the other charts was improper and thus, even if his claim was not forfeited, he demonstrates neither error nor prejudice.

As to chart No. 3, defendant's objection was sustained and his requested admonition was given to the jury. We presume the jury understood and followed the court's admonition. (*People v. Riggs, supra,* 44 Cal.4th at p. 299.)

As to chart No. 4 defendant repeats the claim that listing items the jury did not hear about defendant in mitigation amounted to an argument that they constituted factors in aggravation. The prosecutor made no such argument to the jury. Indeed, in that part of the argument illustrated by the chart, he stated that the absence of a mitigating factor "doesn't become an aggravating factor, it's not something that aggravates it." Moreover, the trial court specifically instructed the jury, "The absence of a statutory mitigating factor does not constitute an aggravating factor." We presume the jury understood and followed that instruction. (*People v. Jones* (1997) 15 Cal.4th 119, 168.)

---

[38] Defendant suggests that his counsel may have lodged additional objections during the unreported bench conference involving his objection to the entry on chart No. 3. But neither of his attorneys corrected the court when, in memorializing that conference, it referred to a single objection. We presume, therefore, that the court's recollection was accurate.

*Q. Jury query re life without possibility of parole*

After it began deliberations, the jury sent a note to the court that asked for the "legal definition of life in prison without possibility of parole." The day after the request was received, the trial court memorialized the discussion it had had with counsel about the query. "The court and counsel have conferred with regard to the issue of a response to this matter, and it has been agreed the court will respond to this inquiry as follows: For the purpose of determining the appropriate sentence for this defendant, you should assume that either the death penalty or confinement in state prison for life without the possibility of parole would be carried out. You are not to consider or speculate as to any other possibility or any circumstance that might preclude either of the two penalties from being carried out." The jury was summoned and this response was read to it twice.

Citing *Simmons v. South Carolina* (1994) 512 U.S. 154, defendant contends that the trial court's response was inadequate because it did not inform the jury that life without possibility of parole "meant that [defendant] would not be eligible for parole if so sentenced."

Defense counsel agreed to the trial court's response to the jury's request. Accordingly, defendant may not now complain that the response was inadequate. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given, the claim of error has been waived"].) Here as elsewhere defendant attempts to avoid forfeiture by asserting the record is incomplete because the bench conference at which the response was agreed upon was unreported and only memorialized the following day. But defense counsel did not object when the court stated that "it has been agreed" the court would respond as it did. On this record, defendant's assertion that there may have been an unreported objection fails.

133

The claim is also meritless.  In *Simmons*, where the South Carolina jury was told simply that its choice was between a death sentence and life imprisonment, the high court held that "prohibiting the defendant from informing the jury that 'life imprisonment' meant life in prison without the possibility of parole resulted in a violation of his right to due process of law." (*People v. Smithey, supra,* 20 Cal.4th at p. 1008 (*Smithey*).)  "[W]e have distinguished *Simmons* on the ground that under California's statutory scheme, the jury expressly is informed of the defendant's ineligibility for parole by the instruction that it must choose between death or 'confinement in the state prison for life without the possibility of parole'; an instruction that such a sentence 'will inexorably be carried out' would be incorrect." (*Id.* at p. 1009.)   Such an instruction is incorrect because it ignores both the superior court's power to "reduce a sentence of death on review under section 190.4, subdivision (e) . . . [and] the Governor's power of commutation." (*People v. Thompson* (1988) 45 Cal.3d 86, 130.)

If the court would have erred by initially instructing the jury that the sentence would inexorably be carried out, it would likewise have erred by doing so in response to the jury's query.  Thus, we find no error.

Defendant argues that, unlike in *Smithey*, the jury in this case was not expressing concern about the appellate process.  (*Smithey, supra,* 20 Cal.4th at 1007 [jury asked trial court, " 'If the death penalty is overthrown — would [defendant] get life or life without parole' "].)  Implicit in the jury's request for a "legal definition" of life without possibility of parole was a question about whether some future eventuality might result in defendant's earlier release.  The trial court's response, directing the jury to desist from any such speculation, was correct.  (*Id.* at p. 1009 ["[T]he court properly may address such confusion by

134

instructing the jury to *assume* that whatever penalty it selects will be carried out"],original italics.)

*R.  Allocution*

Defendant contends that the trial court denied his various federal constitutional rights and violated section 1200 when it rejected his request for allocution.  Under that section, the trial court must ask a defendant, before imposing sentence, whether there is "any legal cause to show why judgment should not be pronounced against him."  (§ 1200.)**39**  "[W]e have repeatedly rejected similar arguments.  [Citations.]  [¶]  We have generally held that capital and noncapital sentences are not similarly situated for purposes of equal protection.  [Citation.]  With regard to allocution specifically, we have explained that noncapital sentencees have no other right to express themselves about the appropriate sentence, while capital defendants may take the stand and testify on that issue."  (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1182-1183.)

Moreover, in *People v. Evans, supra,* 44 Cal.4th 590, we held that noncapital defendants do *not* have a right to allocute under section 1200.  Any statement they wish to make in mitigation "must be made under oath and be subject to cross-examination."  (*Evans,* at p. 598.)  Thus, in addition to the noncomparability of the two classes of defendants, the basic premise of defendant's equal protection claim — noncapital defendants have a right denied to capital defendants — is no longer valid.  In *Evans*, we also observed, with respect to the defendant's due process claim, that permitting a noncapital defendant to

---

**39**     "In legal parlance, the term 'allocution' has traditionally meant the trial court's inquiry of a defendant as to whether there is any reason why judgment should not be pronounced.  [Citations.]  In recent years, however, the word 'allocution' has often been used for a mitigating statement made by a defendant in response to the court's inquiry."  (*People v. Evans* (2008) 44 Cal.4th 590, 592, fn. 2, italics omitted.)

make a sworn statement subject to cross-examination "affords the defendant a meaningful opportunity to be heard and thus does not violate any of the defendant's rights under the federal Constitution." (*Id.* at p. 600.) This is also true of capital defendants who, in the penalty phase, "[are] allowed to present evidence as well as take the stand and address the sentencer." (*People v. Robbins* (1988) 45 Cal.3d 867, 889.)

We decline defendant's invitation to revisit our settled authority on this point and we are not persuaded by his remaining arguments.

*S. Absence of remorse*

Defendant contends that the trial court erred when it allowed the prosecutor to argue that defendant had not demonstrated remorse. Though cast as a claim of trial court error, the argument also includes a criticism of our decisions allowing the prosecutor to argue lack of remorse as a circumstance of the crime for purposes of section 190.3, factor (a). Defendant argues that the prosecutor's argument impermissibly converted lack of remorse into a distinct factor in aggravation. Finally, he asserts the trial court failed to give the jury proper instruction regarding the absence of remorse. His claims are without merit.

By way of background, the prosecutor's argument regarding remorse was double pronged. First, he argued that defendant had failed to produce evidence of remorse and thus the jury could not consider it as a mitigating factor. Second, he argued that defendant's failure to show remorse at the scene of the crime could be considered in connection with the aggravating factor of the circumstances of the crime under section 190.3, factor (a). Both arguments were permissible.

"The presence of remorse is mitigating under the 1978 death penalty law. [Citation.] Its absence, however, is generally not aggravating." (*People v. Ashmus* (1991) 54 Cal.3d 932, 992.) Nonetheless, "[c]onduct or statements at the

136

scene of the crime demonstrating lack of remorse may be consider[ed] in aggravation as a circumstance of the capital crime under section 190.3, factor (a). [Citation.]" (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1184.) "Overt remorselessness *is* a *statutory* sentencing factor . . . because factor (a) of section 190.3 allows the sentencer to evaluate *all aggravating and mitigating aspects* of the *capital crime itself*. Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232, original italics.)

Defendant criticizes our decisions permitting consideration of absence of remorse as within the purview of section 190.3, factor (a) because it is not a separate statutory factor in aggravation under the 1978 death penalty law. He also asserts that permitting the prosecutor to argue the absence of remorse interferes with the jury's duty to weigh relevant factors to determine the appropriate penalty and renders the death penalty law unconstitutional. We are not persuaded by defendant's arguments and adhere to the reasoning of our decisions cited above. Defendant argues that, because our decisions have failed to provide a definition of "remorselessness" or "absence of remorse," "the defense is provided no notice of what facts may draw an argument that defendant lacked remorse." Neither phrase has a specialized or technical meaning so as to warrant a particular definition. Moreover, the facts that might show either remorse or absence of remorse will necessarily vary from case to case and any attempt at a global definition would be inadequate.

We reject defendant's related claim that a special instruction is required directing the jury how to assess and consider the absence of remorse. Because the phrase has no technical or specialized meaning, an instruction as to its meaning

137

and what weight it should or should not be given is unnecessary. In this case, there was no danger the jury would consider the absence of remorse to be a factor in aggravation in and of itself because it was specifically instructed that the absence of a statutory mitigating factor did not constitute an aggravating factor. The prosecutor made the same point when he told the jury the absence of remorse could be considered only in the context of factor (a), the circumstances of the crime. We are not persuaded that the instructions as given, in light of the prosecutor's argument, were insufficient to direct the jury's consideration of evidence of absence of remorse as an element of section 190.3, factor (a).

Defendant asserts that the prosecutor impermissibly argued that remorse was a "condition precedent" that must be fulfilled before the jury could "grant sympathy or mercy to [defendant]." We have examined the passage about which defendant complains.[40] In context, the prosecutor simply and correctly stated that no evidence of remorse had been shown and, therefore, it was not a mitigating factor. After the defense objected to these remarks, the prosecutor added: "The absence of remorse, after the commission of a crime, after the crime has been completed, cannot be used as an aggravating factor." He reiterated that "you haven't heard any evidence that this defendant has demonstrated any remorse, so it's not present here." Viewing the argument as a whole, we do not believe a reasonable juror would have subscribed to the meaning that defendant seeks to impose upon it. (*People v. Cox, supra,* 30 Cal.4th at p. 960.)

---

[40] "You know, what is in the law, we call it a condition precedent, something that has to happen before another thing follows, a prerequisite, something that you would expect to see in existence before you give sympathy, before you grant mercy, remorse, the presence of remorse, the fact that you're sorry for what you have done can be a mitigating factor, but it's not present here. It is not present in this case."

138

Defendant asserts further that the argument constituted an improper comment on defendant's failure to testify, in violation of *Griffin v. California, supra,* 380 U.S. 609. The prosecutor, however, did not refer to defendant's failure to testify. (*People v. Keenan* (1988) 46 Cal.3d 479, 509 [rejecting claim of *Griffin* error where prosecutor did not refer to defendant's failure to testify].) A reasonable juror would have understood his reference to the absence of evidence of remorse to be directed at the evidence the defense did present, not to testimony it did not. (*People v. Cox, supra,* 30 Cal.4th at p. 960.)

Defendant contends the prosecutor "created" a factor in aggravation "based on speculation as to [his] alleged lack of remorse at the time of the crime." First, defendant cites the prosecutor's statement: "Another aggravating factor is his callousness at the scene and the failure to show any remorse at the scene of the crime. Totally callous. [In]different to what she was going through, totally and completely." As we have already noted, the prosecutor's argument — overt lack of remorse at the scene of the crime can be considered under section 190.3, factor (a) — was proper. We have also concluded that the prosecutor's passing reference to callousness as an aggravating factor could not have misled the jury about the factors it was to consider. (See p. 116, fn. 33, *ante*.) Defendant also asserts the prosecutor's argument that as the victim lay dying, defendant did not assist her but was going through her purse looking for money was not supported by the evidence. We have already rejected this claim and do so again. (See pp. 116-117, *ante*.) In short, the prosecutor did not exceed the permissible bounds of argument by asserting that defendant's conduct at the scene of the crime showed a lack of remorse.

Second, defendant argues that consideration of lack of remorse by the jury was impermissible because he sought permission to allocute and express remorse. He cites *Johnson v. Mississippi* (1988) 486 U.S. 578. In *Johnson*, the high court

139

reversed the defendant's death sentence because one of the three aggravating circumstances on which the jury had relied, a New York conviction for assault with intent to commit rape, was reversed by the New York courts after the Mississippi Supreme Court had affirmed the death sentence. That court subsequently denied the defendant postconviction relief. At the high court, Mississippi contended that the defendant's sentence should be affirmed "because when [the Mississippi Supreme Court] conducted its proportionality review of the death sentence on petitioner's initial appeal, it did not mention petitioner's prior conviction in upholding the sentence." (*Id.* at p. 589.) The high court responded: "[T]he error here extended beyond mere invalidation of an aggravating circumstance supported by evidence that was otherwise admissible. Here the jury was allowed to consider evidence that has been revealed to be materially inaccurate." (*Id.* at p. 590, fn. omitted.)

*Johnson* is inapposite. This is not a case where evidence before the jury in its penalty determination was subsequently revealed to have been materially inaccurate. There was no evidence of remorse because defendant elected not to present any such evidence after his request to allocute was properly denied. The prosecutor was entitled to comment on the record as it existed and the jury to rely on that record.

Finally, defendant contends that the cumulative effect of the "absence of remorse" errors requires reversal. As we have rejected all of defendant's claims of error, there is no cumulative effect requiring reversal.

*T. Cumulative error*

Defendant contends the cumulative effect of error during the penalty phase trial requires reversal. We have found that many of defendant's claims of errors are forfeited because he failed to lodge a timely and specific objection below. To

140

the extent his claims were either not forfeited or we have discussed their merits notwithstanding forfeiture, we have found either no error or no prejudice. Accordingly, we reject his claim of cumulative error.

*U. Automatic motion to modify death verdict*

Defendant contends the trial court's ruling on his automatic motion for modification of the death verdict suffered from multiple defects. His claim is without merit.

"In ruling on defendant's application for modification of the verdict" under section 190.4, subdivision (e), "the trial court must reweigh the evidence; consider the aggravating and mitigating circumstances; and determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict." (*People v. Brady* (2010) 50 Cal.4th 547, 588.) " 'That is to say, [the judge] must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported.' " (*People v. Ashmus, supra*, 54 Cal.3d at p. 1006.) The trial court's role is not to make an independent and de novo penalty determination. (*People v. Weaver* (2001) 26 Cal.4th 876, 989.) "In ruling on an automatic motion to modify a death verdict, a trial court need not recount details of, or identify, all evidence presented in mitigation or aggravation. [Citation.] The trial court's only obligation [is] to provide a ruling that allows effective appellate review." (*People v. Romero* (2008) 44 Cal.4th 386, 427; see *People v. DePriest* (2007) 42 Cal.4th 1, 56 ["The court need not describe 'every detail' in making its ruling."].) On review, the trial court's ruling "is subject to independent review, [but] we do not make a de novo determination of penalty." (*Brady,* 50 Cal.4th at p. 588.)

The trial court's preliminary remarks demonstrate that it clearly understood its role. The court quoted the statutory description of its function and cited

141

decisions by this court "requiring that the trial judge make an independent determination whether [imposition] of the death penalty is appropriate in light of the relevant evidence and the applicable law . . . . [¶]  [W]hether in [the court's] independent judgment the weight of the evidence supports the jury verdict."  The court acknowledged further that "the only evidence which the court is to review is that which was before the jury," and, as part of the exercise of independent judgment, "the judge is required to assess the credibility of the witnesses, determine the probative force of the testimony and weigh the evidence."

Based upon its "personal[]" and "careful[]" review of the penalty phase evidence, including "its own personal notes relating to the evidence received" the court made the following findings:  (1) "the court . . . specifically agrees that the jury's assessment that the circumstances in aggravation outweigh the circumstances in mitigation is supported by the evidence"; (2) "the court agrees with the implicit findings of the jury that the witnesses for the [P]eople were credible and believable"; (3) "the court independently finds that the circumstances surrounding the first degree murder of Shirley Olsson were vicious and pitiless. The defendant brutally stabbed the victim numerous times and exhibited a high degree of cruelty and callousness"; (4) "there is no question that the first degree murder of Shirley Olsson was committed during the commission or attempted commission of a burglary"; (5) "there were no circumstances which extenuated the gravity of [defendant's] crimes whether or not they be a legal excuse"; (6) after considering "the evidence from the members of the defendant's family who have testified about his family history, activities and background . . . the court further independently finds that none of the evidence offered by the defendant could in any way be considered a moral justification or extenuation of his conduct"; (7) "there are no factors in mitigation which will extenuate and mitigate the gravity of the crimes committed," specifically, "the capacity of the defendant to appreciate

142

the criminality of his conduct or to conform his conduct to [the] requirements of law, was not impaired as a result of mental disease or defect or the effects of intoxication," "the offenses were not committed while the defendant was under the influence of extreme mental or emotional distress," and the defendant's age "is not a mitigating factor."

Further, the court considered and independently reviewed "any other circumstance which could extenuate the gravity of the crime even though it is not a legal excuse for the crime . . . any sympathetic or other aspect of defendant's background[,] character or record . . . whether or not related to the offenses for which he was on trial, and finds that there are none that extenuate the gravity of the crimes or mitigate[] these offenses." The court concluded that in its "personal assessment" the "factors in aggravation outweigh those in mitigation," and "the evidence in aggravation is so substantial in comparison to the evidence in mitigation that death is warranted and not life in prison without the possibility of parole."

Defendant complains that the trial court failed to make written findings but, to the contrary, the court complied with the statutory directive to "set forth the reasons for his ruling . . . and direct that they be entered on the Clerk's minutes." (§ 190.4, subd. (e).) Defendant also complains that the court "failed to mention any specific evidence . . . did not assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence." These claims are meritless.

Defendant asserts that the court's findings on aggravation were deficient because its discussion of the circumstances of the crime "was so vague that it does not provide any basis for a finding of evidence in aggravation." The court specified the manner of the murder — "the defendant brutally stabbed the victim numerous times and exhibited a high degree of cruelty and callousness." We have

no difficulty understanding the court's meaning or subjecting this finding to our own review.

Similarly, we reject defendant's claim that the trial court's findings as to mitigation were too vague to allow meaningful review. The court was not required to set forth in detail all the evidence presented in mitigation or aggravation. (*People v. Romero, supra,* 44 Cal.4th at p. 427.) We do not presume that, because it did not refer to all evidence in mitigation, it did not review and consider that evidence. Here, the trial court specifically referred to the testimony of defendant's family members regarding his background, character and record, evidence of intoxication, his age and any other circumstance, whether or not related to the crime, and concluded that none of it "extenuate[d] the gravity of the crimes or mitigate[d] these offenses." Furthermore, as its statement shows, the trial court applied the appropriate standard in its examination of the evidence in mitigation, referring not simply to evidence related to the circumstances of the crime, but to all evidence offered in mitigation. (See *People v. Jennings* (1988) 46 Cal.3d 963, 993-994.)

Defendant contends that the trial court failed to properly analyze as mitigating factors his "disadvantaged" childhood, his lack of an extensive violent criminal record, and his lack of prior felony convictions. As to the first factor, the trial court specifically cited in its discussion of mitigation evidence the testimony of defendant's family members about his background. Regarding the second factor, defendant asserts that, because the trial court did not mention his jailhouse altercations in its discussion of factors in aggravation, it must have discounted them. From this premise, he reasons that the court should then have considered in mitigation the absence of violent criminal activity by defendant. (§ 190.3, factor (b) [sentencer to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the

express or implied threat to use force or violence"].)  But the evidence did not show an *absence* of such conduct; rather, it demonstrated that defendant had engaged in such conduct.  The court did not err by failing to consider the absence of such conduct as a factor in mitigation.

In any event, the court is not required to engage in "a rote recitation" of every single factor in mitigation.  (*People v. Osband, supra,* 13 Cal.4th at p. 727.) "The trial court's mere failure to mention expressly all evidence presented in mitigation . . . does not mean the trial court ignored or overlooked such evidence, but simply indicates that the court did not consider such evidence to have appreciable mitigating weight." (*People v. Samayoa* (1997) 15 Cal.4th 795, 860.) "[A]bsent an indication that [the court] ' "ignored or overlooked" ' [citation] the mitigating evidence, we will not find error, and there is no such indication of such an omission here." (*Osband, supra,* 13 Cal.4th at p. 727.)  The same analysis applies to the trial court's failure to expressly mention the absence of felony convictions.

Next, defendant claims that the trial court's ultimate finding that the factors in aggravation outweighed those in mitigation was deficient because it failed to make an adequate record in support of this conclusion.  We reject the assertion. The trial court's lengthy statement demonstrated an understanding of its function and the applicable legal standards, and was supported by references to the evidence.  It bears no resemblance at all to the summary statements we found defective in the two cases on which defendant relies.  (*People v. Bonilla* (1989) 48 Cal.3d 757, 800-801 [" 'I think the aggravating circumstances were there, that they did exceed the mitigating circumstances' " (italics omitted)]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 793 [" '[T]he Court finds that the aggravating circumstances outweigh the mitigating circumstances and that the weight of the evidence supports the jury's verdict of death' "].)

145

Defendant asserts that the trial court impermissibly relied on its own notes. "In ruling on an application for modification of the verdict, the trial court may only rely on evidence that was before the jury." (*People v. Navarette* (2003) 30 Cal.4th 458, 526.) The trial court acknowledged this rule in its prefatory remarks. The court's use of its notes did not violate this rules because, as the court explained, those notes "relat[ed] to the evidence received." Therefore, we reject defendant's claim that the court's ruling was based on "undisclosed and unknown information." (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1065 ["Based on the record, the court consulted its private notes only for the purpose of complying with the mandate of section 190.4, subdivision (e)"].)

Defendant contends that the trial court improperly relied on a probation report. The court acknowledged that it had read the probation report but only for purposes of sentencing defendant on the noncapital offenses and it specifically stated that it "did not consider [the probation report] in its ruling on [the automatic application]." Where a defendant is convicted of both noncapital and capital offenses, it is "preferable" for the trial court "to defer reading the probation report until after ruling on the automatic application for modification of verdict." (*People v. Lewis, supra,* 50 Cal.3d at p. 287.) Here, however, there is nothing in the record to suggest the trial court did not limit consideration of that report to the noncapital offenses.

Finally, defendant argues that the trial court failed to make an independent determination that the death penalty was proper. His claim is belied by the trial court's statement in which it stressed the independent nature of its review and its conclusions. The fact that the court said it agreed with certain findings by the jury — regarding witness credibility, for example — does not mean the court simply deferred to those findings. Rather, in context, it is clear that such agreement was the product of the court's independent review.

146

Accordingly, we conclude the trial court's ruling on the automatic application for modification of verdict was conducted in the manner prescribed by section 190.4, subdivision (e).

## V. *Death qualification voir dire*

Citing the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I of the California Constitution, defendant contends that the death qualification of juries in California is unconstitutional. The claim is forfeited by defendant's failure to raise it below. (*People v. Howard* (2010) 51 Cal.4th 15, 26 (*Howard* ).) It is also meritless.

"The death qualification process is not rendered unconstitutional by empirical studies concluding that, because it removes jurors who would automatically vote for death or for life, it results in juries biased against the defense. [Citations.] [¶] *Lockhart v. McCree* (1986) 476 U.S. 162 . . ., which approved the death qualification process, remains good law despite some criticism in law review articles. [Citations.] 'We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution.' [Citation.] [¶] The impacts of the death qualification process on the race, gender, and religion of the jurors do not affect its constitutionality. [Citations.] Nor does the process violate a defendant's constitutional rights, including the Eighth Amendment right not to be subjected to cruel and unusual punishment, by affording the prosecutor an opportunity to increase the chances of getting a conviction. [Citations.] Defendant claims the voir dire process itself produces a biased jury. We have held otherwise. [Citation.] [¶] Death qualification does not violate the Sixth Amendment by undermining the functions of a jury as a cross-section of the community participating in the administration of justice. [Citations.] Finally,

147

defendant's constitutional rights were not violated by the prosecutor's use of peremptory challenges to exclude jurors with reservations about capital punishment." (*Howard, supra,* 51 Cal.4th at pp. 26-27; see *People v. Taylor*, *supra*, 48 Cal.4th at pp. 602-603.) We adhere to the views expressed in these decisions and reject defendant's claims.

W. *Constitutional claims re death penalty scheme and statute*

### 1. Jury unanimity

Defendant contends "the death penalty scheme" is unconstitutional because "the jury was not required to find beyond a reasonable doubt that any aggravating circumstance existed, that any unanimously proven aggravated circumstances substantially outweighed the mitigating circumstances or that death was the appropriate penalty." Thus, he asserts, his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I of the California Constitution were violated.

"The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating circumstance is proved (except for section 190, factors (b) & (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty. [Citations.] Moreover, the jury need not be instructed as to any burden of proof in selecting the penalty to be imposed. [Citation.] The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 961; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) have not altered our conclusions in this regard. [Citations]." (*People v. Gonzalez and*

148

*Solis* (2011) 52 Cal.4th 254, 333.)  Defendant's arguments do not persuade us otherwise.

## 2. Constitutional challenges to the death penalty statute

Defendant mounts various constitutional challenges to the death penalty statute that we have consistently rejected.  We do so again, finding:

a.  "California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment."  (*People v. Blacksher* (2011) 52 Cal.4th 769, 848.)

b.  "Section 190.3, factor (a), which allows the jury to consider, in choosing the appropriate penalty, '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Eighth or Fourteenth Amendments to the United States Constitution merely because those circumstances differ from case to case, or because factor (a) does not guide the jury in weighing these circumstances.  [Citations.]"  (*People v. Farley* (2009) 46 Cal.4th 1053, 1133.)  "Section 190.3, factor (a), . . . is not unconstitutionally vague, arbitrary or capricious.  [Citations.]"  (*People v. Cowan*, *supra*, 50 Cal.4th at p. 508.)

c.  "Factor (a) of section 190.3. . . does not impermissibly result in 'double-counting' or automatically create a bias in favor of a death verdict.  [Citations.]"  (*People v. Davis* (2009) 46 Cal.4th 539, 627.)

c.  "We also reject defendant's contention that the California death penalty law violates the Eighth and Fourteenth Amendments because the jury is not instructed as to *any* burden of proof in selecting the penalty to be imposed.  As we have explained, '[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible

149

to a burden-of-proof quantification.' [Citation.] The instructions as a whole adequately guide the jury in carrying out their 'moral and normative' function." (*People v. Jenkins*, *supra*, 22 Cal.4th at pp. 1053-1054.) The death penalty statute is not unconstitutional because it fails "to impose a burden of proof on either party, even if only proof by a preponderance of the evidence, or, alternatively, in failing to instruct the jury on the absence of a burden of proof. [Citations]." (*People v. Vines* (2011) 51 Cal.4th 830, 891.)

e. "Defendant contends that the California death penalty statute violates the Eighth and Fourteenth Amendments of the United States Constitution because certain procedural safeguards are lacking: juries are not required to make written findings regarding circumstances in aggravation, or to achieve unanimity as to aggravation circumstances. . . . Each of these contentions has been rejected, and we decline to reconsider them." (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053.)

f. The death penalty statute is not unconstitutional "[i]n failing to require intercase proportionality review." (*Vines, supra,* 51 Cal.4th at p. 891; see *People v. Zambrano, supra,* 41 Cal.4th at 1186.)

g. "The [death penalty] statutes are not invalid because they permit the jury to consider in aggravation, under section 190.3, factor (b), evidence of a defendant's unadjudicated offenses. [Citation.]" (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 208.)

h. "Consideration of both section 190.3, factors (b) (criminal activity involving force or violence), and (c) (prior felony convictions) is permissible. [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 510.)

i. " 'The use in the statutes, and in the standard jury instructions, of terms such as "extreme," "substantial," "reasonably believed," and "at the time of the offense" in setting forth the mitigating factors does not impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty

150

determination.' " (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 208.)
Neither factor (i) nor factor (k) of section 190.3 is unconstitutionally vague. (See
*People v. Slaughter*, *supra*, 27 Cal.4th at p. 1224; *People v. Mendoza* (2000) 24
Cal.4th 130, 192.) The death penalty statute is not unconstitutional because it does
not identify which factors are aggravating and which are mitigating, nor was the
trial court required to so instruct. (*People v. Box*, *supra*, 23 Cal.4th at p. 1217.)

j. " 'There is no violation of the equal protection of the laws as a result of
the statutes' asserted failure to provide for capital defendants some procedural
guarantees afforded to noncapital defendants.' " (*People v. Letner and Tobin,
supra,* 50 Cal.4th at p. 208.) The death penalty is not per se unconstitutional
(*Gregg v. Georgia* (1975) 428 U.S. 153, 187; *People v. Zambrano, supra,* 41
Cal.4th at p. 1187.)

k. We have also repeatedly considered and rejected attacks on the
constitutionality of CALJIC Nos. 8.85 and 8.88. (*People v. Moon* (2005) 37
Cal.4th 1, 41-44.) Defendant provides no persuasive reasons to revisit those
claims.

l. "Defendant argues that the death penalty in California violates the
California Constitution and the Eighth and Fourteenth Amendments to the United
States Constitution because it is imposed arbitrarily and capriciously depending on
the county in which the case is prosecuted. [¶] We have repeatedly rejected
substantially similar claims, concluding over 20 years ago that 'prosecutorial
discretion to select those eligible cases in which the death penalty will actually be
sought does not . . . offend principles of equal protection, due process, or cruel
and/or unusual punishment.' [Citations.] [¶] Defendant, however, urges this court
to reexamine our decisions in prior cases in light of the United States Supreme
Court's voting rights decision in *Bush v. Gore* (2000) 531 U.S. 98, which, he
asserts, requires uniformity among California's 58 counties for prosecutorial

151

standards for seeking the death penalty. But as the high court explained, its consideration of the equal protection challenge to Florida's voting recount process was 'limited to the present circumstances, for the problem of equal protection in *election processes* generally presents many complexities.' (*Id.* at p. 109, italics added.) That case, therefore, does not warrant our revisiting our prior holdings on the instant issue." (*People v. Vines, supra,* 51 Cal.4th at p. 889-890.)

*X. International law*

"Defendant's death sentence violates neither international law nor his rights under the Eighth and Fourteenth Amendments to the federal Constitution, as no authority 'prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citation.] Unless a defendant establishes his trial involved prejudicial violations of state or federal constitutional law, we need not consider the question whether he also suffered violations of international law. [Citation.]" (*People v. McKinnon*, *supra,* 52 Cal.4th at p. 698.) "Finally, we again reject the contention that the death penalty violates international law, is contrary to international norms, or that these norms require the application of the death penalty to only the most extraordinary crimes. [Citation.]" (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 849.)

*Y. Inadequate record*

Defendant contends that missing reporter's transcripts render the record inadequate for meaningful appellate review. His claim is meritless.

"All proceedings in a capital case must, under section 190.9, be conducted on the record with a reporter present and transcriptions prepared. [Citation.] ' "[N]o presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citations]." '

152

[Citations.]" (*People v. Cook*, *supra*, 39 Cal.4th at p. 586.)[41] "The record on appeal is inadequate . . . only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort. [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8.) "Moreover, irregularities in the preliminary hearing are no basis for reversal on appeal unless defendant can demonstrate a resulting unfairness in the subsequent trial. [Citations.]" (*People v. Zambrano, supra,* 41 Cal.4th at p. 1192.)

Defendant concedes that the allegedly missing transcript for August 14, 1992, is, in fact, in the record. A second allegedly missing transcript, for January 27, 1992, listed at page 20 of defendant's opening brief, appears in the augmented court reporter's transcript at pages 115 to 117. With respect to defendant's claim that the trial court's personal notes are missing from the record, defendant does not demonstrate that he ever requested these notes and, in any event, he would not have been entitled to them. (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1065 [defendants not entitled to augment the record with trial court's notes: "The notes were the court's own work product, and personal to the judge"].)

---

[41] A defendant's burden to show the inadequacy of the record begins with an accurate representation of the alleged missing records. In this case, defendant claims that there were " 'forty-four' " court hearings, proceedings or conferences . . . not transcribed in this case," and "on 17 other occasions there is 'no reporter's transcript' of a hearing." He also asserts entitlement to the trial court's trial notes. He concludes: "In short a total of sixty (60) proceedings are missing from the record." But 44 plus 17 is 61, and the court trial notes would be 62. Defendant also double-counts a number of dates under two different categories (e.g., hearings "not transcribed" and occasions where there is "no reporter's transcript"). Finally, he claims that the Attorney General failed to address the absence of 14 unrecorded proceedings but unhelpfully he fails to specify these 14 proceedings, much less carry out his burden of showing that these allegedly missing records prevented meaningful appellate review.

Defendant contends that transcripts are missing for proceedings in the (former) municipal court for August 11 and 19 and September 20, 1987. As to each of these dates, defendant's trial counsel indicated in the settled statement that his recollection of the hearings is contained in the minute orders. The minute orders show the subject matter of the August dates was a defense discovery motion. The trial court granted some items outright, granted others as modified, and denied others. Defendant has neither raised any issue regarding discovery nor demonstrated how he was precluded from doing so because of the missing transcripts.

Defendant contends the record is missing transcripts for preliminary transcript proceedings for November 17, 18, 19, and 24, and December 1, 1987. The settled statement for these dates indicates that the chief subject of these proceedings was a prosecution witness named Thomas Marshall. Marshall testified at the preliminary hearing that defendant told him in jail that he had murdered Sandy Olsson. Marshall did not testify at defendant's trial. Accordingly, any missing proceedings involving his testimony at the preliminary examination could not have resulted in any unfairness to defendant at trial. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1192.) The settled statement also refers to in camera proceedings involving the assertion by police witnesses of a privilege against disclosing records involving Marshall's work as a police informant. Again, because Marshall did not testify at trial, defendant cannot show any prejudice.

The settled statement for November 24, 1987, indicates two off-the-record discussions involving the scope of defense questioning of Sergeant Robertson, about the other leads and suspects in the murder investigation. A review of the clerk's transcript supports this summary. Defendant asserts that the missing record "contains potentially exculpatory evidence" that someone other than he

154

may have committed the murder and the "lack of record" has prevented him from fully pursuing this evidence. This assertion is completely without merit.

On the extant record, defendant's trial counsel acknowledged he had been provided with the information regarding other suspects. His concern was that there might be more. After an unreported discussion, he noted on the record that the prosecutor had agreed to provide him with additional material on the subject of other suspects. Thus, there is no support for defendant's claim that the untranscribed proceedings involved missing and "potentially exculpatory evidence." To the contrary, the extant record indicates that the untranscribed proceedings involved the prosecutor's agreement to turn over materials about other suspects in addition to those already in the defense's possession. None of this, in any event, fulfills defendant's obligation to demonstrate that the untranscribed proceeding has prevented meaningful appellate review of any claim he raised on appeal.

The settled statement for December 1, 1987, indicates there was an off-the-record discussion concerning "the preservation of blood samples and other refrigerated evidence." This followed defendant having been held to answer and ordered to appear for arraignment on December 15, 1987, and an ensuing conversation about the whereabouts and transportation of blood samples. Defendant fails to demonstrate prejudice arising from the absence of a transcript of this apparently routine housekeeping matter.

Next, defendant cites untranscribed pretrial and in limine proceedings for December 15, 1987; April 15, April 18, June 6, and June 7, 1988; June 17, September 23, and November 25, 1991; and January 27, February 11, March 10, March 20, April 17, May 6, and June 9, 1992. The settled statement reveals that the missing transcripts for December 15, 1987, and all of the 1988 transcripts involved routine matters, including continuance of arraignment, the filing of a

155

section 995 motion that was then continued for hearing, the dropping of pending matters without prejudice because defendant was absent, and the continuance of a motion to settle the record of the preliminary examination.[42] Our review of the settled statement and the clerk's transcript for all of the 1991 dates and all of the 1992 dates except June 9, 1992, reveals that on each of those occasions the court's only action was to continue the case for trial setting. The settled statement and clerk's transcript reflect that June 2, 1992, was the first day of trial. However, counsel waived the reporter's presence, conferred with the court in chambers, and continued the trial to June 9. On June 9, 1992, counsel again waived the reporter's presence, conferred with the court in chambers, and put the matter over to June 10 for trial. On both days, counsel waived defendant's presence. Although trial counsel Wagner had no specific memory of the proceedings of those days, the settled statement reflects that "[t]he majority of court appearances following Mr. Wagner's appointment related to scheduling matters . . . ." Thus, again, the record indicates that nothing more took place on these dates other than routine scheduling matters and defendant fails to persuade otherwise. Given the vigor with which trial counsel conducted the defense, it is inconceivable that they would have waived defendant's appearance and the reporter had they anticipated that any substantive matter would be discussed on any of these dates.

---

[42] Defendant contends that the April 18 and June 6, 1988 proceedings involved his suppression motions and are therefore relevant to his claim on appeal that these motions were erroneously denied. However, the reporter's certificate states that his shorthand notes "reflect that on both dates, when the Court called the case of [defendant], the defendant was not present in court and the pending matters were dropped from the calendar." Even if the matters dropped were defendant's suppression motions, we fail to see how this routine proceeding prevented meaningful appellate review of his claims, nor does he enlighten us. Defendant's burden to demonstrate prejudice requires something more than the fortuity that an untranscribed proceeding had some tangential relationship to a claim he later raised on appeal.

Defendant next directs us to untranscribed trial proceedings for the following 1992 dates:  June 11, June 25, July 1, July 24, August 4, August 11, August 12, August 13, August 20, August 27, September 3, September 9, September 10, September 15 (three times), September 16, and November 2.  The extant record of the proceedings on these dates is sufficient to disclose their nature and belies defendant's assertion that they may have contained information that precludes meaningful appellate review of any argument he has raised or prevented him from advancing an argument he would otherwise have made.

The extant record for June 11 shows that the court and counsel conferred off the record for scheduling purposes and to mark certain exhibits during a pretrial proceeding.  The extant record for June 25 and July 1 indicates that on both dates the court and counsel conferred off the record about juror questionnaires, as the result of which the parties excused a number of prospective jurors by stipulation.  Defendant asserts there is an untranscribed conference on July 24, but the page to which he refers us in the reporter's transcript is for June 16, and contains no such notation.  There was an off-the-record discussion on July 23 involving the prosecutor's request to use certain photographs at the guilt phase trial.  This was followed on July 24 by an on-the-record discussion of each proposed photograph that included the defendant's objections and the court's rulings.

On August 4, there was an unreported discussion of defendant's objection to the prosecutor's question to John Chandler about defendant's employment history.  Before recessing for the morning, the trial court memorialized the discussion on the record, explaining the basis of defendant's objection — relevance — and that it had overruled the objection.  Defendant cites an unreported discussion on August 11, following an objection by defense counsel to the prosecutor's question to Sergeant Robertson about whether Thomas Pillard,

157

also known as "Doubting Thomas," had come up in the investigation prior to March 30, 1987. Before recessing for the day, the trial court memorialized for the record the basis of the objection — relevance — and its ruling. Defendant cites an unreported discussion on August 12 regarding the prosecutor's objection to questions of his criminalist by the defense regarding DNA testing of hairs found in the victim's bedroom. The prosecutor withdrew the objection and the matter was resolved by stipulation. The record reveals that on August 13, there was an unreported discussion regarding exhibits and guilt phase jury instructions. According to the settled statement, Defense Counsel Wagner "recall[ed] conferring on guilt phase instructions and believe[d] the results of these discussion were later put on the record." In fact, there was a lengthy on-the-record hearing regarding the admission of exhibits into evidence and guilt phase instructions. Defendant points to an unreported discussion on August 20, after the jury had been sent out for guilt phase deliberations. That discussion followed an on-the-record discussion regarding possible jury requests for tapes and transcripts of the tapes. Just before going off the record, the court stated, "We have certain matters to take up," which included a "review of the verdict forms," "several items of evidence we've referred to as the envelope," and "the issue how we will accommodate any request for these tapes and transcripts. And once we arrive at that determination we'll put that on the record." These were housekeeping matters, none of which required any further on-the-record discussion. Defendant asserts there was an unreported discussion on August 27, but at the page he cites the court refers merely to "a brief scheduling conference."

Defendant directs us to an unreported discussion on September 3. A review of the record reveals that this involved a request by the parties for a written copy of the court's victim impact evidence ruling. This is confirmed by defense counsel's recollection in the settled statement that the discussion "concerned the

court's issuance of a written ruling on victim impact evidence." An unreported discussion on September 9 occurred after defendant's brother finished testifying and the defense requested he be excused. The prosecutor asked that he remain on call. After the discussion, the witness was provisionally excused. This is confirmed by defense counsel's recollection in the settled statement that the discussion involved "holding or excusing witness Roger Tully." A second unreported discussion involved a defense objection to the prosecutor's question of defendant's son about what he and defendant had done the last time they had seen each other. Defense counsel objected it was beyond the scope of direct; the objection was overruled. This is confirmed by defense counsel's recollection in the settled statement.

According to the clerk's transcript, an unreported discussion on September 10 involved penalty phase instructions. This is confirmed by defense counsel's recollection in the settled statement that the discussion involved "penalty phase instructions" and was later "put on the record." In fact, there is an on-the-record discussion of penalty phase instructions. Defendant points to three unreported discussions on September 15. The first two unreported discussions involved defense objections to the prosecutor's victim impact arguments. The trial court subsequently memorialized these discussions, the nature of the defense's concern, and its rulings. The third discussion involved scheduling. This is confirmed by the recollections of Defense Counsel Wagner in the settled statement. Defendant cites an unreported discussion on September 16, following the receipt by the court of a jury question about the definition of life without possibility of parole. The next morning, September 17, the court explained the purpose of the conference and that counsel had agreed to its proposed response.

159

Defendant cites an unreported discussion on November 2, but, as defense counsel's recollection in the settled statement confirms, it was simply to put the case over to December 4 for the probation report and sentencing.

In his opening brief, defendant merely makes a global and unsubstantiated claim that missing or unreported transcripts prevented meaningful appellate review, without bothering to specify the exact issues on which he rests this claim. Our review of these missing transcripts belies his claim. In each case, either the record is sufficient for review or the proceedings involved routine matters.

For the first time in his reply brief, defendant attempts to specify 11 claims as to which the absence of transcripts prevented meaningful appellate review. It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party. In any event, defendant's specification does nothing more than attempt to link each missing transcript to various arguments without explaining why the missing transcript had any impact at all on his ability to raise the issue or on our ability to review it. This is inadequate to sustain his burden of showing prejudice.

We have before us an 18-volume reporter's transcript comprising over 3,900 pages as well as supplemental reporter's transcripts and a 51-volume clerk's transcript comprising almost 15,500 pages. The opening brief in this case is in two separate volumes, coming in at 745 pages, while the reply brief adds another 522 pages to defendant's briefing. The Attorney General's brief is 375 pages long; total briefing comprises over 1,600 pages. "With respect to every issue raised on appeal, we have found the record sufficient to permit review. It is in this context that we must find that any abuse of discretion, assuming it existed, was not prejudicial, because the record is clearly adequate for meaningful appellate review." (*People v. Pinholster*, *supra*, 1 Cal.4th at p. 922.) Accordingly, we reject defendant's claim.

160

## III. CONCLUSION

We affirm the judgment in its entirely.


BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY KENNARD, J.**

I join the majority in affirming the judgment of death. I write separately, however, to address the merits of defendant's claim that the prosecutor committed misconduct at the penalty phase by using biblical quotations in his closing statement to the jury, a subject the majority does not address because it concludes that defendant forfeited the claim by failing to object.

**I**

During closing argument at the penalty phase of defendant's capital trial, the prosecutor showed the jury a large chart entitled "The Bible Sanctions Capital Punishment." The chart contained these four quotations from the Bible: (1) "Who sheds the blood of man by man shall his blood be shed, for in his image did God make man"; (2) "He that smiteth a man so that he die, shall be surely put to death"; (3) "And if he strike him w[ith] an instrument of iron so that he die, he is a murderer: The murderer shall surely be put to death"; (4) "And you shall not take reparations for the soul of a murderer who deserves to die but he shall be put to death."

In his initial argument to the jury,[1] the prosecutor said: "[W]hen we talk about religion, it is not something that is to be used in aggravation at all, what the Bible or the Koran or anything has to say, but *the one thing that is universal*

---

[1] The trial court allowed both the prosecution and the defense two penalty phase arguments.

1

*throughout all religions is this idea that murderers are to be punished, and that the death penalty is sanctioned and that it is appropriate.* And just so there isn't anybody who lies awake at night saying . . . is it permissible under my religion to do this sort of thing? . . . [T]hat was something we hoped you thought of beforehand. And there is a question to that effect in various forms that asks you about your religious beliefs: Is that going to stand in the way? [¶] Well, many times people get to this point, and they start thinking about that . . . . [T]he Bible does, in fact, sanction capital punishment. *There is one that is just so right on point:* [¶] '*He who strikes him with an instrument of iron so that he die, he is a murderer, and the murderer will surely be put to death.* And you shall take no reparations for the soul of a murderer who deserves to die, but *he shall be put to death.* [¶] He who sheds the blood of man by man, shall his blood be shed. For in his image did God make man. His blood or his life will be shed by man.' [¶] Now, as I said, religion is not supposed to be the guiding factor in finding aggravation, but I just want to clear the air there that religion does not stand in the way, and that's not supposed to enter into your evaluation." (Italics added.)

Defense counsel then argued to the jury that, contrary to the prosecutor's claim that all religions permit punishment by death, Buddhism does not. Also, defense counsel said, under ancient Jewish law such punishment was almost never imposed — once every 30 years according to one scholar quoted in the Talmud; once every 160 years according to another. He then quoted from the New Testament: "Vengeance is mine, said the Lord."

The prosecutor began his final statement to the jury with these words: "[T]his process that we go through here [is] a lot different than it was in the Old Testament. *The Old Testament, when God spoke, he made it very clear. Very clear. Murderers shall die. And God also made it very clear that it was man who was going to impose that penalty.* [¶] . . . Paul makes it very clear, 'the ruler bears

2

not the sword in vein [*sic*: vain] for he is the minister in God, a revenger to execute wrath upon him that do with [*sic*: doeth] evil.' [¶] . . . God made it clear, [but] when man gets into the act he starts softening up the rules a little bit and that's okay." (Italics added.)

In a final statement, defense counsel told the jury: "God did not sentence Cain to death for killing his brother. He banished him." Counsel also noted that "the major religious groups in this country . . . have taken rigorous stands against the death penalty."

## II

As this court has said, in a capital case the prosecution may not rely on biblical authority in urging the jury to return a verdict of death, as this would "create and encourage an intolerable risk that the jury will abandon logic and reason and instead condemn an offender for reasons having no place in our judicial system." (*People v. Roldan* (2005) 35 Cal.4th 646, 743; see also *People v. Williams* (2010) 49 Cal.4th 405, 465 (*Williams*).) Federal courts too have said this. (See *Romine v. Head* (11th Cir. 2001) 253 F.3d 1349, 1358 [prosecutor committed reversible error by arguing "biblical law to the jury as a basis for urging it to . . . sentence [the defendant] to death"]; *Sandoval v. Calderon* (9th Cir. 2000) 241 F.3d 765, 777 ["[R]eligious arguments have been condemned by virtually every federal and state court to consider their challenge. [Citations.]"]; *Bennett v. Angelone* (4th Cir. 1996) 92 F.3d 1336, 1346 ["Federal and state courts have universally condemned . . . religiously charged arguments as confusing, unnecessary, and inflammatory."].) As one federal appellate court has explained, "[biblical] statements, worthy of the profoundest respect in proper contexts, have no place in our non-ecclesiastical courts and may not be tolerated there." (*Ibid*.)

Here, as discussed in part I, *ante*, the prosecutor showed the jury a large chart bearing the heading "The Bible Sanctions Capital Punishment," and containing four biblical passages requiring death for murderers; and the prosecutor told the jury that God "made it very clear" that "[m]urderers shall die." The majority does not decide whether the prosecutor's religion-based argument was proper. Instead, it concludes that defendant forfeited his claim of error by failing to object at trial, and that even if the prosecutor committed misconduct no prejudice resulted. (Maj. opn., *ante*, at pp. 123-124, 127-129.) In my view, the prosecution's reliance on religious authority went beyond the parameters of permissible argument.

Pertinent here is this court's decision in *Williams*, *supra*, 49 Cal.4th 405. In that capital case, the prosecutor at the penalty phase quoted several statements from the Bible that, in the prosecutor's words, " 'unambiguously command[] that murderers be put to death.' " (*Id.* at p. 465.) Therefore, the prosecutor argued, "even the Bible for those of you who may have some religious scruples does not say that you should not use your own moral beliefs in making [the] determination here." (*Ibid*.) This court in *Williams* held that the prosecutor's argument was improper, explaining: "Although . . . the prosecutor framed her religious comments as an ostensible exhortation for jurors to refrain from deciding *against* the death penalty based upon religious views" by telling jurors not to have "religious scruples" about imposing the death penalty, "the content of her remarks emphatically communicated that the Bible *supports* imposition of the death penalty. She 'urged that the Bible not only permits such action, but demands it.' [Citation.] Similarly framed arguments have been held improper. [Citations.]" (*Id*. at p. 466.)

Like the prosecutor in *Williams*, *supra*, 49 Cal.4th 405, the prosecutor here tried, put colloquially, to have it both ways. He correctly explained to the jury that

4

"religion . . . [is] not supposed to enter into your evaluation." But he also repeatedly reminded the jury that the Bible required that murderers be put to death. For instance, in his initial statement to the jury, the prosecutor described as "just so right on point" the biblical statement (one of several shown to the jury), that " '[h]e who strikes him with an instrument of iron so that he die [here the victim was killed with a knife], he is a murderer, and the murderer will surely be put to death.' " Then, in his final statement to the jury, the prosecutor said: "[W]hen God spoke, he made it very clear. Very clear. Murderers shall die."

As in *Williams*, here the prosecutor's reliance on religious authority "emphatically communicated that the Bible *supports* imposition of the death penalty" (*Williams*, *supra*, 49 Cal.4th at p. 466), and "strayed beyond the bounds of permissible argument based upon religion" (*ibid*.).

### III

As I noted at the outset (see *ante*, p. 1), the majority declines to decide whether the prosecutor committed misconduct by relying on religious authority in his penalty phase arguments. Instead, it concludes that, by failing to object to the prosecutor's argument at trial, defendant has forfeited his right to challenge it in this appeal. As explained below, I reluctantly agree.

In concurring and dissenting opinions in three previous capital cases, I concluded that, notwithstanding the defense attorney's failure to object, the prosecutor's improper penalty phase reliance on religious authority for imposition of the death penalty required reversal of the judgment of death, as defense counsel's failure to object to the prosecutor's religion-based argument resulted in a denial of the defendant's right to effective representation. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1202-1203 (conc. & dis. opn. of Kennard, J.); *People v. Slaughter* (2002) 27 Cal.4th 1187, 1225-1229 (conc. & dis. opn. of

5

Kennard, J.); *People v. Wash* (1993) 6 Cal.4th 215, 279-283 (conc. & dis. opn. of Kennard, J.).)

It may well be that here defense counsel decided not to object to the prosecutor's religion-based argument favoring death for murderers so the defense could in turn cite religious authority expressing a contrary view. But as I have said in the past: " 'A religious argument against the death penalty is no more acceptable at the penalty phase of a capital case than a religious argument in favor of the death penalty. . . . It follows that defense counsel's decision to respond to the prosecutor's religious argument by relying on opposing religious authority cannot be considered a legitimate tactical choice that would excuse his failure to object to the prosecutor's impermissible religious argument.' " (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1203 (conc. & dis. opn. of Kennard, J.), quoting *People v. Wash*, *supra*, 6 Cal.4th at p. 283 (conc. & dis. opn. of Kennard, J.); see also *People v. Slaughter*, *supra*, 27 Cal.4th at p. 1227 (conc. & dis. opn. of Kennard, J.).)

That view, however, has not been embraced by this court. (*People v. Slaughter*, *supra*, 27 Cal.4th at p. 1210; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1212-1213; *People v. Welch* (1999) 20 Cal.4th 701, 764.) Also, here defendant does not argue on this appeal that his counsel's failure to object to the prosecutor's religion-based argument constituted ineffective representation, perhaps because he plans to raise that argument in a petition seeking habeas corpus relief. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 ["A claim of ineffective assistance . . . is more appropriately decided in a habeas

corpus proceeding."].)  For these reasons, on this appeal I agree with the majority that defendant's attack on the prosecutor's religion-based closing statement should be rejected on the ground of forfeiture.[2]

KENNARD, J.

---

[2]    The majority also concludes that even if the prosecutor's use of biblical quotations in closing argument was improper, the misconduct did not prejudice defendant.  (Maj. opn., *ante*, at pp. 127-129.)  Because defendant forfeited his right to raise the issue, I see no need to decide whether the prosecutor's misconduct would require reversal of the judgment of death.

**CONCURRING OPINION BY LIU, J.**

I join the opinion of the court and also agree with Justice Kennard, for the reasons persuasively stated in parts I and II of her concurring opinion (conc. opn. of Kennard, J., *ante*, at pp. 1-5), that the prosecutor's use of religious authority was improper in this case.

LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Tully

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S030402
**Date Filed:** July 30, 2012

_____

**Court:** Superior
**County:** Alameda
**Judge:** William R. McGuiness

_____

**Counsel:**

James S. Thomson, under appointment by the Supreme Court; Thomson & Stetler, Saor E. Stetler; and Jolie Lipsig for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and Margo J. Yu, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James S. Thomson
819 Delaware Street
Berkeley, CA  94710
(510) 525-9123

Margo J. Yu
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5872